**FILED**

NOV 2 8 2011

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

*Reginald L. McCoy, #11732-018*
F.R.C. Oak Unit          PETITIONER
          Evangeline
          VS  P.O. Box 5000
              Oakdale, LA 71463
*Harley G. Lappin*, DIRECTOR
U.S. BUREAU OF PRISONS
          AND
*Eric B. Holder.*
U.S. ATTORNEYS GENERAL

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case: 1:11-cv-02111
Assigned To : Unassigned
Assign. Date : 11/28/2011
Description: Habeas Corpus

BRIEF IN SUPPORT OF
APPLICATION FOR WRIT
OF HABEAS CORPUS

AFFIDAVIT OF: *Reginald L. McCoy*

STATE OF: *Louisiana*

COUNTY OF: *Allen Parish*

    I, *Reginald L. McCoy*, after being duly sworn, makes
this affidavit, with Incorporated Points, Authorities and
Memorandum of Law, in support of the foregoing, attached,
application for Writ of Habeas Corpus, brought in the Nature of *28
USC §1332: §2241 (a)(2) and (3)*, and invoking the venue and
jurisdiction of this court under *D.C. Code §13-422*, which provides:

> A District of Columbia court may exercise
> personal jurisdiction over a person domiciled
> in, organized under the laws of, or
> maintaining his/her principal place of
> business in, the District of Columbia as to
> any claim for relief. *See, also, D.C. Code §
> 16-1901*

Respondents, named, *supra [FRCP, Rule 10]*, are (1) the proper

RECEIVED
NOV 1 5 2011
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

- 2 -                                              10

1

custodians over Petitioner for the purpose of this cause, (2) both having their principal place of business in the District of Columbia, (3) the Judgment and Commitment Order from the U.S. District Court specifies that Petitioner is placed into the custody of respondents, and (4), this court has personal jurisdiction over both respondents.

Petitioner establishes by and through the following, that he is in-custody of respondents in violation of his Constitutional Rights, due to usurpation of authority and jurisdiction of the Federal government, and through an inadvertent misapplication of Federal Statutory provisions, set-out and enumerated on the governments charging instruments (*Exhibit "A"*) attached, which will be shown to possess restricted application to Federal agencies, and officers, agents, and employees of the Federal government, only, as supported more fully, infra, and by way of *Exhibit "B"* attached.

Petitioner presents a detailed Memorandum of Law on the subject of Federal Judicial Authority within the several (sovereign) States of the Union, united by and in the Nature of the Constitution for the United States of America, as amended A.D. 1791, to wit:

This memorandum will be construed to comply with provisions necessary to establish presumed fact *(Rules 301 and 302, Federal Rules of Evidence, and attending State rules)*, should interested parties fail to rebut any given allegation of fact, or matter of law, addressed herein. This position will be construed as adequate to meet all requirements of judicial notice, thus preserving fundamental Law. This memorandum addresses jurisdiction of United States District Courts and related agencies of the United States (federal government)

History

In the American system of Government, the Separation of Powers Doctrine works in two ways:  First, it assures separation between the three branches of government, the branches being legislative, executive, and judicial.  Second, the Doctrine effects vertical separation between the operations of the state and federal governments, or put another way, operations of the government of the United States and the governments of the several States which are parties to the Constitution for the United States of American, as lawfully amended (*hereinafter "U.S. Constitution"*).

In this system, as asserted by American Founders in the Declaration of Independence, all Men (and Women) are created equal, and are equally endowed by their Creator with certain unalienable or inherent Rights, those listed in the Declaration of Independence being the Rights to life, liberty, and the pursuit of happiness, or in the less poetic phrasing of the Fifth Amendment to the U.S. Constitution: life, liberty and property.  This list, of course, is not exhaustive, as articulated in the Ninth and Tenth Amendments to the U.S. Constitution, and all, individually and collectively, are accountable in the framework of "the laws of Nature and Nature's God."  The phrase, in modern terms, is better understood as physical and moral law.  Man cannot author or amend the laws of Nature and Nature's God, but is directly accountable in the framework of cause and effect, or where moral law is concerned, cause and consequence.

By establishing these principles prior to addressing the reasons for, and the power and operation of, government, American Founders preserved the essence of English and American-lineage Common Law which evolved and was proven by cultural experience over many hundreds of years.  The Magna Carte, drafted and signed by King John in 1215, is commonly recognized as the point of demarcation so far as a formal proclamation of common rights is concerned.  The foundation was basically biblical, with the understanding that People are individually created and are, therefore, individually accountable to God.  Even when governments encroach on the special relationship between Man and God, Man is still accountable, individually and collectively, and she/he invariably suffers the consequences of tyranny.

The Founders went on to say that governments are established among Men for the sole purpose of securing inherent Rights, and governments so established may rule only by the consent of the Governed.

In July 1776, the notion of specifically delegated authority conveyed by constitutions was well understood, because the English considered the Magna Carte and subsequent similar documents to be elements of their unwritten constitution.  On the other hand, American colonies had continuing experience with written constitutions for civil government which began in 1636 (Massachusetts).

The original thirteen colonies of America were separately established by charters from the English Crown. Outside of the common bond of each being a dependency and colony of the mother country, England, the colonies were not otherwise united. Each had its own governor, legislative assembly and courts, and each was governed separately and independently by the English Parliament.

The Political connections of the separate colonies to the English Crown and parliament descended to an unhappy state of affairs as the direct result of Parliamentary acts adopted in the late 1760's and early 1770's. Due to the real and perceived dangers caused by these various acts, the First Continental Congress was convened by representatives of the several colonies in October, 1774, the purpose of which was to submit a petition of grievances to the British Parliament and Crown. By the Declaration and Resolves of the First Continental Congress, dated October 14, 1774, the colonial representatives labeled these Parliamentary acts of which they complained as "impolitic, unjust, and cruel, as well as unconstitutional, and most dangerous and destructive of American rights," and the purpose of which were designs, schemes and plans "which demonstrate a system formed to enslave America." Revolution was assuredly in the formative stages absent conciliation between the mother country and colonies.

Between October, 1775, and the middle of 1776, each of the colonies separately severed their ties and relations with England, and several adopted constitutions for the newly formed States. By July, 1776, the exercise of British authority in any and all colonies was not recognized in any degree. The capstone of this actual separation of the colonies from England was the more formal Declaration of Independence.

The legal effect of the Declaration of Independence was to make each new state a separate and independent sovereign over which there was no other government of superior power or jurisdiction. This was clearly shown in *M'Ilvaine v. Coxe's lessee, U.S. (4 Cranch) 209, 212 (1808)*, where it was held:

> This opinion is predicated upon a principle which is believed to be undeniable, that the several states which composed this Union, so far at least as regarded their municipal regulations, became entitled, from the time when they declared themselves independent, to all the rights and powers of sovereign states, and that they did not derive them from concessions made by the British

6

5

king.    The  treaty  of  peace  contains  a
recognition of their independence, not a grant
of it.   From hence it results, that the laws
of the several state governments were the laws
of  sovereign  states,  and  as  such  were
obligatory upon the people of such state, from
the time they were enacted.

And a further expression of similar import is found in
*Harcourt v. Gaillard, 25 U.S. (12 Wheat.) 523, 526, 527
(1827)*, where the Court stated:

> There was no territory within
> the United States that was claimed
> in any other right than that of some
> one  of  the  confederated  states;
> therefore,  there  could  be  no
> acquisition of territory made by the
> United  States  distinct  from,  or
> independent  of  some  one  of  the
> states.

Each  declared  itself  sovereign  and  independent,
according to the limits of its territory.

[T]he soil and sovereignty within their acknowledged
limits  were  as  much  theirs  at  the  declaration  of
independence as at this hour.

Thus, unequivocally, in July, 1776, the new States
possessed all sovereignty, power, and jurisdiction over
all the soil and persons in their respective territorial
limits.

This condition of supreme sovereignty of each State
over all property and persons within the borders thereof
continued notwithstanding the adoption of the Articles of
Confederation.   In Article II of that document, it was
expressly stated:

Article II.   Each state retains its sovereignty,
freedom, and independence, and ever Power, Jurisdiction
and right, which is not by this confederation expressly
delegated to the United States, in Congress assembled.

As the history of the confederation government
demonstrated,  each  State  was  indeed  sovereign  and
independent to the degree that it made the central
government  created  by  the  confederation  fairly
ineffectual.    These  defects  of  the  confederation
government strained the relations between and among the
States  and  the  remedy  became  the  calling  of  a
constitutional convention.

The representatives which assembled in Philadelphia in May, 1787, to attend the Constititutional Convention met for the primary purpose of improving the commercial relations among the States, although the product of the Convention produced more than this. But, no intention was demonstrated for the States to surrender in any degree the jurisdiction so possessed by the States at that time, and indeed the Constitution as finally drafted continued the same territorial jurisdiction of the States as existed under the Articles of Confederation. The essence of this retention of state jurisdiction was embodied in Art. I, § 8, Cl. 17 of the U.S. Constitution, which reads as follows:

> To exercise exclusive Legislation in all Cases, whatsoever, over such district (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings;...

The necessity for granting federal government sovereignty over land which would serve as the seat of that government became conspicuous during the Revolution, when a contingent of irate folks from the Continental Army beleaguered Congress while it was in session in Philadelphia. Members of Congress fled Philadelphia to Princeton, New Jersey, and from there to Annapolis, Maryland. Philadelphia and Pennsylvania governments were unable, or unwilling, to disperse the rebels who taunted and insulted Members of Congress. Problems persisted for the weak government under the Articles of Confederation following the Revolution, and it was in this framework that the Constitutional Convention was called in 1787. The purpose for establishing a seat of government under Congress' exclusive legislative jurisdiction was addressed in Essay No. 43 of The Federalist:

> The indispensable necessity of complete authority at the seat of government carries its own evidence with it. It is a power exercised by every legislature of the Union, I might say of the world, by virtue of its general supremacy. Without it not only the public authority might be insulted and its proceedings interrupted with impunity, but a dependence of the members of the general government on the State comprehending the seat of the government for protection in the exercise of their duty might bring on the national councils an imputation of awe or influence equally dishonorable to the government and dissatisfactory to the other members of the Confederacy. This consideration has the more weight as the gradual

accumulation of public improvements at the stationary residence of the government would be both too great a public pledge to be left in the hands of a single State, and would create so many obstacles to a removal of the government, as still further to abridge its necessary independence.   The extent of this federal district is sufficiently circumscribed to satisfy every jealousy of an opposite nature.   And as it is to be appropriated to this use with the consent of the State ceding it; as the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they will have had their voice in the election of the government which is to exercise authority over them; as a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the authority of the legislature of the State, and of the inhabitants of the ceded part of it, to concur in the cession will be derived from the whole people of the State in their adoption of the Constitution, every imaginable objection seems to be obviated.

The necessity of a like authority over forts, magazines, etc., established by the general government, is not less evident.   The public money expended on such places, and the public property deposited in them, require that they should be exempt from the authority of the particular State.   Nor would it be proper for the places on which the security of the entire Union may depend to be in any degree dependent on a particular member of it.   All objections and scruples are here also obviated by requiring the concurrence of the States concerned in every such establishment.

Petitioner cites several early court cases which addressed the matter of State versus "United States" (federal government) jurisdiction, with each of the decisions reinforcing the principle of State sovereignty, unless or until land is ceded by State legislature to the United States:

Perhaps one of the earliest decisions on this point was *United States v. Bevans, 16 U.S. (3 Wheat.) 336 (1818)*, which involved a federal prosecution for a murder committed on board the Warship, Independence, anchored in the harbor of Boston, Massachusetts.   The defense complained that only the state had jurisdiction to prosecute and argued that the federal Circuit Courts had no jurisdiction of this crime supposedly committed within the federal government's admiralty jurisdiction.   In argument before the Supreme Court, counsel for the United States admitted as follows:

- 6 -

> The exclusive jurisdiction which the United States have in forts and dockyards ceded to them, is derived from the express assent of the states by whom the cessions are made. It could be derived in no other manner, because without it, the authority of the state would be supreme and exclusive therein, *3 Wheat., at 350, 351.*

In holding that the State of Massachusetts had jurisdiction over the crime, the Court held:

> What then, is the extent of jurisdiction which a state possesses?

> We answer, without hesitation, the jurisdiction of a state is co-extensive with its territory; co-extensive with its legislative power, *3 Wheat., at 386, 387.*

> The article which describes the judicial power of the United States is not intended for the cession of territory or of general jurisdiction. . . . Congress has power to exercise exclusive jurisdiction over this district, and over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings.

> It is observable that the power of exclusive legislation (which is jurisdiction) is united with cession of territory, which is to be the free act of the states. It is difficult to compare the two sections together, without feeling a conviction, not to be strengthened by any commentary on them, that, in describing the judicial power, the framers of our constitution had not in view any cession of territory; or, which is essentially the same, of general jurisdiction, *3 Wheat., at 388.*

Thus in *Bevans*, the Court established a principle that federal jurisdiction extends only over the areas wherein it possesses the power of exclusive legislation, and this is a principle incorporated into all subsequent decisions regarding the extent of federal jurisdiction. To hold otherwise would destroy the purpose, intent and meaning of the entire U.S. Constitution.

The decision in *Bevans* was closely followed by decisions made in two state courts and one federal court within the next two years. In *Commonwealth v. Young, Brightly, N.P. 302, 309 (Pa. 1818),* the Supreme Court of Pennsylvania was presented with the issue of whether lands owned by the United States for which Pennsylvania had never ceded jurisdiction had to be sold pursuant to state law. In deciding that the state law of Pennsylvania exclusively controlled this sale of federal land, the Court held:

The legislation and authority of congress is confined to cessions by particular states for the seat of government, and purchases made by consent of the legislature of the state, for the purpose of erecting forts. The legislative power and exclusive jurisdiction remained in the several States, of all territory within their limits, not ceded to, or purchased by, Congress, with the assent of the state legislature, to prevent the collision of legislation and authority between the United States and the several States.

A year later, the Supreme Court of New York was presented with the issue of whether the State of New York had jurisdiction over a murder committed at Fort Niagara, a federal fort. In *People v. Godfrey, 17 Johns. 225, 233 (N.Y. 1819)*, that court held that the fort was subject to the jurisdiction of the State since the lands therefor had not been ceded to the United States. The rationale of its opinion stated:

To oust this state of its jurisdiction to support and maintain its laws, and to punish crimes, it must be shown that an offense committed within the acknowledged limits of the state, is clearly and exclusively cognizable by the laws and courts of the United States. In the case already cited, Chief Justice Marshall observed, that to bring the offense within the jurisdiction of the courts of the union, it must have been committed out of the jurisdiction of any state; it is not (he says,) the offense committed, but the place in which it is committed, which must be out of the jurisdiction of the state.

The case relied upon by this court was *U.S. v. Bevans* supra.

At about the same time that the New York Supreme Court rendered its opinion in *Godfrey*, a similar fact situation was before a federal court, the only difference being that the murder committed in the case occurred on land which had been ceded to the United States. In *United States v. Cornell, 25 Fed.Cas. 646, 648 No. 14,867 (C.C.D.R.I., 1819)*, the court held that the case fell within federal jurisdiction, describing such jurisdiction as follows:

But, although, the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction or sovereignty of such State over the lands so purchased. It remains until the State has relinquished its authority over the land either expressly or by necessary implication.

When therefore a purchase of land for any of these purposes is made by the national government, and the State Legislature has given its consent to the purchase,

the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of Congress, and the State jurisdiction is completely ousted.

Through the first half of the 19th Century, State and United States territorial jurisdiction was reasonably clear-cut, as accounts above evidence. But, during the Civil War and afterwards, entrenched powers concluded that Congress, on behalf of the United States, has a unique role in and through the territorial United States in those lands, whether ceded by legislatures of the several States, or acquired, by war or otherwise, by the United States. This alleged authority is at Article IV, Section 3, Clause 2 (4:3:2) of the U.S. Constitution:

> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States . . . .

During the Reconstruction period immediately following the Civil War, an Imperial Congress postured to make an end run around the U.S. Constitution. One of the first important measures was promulgation in their proposal for a Fourteenth Amendment. This amendment, secured at bayonet point, created a colorable citizenship known as a "Citizen of the United States". To that point, people generally thought of themselves as United States citizens just as they do today; and the body of the U.S. Constitution even makes rhetorical use of the term "Citizen of the United States", but People were Citizens of their respective *Union* States, and this term could have referred to no other status, since there was no such thing as "federal citizenship" when the U.S. Constitution was written. The distinction between separate classes of citizens is best demonstrated by comparing court decisions, the first in 1855, the second in 1875:

> A citizen of any one of the States of the union, is held to be, and called a citizen of the United States, although technically and abstractly there is no such thing. To conceive a citizen of the United States who is not a citizen of some one of the States, is totally foreign to the idea, and inconsistent with the proper construction and common understanding of the expression as used in the Constitution, which must be deduced from its various other provisions. The object then to be attained, by exercise of the power of naturalization, was to make citizens of the respective States (Ex Parte Knowles, 5 Cal. 300 (1855))

We have in our political system a Government of the United States and a government of each of the several States. Each one of these governments is distinct from the others, and each has citizens of its own who owe it allegiance, and whose rights, within its jurisdiction, it

must protect.  The same person may be at the same time a citizen of the United States and a citizen of a State, but his rights of citizenship under one of these governments will be different from those he has under the other.  *(United States v. Cruikshank, 95 U.S. 542 (1875))*

Where the State Citizen, identified in the Preamble of the U.S. Constitution and in 1:2:2, 1:3:3, 3:2:1, and 4:2:1, is a Sovereign or Principal, the Fourteenth Amendment citizen of the United States belongs to a subject, or subordinate class, as demonstrated by Section 1 of that "amendment":

    Section 1.  All persons born or naturalized in the United States, the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;  nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The citizen of the United States (a/k/a "federal citizen") was distinct from the State Citizen, or there wouldn't have been any need to restate due process rights already articulated in the Fifth Amendment.  In the framework of what has already been covered, it is clear that Citizens of the States (a/k/a State Citizens) were not then, and are not now, "subject to the jurisdiction" of the United States within the several States.  This matter was addressed by Thomas Jefferson by way of "The Kentucky Resolutions" in response to the Alien and Sedition Acts in 1798.  The second of nine resolutions addressed the matter of United States authority to punish crimes:

    2. Resolved, That the Constitution of the United States, having delegated to Congress a power to punish treason, counterfeiting the securities and current coin of the United States, piracies, and felonies committed on the high seas, and offenses against the law of nations, and no other crimes whatsoever.

Where Jefferson articulated the limited, direct authority which the United States could exercise over State Citizens, the Fourteenth Amendment citizen of the United States appears to be subject to United States authority wherever she/he might be, whether in the geographical United States (a/k/a "the federal zone"), or in any of the several States which are parties to the U.S. Constitution (a/k/a "the state zone").  More to the point, however, the subject class of citizens of the United States would be viewed on a par with corporations, associations, and other *artificial* entities created, franchised, and/or sanctioned by government, and United States authority would reach into the States under the auspices not of inherent or unalienable Rights -- rights granted by government to its subject classes.

13

13

From this point forward, the American dialogue concerning Law was to change, departing the biblical base of Common Law where God is Sovereign and Man is endowed directly by His Creator, to embrace a secular view of man whereby the individual is little more than a chattel property, and exists solely for the convenience and exploitation of entrenched powers (read "Oligarchy"). This change is easily demonstrated in the _Roe v. Wade_ decision, which threw the door open to abortion on demand. Even though medical science long ago demonstrated that life begins at conception, the U.S. Supreme Court did not consider either the existence or sanctity of life in the landmark decision. The unborn baby, conveniently referred to as a "fetus," does not qualify as a "person" in the context of the Fourteenth Amendment definition promulgated by Congress, so, since the unborn lacks legal standing, the law is indifferent to his existence; whether or not life has intrinsic value or unborn babies have God-given rights wasn't and isn't even considered.

The so-called Fourteenth Amendment effected a subtle perversion of first causes. Where State citizens, being Sovereign, have God-given rights which are merely secured by the State and federal constitutions, the subject citizen of the United States falls under Congress' Article IV legislative jurisdiction; the list of his constitutionally assured rights is itemized in the Fourteenth Amendment. Beyond that, he is dependent on Congress for grants of privilege; rather than God, government is the federal citizen's prime mover.

The next important move was incorporation of the District of Columbia as a municipal corporation and political subdivision of the geographical, or self-interested, United States (federal government). Original incorporation was in 1871, with several re-organizations during that decade and since. Thereafter, the corporate federal government became increasingly important, particularly through late-century westward development, as the United States (federal government) managed settlement territory simultaneously with post-Civil War reconstruction -- influences in the _Julliard_ case when it reversed Justice Fields from four years earlier by concluding that Congress could print paper money because the U.S. Constitution does not expressly prohibit United States paper money.

Considering provisions of Article I, Sec. 8, Clause 5 (1:8:5), and Article I, Section 10, Clause 1 (1:10:1), of the U.S. Constitution, which stipulate that Congress will mint coin and regulate value, and the several States cannot make anything but gold and silver coin a tender for payment of debt, the _Julliard_ decision was conspicuously contrary to constitutional intent, but as Naval Academy founder George Bancroft pointed out in a detailed rebuttal to the decision (a Plea for the Constitution of the United States: Wounded in the House of Its Guardians), _Julliard_ was based on Congress' legislative jurisdiction under Article IV of the U.S. Constitution, in the geographical United States. Thus, manifestation of Congress' dual role -- exercise only of delegated power under Article I within the several States, and exercise of

any power not specifically prohibited by the U.S. Constitution within the geographical United States (the federal zone) under Article IV. So far as lawful implication, the People and the governments of the several States had·the Right to reject United States paper money, as several court decisions confirm; but, as a practical matter, the nation was largely changed over to paper money, rather than gold and silver coin, by the time the Federal Reserve Act established the Federal Reserve System in 1913. By 1933, the Federal Reserve Note, not to be confused with the current Federal Reserve Bank Note, was backed 60% by obligations of the United States, and by 40% gold.

Congress also engaged in massive land-grabs both within the Continental United States and abroad. Takeover of the Hawaiian Islands, going to war with Spain to take the Philippines, Puerto Rico, etc., and nearly all States admitted to the Union after the Civil War were blackmailed into land concessions. Oklahoma, admitted in 1907, adopted the following provision at Article I, Section 3 of the state constitution:

The people inhabiting the state do agree and declare that they forever disclaim all right and title in or to any un-appropriated public lands lying within the boundaries thereof.

Even though the U.S. Constitution grants authority for the United States (federal government) to establish nothing more than forts, magazines, arsenals, dockyards and other needful buildings within the several States, from the time of the Civil War, well into this century, including mineral-rich Alaska, Congress indulged its greed for land; whereas the intent of American founders, via the U.S. Constitution, the "Ordinance of 1887: the Northwest Territorial Government", and other such instruments, was clearly to keep the federal beast locked soundly within its box which was, for the most part, limited to the ten miles square (100 square miles) authorized for the seat of the federal government.

Toward the end of the 19th Century, some of the retained federal lands within the several States were declared to be National Parks. Development of federally owned resources accelerated in the 1930's via public works programs, such as building dams for flood control and electrical generation, and a multitude of other enterprises.

On the enforcement and judicial fronts, there was a corresponding re-organization. The Department of Justice was created by Act of Congress on June 22, 1870 (Forty-First Congress, Session II, Chapter 150 pages 162 et seq.), with the Attorney General at the head of this organization. To that point, each government agency or department pretty well took care of its own legal affairs, but the Act establishing the Justice Department consolidated authority over most enforcement and legal matters, including those of the Department of the Interior.

Changing United States courts around was a somewhat longer process, but it was managed over time.  The United States Circuit Courts became United States Courts of Appeal via Act of Congress on March 3, 1891, and organization of United States District Courts, with amendments since, was accomplished by Act of Congress on March 3, 1911 (Sixty-First Congress, Session III, Chapter 231, pages 1087 *et seq.*)

While some of the seemingly unrelated history conveyed in Part I of this memorandum might appear not to address United States judicial authority within the several States, it will fall into place when the office of "federal magistrate" is addressed. Magistrates in United States District Courts are simply federal park commissioners and nothing more.  The name was changed, but the character and jurisdiction of the office did not.

The territorial jurisdiction of federal magistrates, which is easily demonstrated by way of two statutes, is concurrent with jurisdiction of United States District Courts within the several States.  Or at least it would appear so.  The first definition, in relative part, comes from *Title 18 of the United States Code,* the *Code of Criminal Procedure, at Section 7*, with particular attention to §7(3) (U.S.C., 1979 edition):

§7.  Special Maritime and Territorial jurisdiction of the United States defined:

The term "Special Maritime and Territorial jurisdiction of the United States", as used in this title [18 U.S.C. §§1 et seq.], includes:

(3)  Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

The second comes from the so-call *Buck Act, at 4 U.S.C. §110 (1995 Lawyers's cooperative CD-ROM edition)*:

§110.  Same; definitions as used in Sections 105-109 of this title --. . .

(d)  The term "State" includes any Territory or possession of the United States.

(e)  The term "Federal area" means any lands or premises held or acquired by or for the use of the United States or any department, establishment, or agency of the United States; and any Federal area, or any part thereof, which is located within the exterior boundaries of any State, shall be deemed to be a Federal area located

<u>within such State.</u>

[emphasis added]

Definition of the term "State" as included in the above cite as used in both the United States Code and in the codes of the various States is essential to understanding that most statutes in the United States Code presume application in federal "States" such as the District of Columbia, Puerto Rico, etc., and *not* within the several States which are parties to the U.S. Constitution.   The distinction in *18 U.S.C. §7(3)* is subtle, but becomes clearer when read very carefully:  Special Territorial jurisdiction, where the United States Code of Criminal Procedure is applicable, embraces: (1) "Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction;" (2) "<u>or</u> any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

In the first instance, the United States (federal government) has exclusive or concurrent jurisdiction over any land acquired for any purpose; whereas, in the second instance, the United States (federal government) has jurisdiction only over lands which are acquired for a constitutional purpose, as specified in Article I, after the land has been ceded to the United States by the State legislature.  In the District of Columbia, Puerto Rico, the Virgin Islands and other United States (federal government) possessions classified as "States" in federal municipal law, Congress has unrestricted and exclusive legislative jurisdiction, pursuant to Article IV, so purchase of land for United States (federal government) use automatically comes under Congress' legislative jurisdiction, with or without consent of the State legislative body.  In the second instance, legislatures of the several States must cede jurisdiction over acquired property to the United States (federal government) before any judicial authority can be exercised.

The *Buck Act* definition of "State" is about as straightforward as any of the various definitions of "State" which refer to the federal "States":

The term "State" includes any territory or possession of the United States.

A similar definition of the term is located in *Rule 54 of the Federal Rules of Criminal Procedure:*

"State" includes District of Columbia, Puerto Rico, territory and insular possession.

Jurisdiction of United States District Courts, being limited to federal "States" and to federal enclaves within the several States, is further reinforced by another *Rule 54* application:

"Act of Congress" includes any Act of Congress locally applicable to and in force in the District of Columbia, in Puerto Rico, in a territory or in an insular possession.

The distinction between federal "States" and the sever [Union] States is clarified in the jurisdiction and venue statute (territorial jurisdiction) governing conduct of United States District Courts. According to <u>The United States Government Manual</u> for 1995/96, at page 75, is *18 U.S.C. §3231 (1979 edition, U.S.C.):*

§3231.   District courts

The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

Nothing in this Title *[18 U.S.C. §§1 et seq.]* shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.

If the distinction between the federal "States" and the several [Union] States is not made clear enough by *§3231,* proof of the distinction is found in the legislative history of *18 U.S.C. §3241,* again using the 1979 edition of the United States Code ("U.S.C."):

§3241.   Jurisdiction of offenses under certain sections.

The United States District Court for the Canal Zone and the District Court of the Virgin Islands shall have jurisdiction of offenses under the laws of the United States, not locally inapplicable, concurrently within the territorial jurisdiction of such courts, and jurisdiction, concurrently with the district courts of the United States, of offenses against the laws of the United States committed upon the high seas.

At various times, other territorial courts were included in this statute. The district court of the Philippines was removed in 1946 when the island nation became an independent commonwealth; then "Act July 7, 1958 deleted "District Court for the Territory of Alaska' . . . In other words, up until the point at which Alaska was admitted to the Union, that territory was considered a federal "State." Once admitted to the Union, Alaskan courts no longer qualified as courts of the United States. State courts, because of Tenth and Eleventh Amendments and the Separation of Powers Doctrine, could not legitimately exercise any federal authority. The Canal Zone district court has been removed from this statute since the 1979 U.S.C. edition was published, so the District Court of the Virgin Islands is the only remaining federal "State" court

that exercises concurrent jurisdiction with United States District Courts under *18 U.S.C. §3241*.

We turn now to the "special territorial" jurisdiction found at *18 U.S.C. §7(3)* by way of examining the evolution of what are today known as "federal magistrate judges", formerly known as "federal magistrates", and before that, as "national park commissioners". The first selection comes from historic and amendment notes following *28 U.S.C. §631,* which provides for appointment and tenure of federal magistrate judges (1995 Lawyer's Cooperative CD-ROM edition of U.S.C.).

1979.   Act October 10, 1979, in subsec. (a), substituted "Where the conference deems it desirable,'a magistrate may be designated to service in one or more districts adjoining the district for which he is appointed.   Such a designation shall be made by the concurrence of a majority of the judges of each of the district courts involved and shall specify the duties to be performed by the magistrate in the adjoining district or districts.    For "Where an area under the administration of the National Park Service, or the United States Fish and Wildlife Service, or any other Federal agency, extends into two or more judicial districts and it is deemed desirable by the conference that the territorial jurisdiction of a magistrate's appointment include the entirety of such area, the appointment or re-appointment shall be made by the concurrence of a majority of all judges of the district courts of the judicial districts involved, and where there is no such concurrence by the concurrence of the chief judges of such district courts."; in subsec. (b), in the introductory matter, inserted "re-appointed to", in para. (1), inserted", and has been for at least five (5) years, "in cl. (A), inserted "or", in cl. (B), deleted "or" following "Islands;" deleted cl. (C) which read: "in an area under the administration of the National Park Service, the United States Fish and Wildlife Service, or any other Federal agency that extends into two or more States, a member in good standing of the bar of the highest court of one of those states:" 'in para. (4), substituted";and" for a period and added para. (5), re-designated subsec. (f)_(j) as subsecs. (g)_(k) respectively; and added new subsec. (f).
[emphasis added]

Before examining deletions made in the 1979 amending Act, it will be useful to import the index from earlier law pertaining to national park commissioners before all the name changes, with the current Magistrate Act at *28 U.S.C. §§631-639:*

Amendments (1995 Lawyer's Cooperative CD-ROM edition of U.S.C.)

1954.  Act August 13, 1954 ch 728, §1(c), 68 Stat. 704, amended the analysis of this chapter by adding "and expenses" to item 633.

1968.  Act October 17, 1968, P.L. 90-578, Title I, §101, 82 Stat. 1108, amended the analysis of this chapter by substituting items 632 through 639 for items which read:

§632.  Park commissioners: jurisdiction and powers; procedure

§633.  Fees and expenses

§634.  Salaries of Park Commissioners; disposition of fees

§635.  Park Commissioners; residence

§636.  Accounts

§637.  Oaths, acknowledgments, affidavits and depositions

§638.  Seals

§639.  Dockets and forms; United States Code".

1972.  Act March 1, 1972, P.L. 92-239, §3, 86 Stat. 47, amended the analysis of this chapter substituting, "powers, and temporary assignment" for "and powers" in item 636.

It is also useful to see the evolution of this Act dating to the last century:

Based on Title 28, U.S.C., 1940 ed., §§526 and 527, sections 27, 66, 80e, 100, 117e, 129, 172, 198e, 204e, 256d, 395e, 403c-5, 403h-5, 404c-5, and 408m of Title 16, U.S.C., 1940 ed., Conservation, and Section 863 of Title 48 U.S.C., 1940 ed., Territories and Insular possessions (May 27, 1894, ch. 72, §5, 28 Stat. 74; May 28, 1896, ch. 252, §§19, 20, 29 Stat. 184; April 12, 1900, ch 191, §34, 31 Stat. 84; March 2, 1901, ch. 814, 31 Stat. 956; March 3, 1911, ch. 231 §291, 36 Stat. 1167; January 7, 1913, ch. 6, 37 Stat. 648; August 22, 1914.

Section consolidates Section 526 and a portion of 527, both of *Title 28, U.S.C. 1940 ed.,* with provisions of *Sections 27, 66, 80e, 100, 117e, 129, 172, 198e, 204e, 256d, 395e, 403c-5, 403h-5, 404c-5 and 408m of Title 16, U.S.C., 1940 ed.,* Territories and Insular Possessions, relating to appointment of United States commissioners.  For other provisions of said sections *see,*

Distribution Table.

    Some of the provisions of Section 863 of Title 48, U.S.C., 1940 ed., Territories and Insular Possessions were retained in that title.

    The provision of *Sections 395e, 403c-5, 404c-5, and 408m of Title 15, U.S.C., 1940 ed.,* for appointment of the Park Commissioner in the Hawaii National Park, Shenandoah National Park, Great Smoky Mountains National Park, Mammoth Cave National Park and Isle Royale National Park upon "the recommendation of the Secretary of the Interior" was omitted as inconsistent not only with other provisions of this title but with other statutes applicable to other national parks.

    All such park commissioners are United States commissioners and the revision of these sections make possible uniformity and consistency in administrative matters concerning such commissioners. *See, also, Sections 604 and 634 of this title.*)

    Words "the Director of the Administrative Office of the United States Courts" were substituted for "Attorney General" in *Section 526 of Title 28, U.S.C., 1940 ed.,* in view of the general supervision by the Director over clerks and commissioners under *Section 601 et seq.* of this title.

    A provision in *Section 526 of Title 28, U.S.C., 1940 ed.,* that commissioners should have the same powers and duties as are conferred and imposed by law, was omitted as superfluous.

                        [emphasis added]

Jurisdiction provisions relating to federal magistrate judges/national park commissioners were enacted in definitive terms for the Grand Canyon National Park Commissioner:

    Special Commissioner for Grand Canyon National Park; appointment; jurisdiction; compensation. Act September 14, 1959, P.O. 86-248 §§1-3, 73 Stat. 546, provided:

    "Sec. 1.  The United States District Court for the District of Arizona shall appoint a special commissioner for the Grand Canyon National Park, Arizona. The commissioner shall hold office for four years, unless sooner removed by the district court, and he shall be subject to the general laws and requirements applicable to United States commissioners.

    "Sec.2.  The jurisdiction of the commissioner in adjudicating cases brought before him shall be limited to the trial, and sentencing upon conviction, of persons

21

charged with the commission of those misdemeanors
classified as petty offenses *(18 U.S.C.§1)[18 U.S.C.§1]*
relating to the violation of Federal laws or regulations
applicable within the park:  Provided, that any person
charged with a petty offense may elect to be tried in the
district court of the United States; and the commissioner
shall apprise the defendant of his right to make such
election, but shall not proceed to try the case unless
the defendant, after being so apprised, signs a written
consent to be tried before the Commissioner.   The
exercise of additional functions by the commissioner
shall be consistent with and be carried out in accordance
with the authority, laws, and regulations of general
application to United States Commissioners. The rules of
procedure set forth in *Title 18, Section 3402, of the
United States Code [18 U.S.C.§3402]*, shall be followed in
the handling of cases by such commissioner.   The
probation laws shall be applicable to persons tried by
the commissioner and he shall have power to grant
probation.

<div align="center">[emphasis added]</div>

Now we go to a few court cases to nail the matter down:

     Powers and duties were coextensive with limits of
judicial district in which he was appointed.  *United
States v. Harden*, 10 F.802 (D.C. N.C., 1881); *United
States v. Stern*, 177 F.479 (D.C. Pa. 1910).

     Purpose of *Federal Magistrates Act, 28 U.S.C. §§631
et seq.*, was to provide method to relieve judges of some
of the non-Article III functions.  *United States v. First
National Bank of Rush*, 576 F.2d 852 (10th cir., 1978),
78-1 USTC §9462, 42 AFTR 2d 78-5049.

     Purpose of *Federal Magistrates Act (28 U.S.C. §§631-
638)* is to remove from workload of United States District
Courts matters which are more desirably performed by
lower tier of judicial officers.  *United States v.
Richardson*, 57 FRD 196 (D.C. N.Y., 1972).

Evolution of the federal magistrate judge demonstrates that he
is merely a glorified national park commissioner, who is a bar-
licensed attorney, and his territorial jurisdiction is concurrent
with jurisdiction of the United States District Court where he
serves. As previously demonstrated via analysis of *18 U.S.C. §7(3)
and 4 U.S.C. §110(d) and (e)*, there is a gray area where there
might be some discretion.  In the federal "States", United States
District Court venue and jurisdiction may extend to National Parks
and other lands retained by the United States, but in the several
States which are parties to the U.S. Constitution, United States
judicial authority may be exercised only on federal enclaves, i.e.
lands ceded to the United States by legislatures of the several
States, "for the erection of a fort, magazine, arsenal, dockyard,

or other needful building" (1979 edition, U.S.C.). There is, and was, no constitutional authority for Congress to retain land for the United States, as was the case in Oklahoma, Colorado, Nevada, Alaska, etc., in states admitted to the Union subsequent to the Civil War. Nevada appears to be leading the charge on this issue, namely, the right of the United States (federal government) to retain land in the several States other than for constitutional purposes; and it is clear, by distinctly separate authorities pertaining to federal "States" and to the several States in *18 U.S.C. §§7(3) and 3231 and 4 U.S.C. §1001(d) and (e),* that application of judicial authority in the United States Code of Criminal Procedure limits jurisdiction to federal enclaves which have been ceded by legislatures of the several States for constitutional purposes only.

Still, this is a vague area which has yet to be thoroughly explored: Within the several States, the United States has judicial authority either: (1) on federal enclaves ceded by legislatures of the several States for constitutional purposes, or (2) on federal enclaves ceded for constitutional purposes and in national parks. In his memorandum, Becraft frames his conclusion concerning United States judicial jurisdiction by basing it on an 1885 Supreme Court decision, even though the decision was premised on facts relative to the federal reservation at Ft. Leavenworth, Kansas:

> The single most important case regarding the subject of federal jurisdiction appears to be *Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 531, 5 S.Ct. 995 (1885)*, which sets forth the law on this point fully. There, the railroad company property which passed through the Fort Leavenworth federal enclave was being subjected to taxation by Kansas, and the company claimed an exemption from state taxation. In holding that the railroad company's property could be taxed, the Court carefully explained federal jurisdiction within the States:

>> The consent of the states to the purchase of lands within them for the special purposes named, is however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private individuals.

Thus, the cases decided within the 19th Century clearly disclosed the extent and scope of both State and federal jurisdiction. In essence, these cases, among many others, hold that the jurisdiction of any particular State is co-extensive with its borders or territory, and all persons and property located or found therein are subject to such jurisdiction; this jurisdiction is superior. Federal jurisdiction results only from a conveyance of state jurisdiction to the federal government for lands owned or otherwise possessed by the federal government, and thus federal jurisdiction is extremely limited in nature. And there is no federal jurisdiction if there be no grant or cession of jurisdiction by the State to the federal government. Therefore, federal territorial jurisdiction exists only in Washington, D.C., the federal enclaves within the States, and the territories and possessions of the United States.

During the Eisenhower administration, the matter of federal jurisdiction within the States was addressed at length by a specially formed Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States, with both State and United States (federal government) representatives participating in the study. Assistant Attorney General Mansfield D. Sprague chaired the committee. Part I of the report, titled "The Facts and Committee Recommendations,: was submitted to President Eisenhower in April, 1956, and Part II, titled "A Text of the Law of Legislative Jurisdiction," was submitted in June, 1957. The latter report, in particular, affirms the conclusion that United States judicial authority within the several States extends only so far as the constitutional grant:

> The Constitution give express recognition to but one means of federal acquisition of legislative jurisdiction . . . by state consent under Article I, section 8, clause 17 . . . Justice McLean suggested that the Constitution provided the sole mode for transfer of jurisdiction, and that if this mode is not pursued, no transfer of jurisdiction can take place. [Page 41]

> It scarcely needs to be said that unless there has been a transfer of jurisdiction (1) pursuant to clause 17 by a federal acquisition of land with State consent, or (2) by cession from the State to the Federal Government, or unless the Federal Government has reserved jurisdiction upon the admission of the state, the Federal Government possesses no legislative jurisdiction over any area within a State, such jurisdiction being for exercise by the State, subject to non-interference by the State with Federal functions. [*Id.*, at 45]

> The Federal Government cannot, by unilateral action on its part, acquire legislative jurisdiction over any

2ℓ

area within the exterior boundaries of a State.  [*Id.*, at 46]

On the other hand, while the Federal Government has power under various provisions of the Constitution to define, and prohibit as criminal, certain acts of omissions occurring anywhere in the United States, it has no power to punish for various other crimes, jurisdiction over which is retained by the States under our Federal-State system of government, unless such crimes occurs on areas as to which legislative jurisdiction has been vested in the Federal Government.  [*Id.*, at 107]

The 1957 report appears to accommodate United States (federal government) retention and/or acquisition of land, and therefore legislative and judicial jurisdiction, other than that specifically prescribed in the U.S. Constitution under Article I authority. Therefore, if the report is correct on this hair-splitting matter, congressional blackmail of States admitted to the Union after the Civil War would appear to be legitimized, and the report seems to accommodate legislative cession of land to the United States (federal government) for other than constitutional purposes . . . national parks, flood control, and electrical generation dams, etc.

However, the jury is still out on this matter, because recent U.S. Supreme Court decisions such as *New York v. United States*, et al., *505 U.S. ___, 120 L.Ed.2d 120, 112 S.Ct. 2408 (1992)*, seem to condemn this conclusion under authority of the Tenth Amendment and the Separation of Powers Doctrine.  The United States (federal government) cannot exercise any authority within the several States which is not specifically enumerated in Article I of the U.S. Constitution; and officers of the several States cannot accommodate any United States (federal government) exercise of power which is not specifically delegated under Article I, without first securing a constitutional amendment.

Regardless of the Tenth Amendment and the Separation of Powers issues, any given Act of Congress, under United States judicial authority, applies only to the extent of the Act and attending regulations, with territorial limits prescribed at *18 U.S.C. §7(3) and 4 U.S.C. §110(d) and (e)*.

General speaking, territorial bounds for United States judicial authority are applicable with respect to both civil and criminal matters, with diversity of citizenship being the only exception in civil matters.  This expansion of United States judicial authority does not extend to criminal matters, except as specified by Thomas Jefferson in "The Kentucky Resolutions."  The U.S. Supreme Court has repeatedly prescribed the limits of federal criminal jurisdiction in definite terms.  The conclusive statement is this:  "[Federal] legislation applies only within the territorial jurisdiction of the United States unless a contrary intent appears [in the legislation] . . . "  *See, Caha v. United*

25

*States,* 152 U.S. 211, 215 (1894), 14 S.Ct. 513; *American Banana Company v. United Fruit Company,* 213 U.S. 347 (1909), 357, 29 S.Ct. 511; *United States v. Bowman,* 260 U.S. 94 (1922), 97, 93, 43 S.Ct. 39; *Blackmer v. United States,* 284 U.S. 421 (1932), 437, 52 S.Ct. 252; *Foley Bros. v. Filardo,* 336 U.S. 281 (1949), 285, 69 S.Ct. 575; *United States v. Spelar,* 338 U.S. 217, 222 (1949), 70 S.Ct. 10; and *United States v. First National Bank,* 321 F.2d 14, 23 (2nd cir. 1963).

The matter is addressed in *Rule 54 of the Federal Rules of Criminal Procedure* [selected portions, 1978 edition, U.S.C.]:

Rule 54.   Application and Exception

(a) Courts.   These rules apply to all criminal proceedings in the United States District Courts.

(c) Application of terms.   As used in these rules the following terms have the designated meanings.

"Act of Congress" includes any Act of Congress locally applicable to and in force in the District of Columbia, in Puerto Rico, in a territory or in an insular possession.

The words "demurrer," "motion to quash," "plea in abatement," "plea in bar" and "special plea in bar," or words to the same effect, in any Act of Congress shall be construed to mean the motion raising a defense or objection provided in *Rule 12.*

"Federal Magistrate" means a United States magistrate as defined in *28 U.S.C. §§631-639*, a judge of the United States or another judge of judicial officer specifically empowered by statute in force in any territory or possession, the Commonwealth of Puerto Rico, or the District of Columbia, to perform a function to which a particular rule relates.

"Judge of the United States" includes a judge of a district court, court of appeals, or the Supreme Court.

"Law" includes statutes and judicial decisions.

"Magistrate" includes a United States magistrate as defined in *28 U.S.C. §§631-639*, a judge of the United States, another judge or judicial officer specifically empowered by statutes in force in any territory or possession, the Commonwealth of Puerto Rico, or the District of Columbia, to perform a function to which a particular rule relates, and a state or local judicial officer, authorized by *18 U.S.C. §3041* to perform the functions prescribed in *Rule 3, 4, and 5.*

"State" includes District of Columbia, Puerto Rico, territory and insular possessions.

"United States Magistrate" means the officer authorized by *28 U.S.C. §§631-639.*

Application of Acts of Congress was clearly articulated in *Caha v. United States, supra,* where the Supreme Court stated as follows:

> The laws of Congress in respect to those matters do not extend into the territorial limits of the states, but have force only in the District of Columbia, and other places that are within the exclusive jurisdiction of the national government.

Application of terms in *Rule 54* of the Federal Rules of Criminal Procedure appears to excuse jurisdiction of United States courts on national parks within the several States, as has repeatedly been demonstrated via *4 U.S.C. §110(d) and (e) and 18 U.S.C. §7(3)* definitions and applications, and the definition of "State" cited above; but, regardless of this hair splitting, United States judicial authority via United States District Courts, which is concurrent with jurisdiction of national park commissioners (now known as federal magistrate judges), does not extend to the several States in any general way, other than in territory ceded by the legislatures of the several States, whether for constitutional purposes or for national parks.  Thus, the law of legislative jurisdiction is preserved in the convoluted United States Code by tracking the history and evolution of United States courts and their officers.

Judicial authority of the United States is established in Article III of the U.S. Constitution:

Article III

Section 1.  The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish.  The judges, both of the Supreme and inferior Courts, shall hold their offices during good behavior, and shall, at states times, receive for their services a compensation, which shall not be diminished during the continuance in office.

Section 2.  [1]  The judicial power shall extend to all cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority; -- to all cases affecting Ambassadors, other public ministers and consuls; -- to all cases of Admiralty and Maritime jurisdiction; -- to controversies to which the United States shall be a party

27

between two or more States; -- between a State and
Citizen of another State; -- between Citizens of
different States; -- between Citizens of the same State
claiming lands under the grants of different states, and
between a State, or the Citizens thereof, and foreign
States, citizens or Subjects.

[2]   In all cases affecting Ambassadors, other
public ministers and counsels, and those in which a State
shall be a party, the Supreme Court shall have original
jurisdiction.  In all the other cases before mentioned,
the Supreme Court shall have appellate jurisdiction, both
as to Law and Fact, with such exceptions, and under such
regulations as the Congress shall make.

[3]   The trial of all crimes, except in cases of
Impeachment, shall be by jury; and such trial shall be
held in the State where the said crimes shall have been
committed; but when not committed within any State, the
trial shall be at such place or places as the Congress
may by Law have directed.

Section 3. [1]   Treason against the United States,
shall consist only in levying war against them, or, in
adhering to their enemies, giving aid and comfort.  No
person shall be convicted of Treason unless on the
testimony of two witnesses to the same overt Act, or on
confession in open court.

[2]   The Congress shall have power to declare the
punishment of Treason, but no Attainder of Treason shall
work Corruption of Blood, or Forfeiture except during the
life of the person attainted.  [copied from Black's Law
Dictionary, 6th edition]

The U.S. Supreme Court has classified the judicial authority
which is granted under Article III into three categories:  First,
those cases in Common Law and equity which are cognizable within
the framework of the Section 2, Clause 1 "arising under" clause;
second, Admiralty and Maritime jurisdiction under Section 2, Clause
1; and third, cases pertaining to ambassadors, etc.  Cases relating
to the several States are affected by the Eleventh Amendment,
ratified in 1798, but don't materially affect the instant matter.

Concern in this context focuses on two types of law and the
originating source.  Use of the term "law" in Article III of the
U.S. Constitution, as is the case for due process amendments in the
Bill of Rights (first Ten Amendments, particularly the Fourth,
Fifth, Sixth and Seventh), contemplates the Common Law of English-
American lineage.  Equity, also known as chancery, pertains
primarily to commercial or contract law, and is voluntary on the
part of participating parties.  In other words, Common Law was
assumed and construed to be the Law of the Land applicable both
within the United States (federal zone) and within the several

26

States.

Constitutional intent was carried out by the first Congress via the Judicial Act of 1789.  In this Act, original cognizance over Admiralty and Maritime affairs was vested in courts of the United States, exclusive of the several States, with a safeguard built in, known as the "saving to suitors clause."  Suitors or parties to an action, could remove to Common Law jurisdiction where the Common Law was competent to provide a remedy.  The saving to suitors clause is retained in the current United States Code.  *See*, *28 U.S.C. §1333(1)*.

In the beginning, Admiralty and Maritime jurisdiction applied only to matters concerning international contracts and affairs on the high seas, with the Law of Nations providing a guiding light. The Supreme Court, early on, concluded that, while Admiralty jurisdiction is conveyed in *Article III, §2, Clause 1,* it is distinct from authority pertaining to law and equity and, therefore, does not fall under authority of the "arising under" clause.  *See*, *American Insurance Co. v. 356 Bales of Cotton, 26 U.S. 511 (1828), 7 L.Ed 242; Romero v. International Terminal Operating Co., 358 U.S. 354 (1959), 3 L.Ed.2d 368, 79 S.Ct. 468, reh. den. 359 U.S. 962, 3 L.Ed.2d 769, 79 S.Ct. 795.*

The nature and origin of Admiralty law is set out in Vol. 1 of Corpus Juris, 1914 edition, p.1249, as follows:

I. DEFINITION

[§1] Admiralty is that branch of department of jurisprudence which relates to and regulates maritime property, affairs, and transactions, whether civil or criminal.  In a more limited sense it is the tribunal exercising jurisdiction over maritime causes and administering the Maritime law by procedure peculiar to itself and distinct from that followed by courts either of equity or of common law.

II. ORIGIN AND GROWTH

[§2] A.  Under the Civil Law.  Admiralty courts owe their origin and procedure largely to the civil law, which prevailed in Italy and along the north coast of the Mediterranean, where naval commerce was originally most active, and where, after the fall of the Western Empire, the merchants and traders by sea brought about the establishment of a court of consuls in each of the principal maritime cities to hear causes arising out of maritime commerce and property.  The judges of these consular courts were chosen on Christmas of each year by the chief merchants, and they enforced and applied to controversies the customs of the sea, whose origin is long anterior to the civil law itself.  These courts gradually developed and extended their jurisdiction as

29

maritime commerce became more profitable and important, until ultimately, in most states, they were merged into, and became known as, Courts of Admiralty.

[§3] B. In England. The admiralty is a court of ancient origin, traceable back in English jurisprudence to the reign of Edward I, and exercising a jurisdiction coeval and coextensive with that of other foreign maritime courts; indeed, by some authorities it is said to have existed long before that time. But owing to the hostility which, from historic causes, gradually developed in England against the civil law, the jurisdiction of admiralty was there greatly restricted and limited, both by statute and by decisions of the common-law courts interpreting the same. A reaction in favor of the admiralty courts has now taken place, however, and by acts of parliament they have regained much of their lost jurisdiction, and have acquired jurisdiction over all claims for damages done by any ship, whether on land or water.

[§4] C. In the United States. It is now well settled, after much controversy, that the jurisdiction of the courts of admiralty in the United States is not limited to that of the English admiralty at the time of the Revolution, but is derived from the early usages of the statutes and the federal laws and decisions.

The history related above hardly does justice to the continued English-American battle over imposition of Admiralty Law which, as the article suggests, is in the nature of Roman Civil Law, British Feudal law, or simply Civil Law, whereby legislative and administrative bodies are ultimate authorities without any reference to an independent judicial body. This kind of rule had the effect of setting English Barons against King John I, with the results being the Magna Carte, signed in 1215, and in 1640, the Popular Rebellion which ended Star Chambers and convoluted ecclesiastical courts under Charles I. American founders were fully aware of the effects of admiralty or Civil Law -- the vice-admiralty courts of George III were largely responsible for the Revolution. Thus, the "saving to suitors" clause was incorporated in the Judicial Act of 1789.

However, in the period following the Civil War, Congress found admiralty rule convenient and, as the geographical United States, under Congress' alleged Article IV legislative jurisdiction, became an increasingly powerful influence, admiralty rule was extended. First, as already noted from The United States Government Manual of 1995/96, Circuit Courts were changed to Courts of Appeal by Act of March 3, 1891, then United States District Courts were reorganized and set by Act of March 3, 1911 (Sixty-First Congress, Sess. III, chap. 231, pp.1087, et seq.[Public No. 475]). The Nature of United States District Courts is revealed in the Act at §9: "The district courts, as courts of admiralty and as courts of equity . . . "

In other words, the district courts of the United States, from the Act of March 3, 1911 on, if not before, have never really had a Common Law character in federal territories, and their legitimate relationship to and within the several States has at best been at arm's length and shaky, where the real party of interest is the geographical United States (federal government) under Congress' Article IV legislative jurisdiction, exclusive of Article I delegated authorities.   However, within federal areas or territories, as described in the *Buck Act at 4 U.S.C. §4(e)*, and *the first part of 18 U.S.C. §7(3)*, the same limitation does not apply, as disclosed at *§11* or *Corpus Juris* supra, p.1251:

> [§11] 7.   Territorial courts.   Although admiralty jurisdiction can be exercised in the states in those courts only which are established in pursuance of the third article of the Constitution, the same limitation does not extend to the territories, and Congress may vest admiralty jurisdiction in courts created by a territorial legislature as well as in territorial courts created by Act of Congress, and it has exercised this bower in both instances.   *[in re Cooper, 143 U.S. 472, 12 Sec. 453, 36 L.Ed 232; The City of Panama, 101 U.S. 453, 25 L.Ed. 1061: American Insurance Co. v. 356 Bales of Cotton* supra . . . .]

To say that United States district courts didn't have a Common Law character isn't precisely correct.   In diversity suits at law or in equity, or suits covered by other provisions of the "arising under" clause, they appear to have had a "law" character.   However, in 1938, via *Erie Railroad Co. v. Tompkins*, the U.S. Supreme Court declared that there is no longer a national or general Common Law. Today, they operate exclusively under "Special Maritime and Territorial jurisdiction of the United States," as defined at *18 U.S.C. §7(3)*, under admiralty/civil law rules, which are contrary to the Common Law indigenous to the several States.   In fact, court decisions disclose that they have only admiralty and vice-admiralty capacities and, in effect, they either accommodate private international law or they serve as administrative law courts (*See, 5 U.S.C. §§701 et seq.*).   The U.S. Supreme Court is the only remaining United States court which is a true Article III judicial character and, under *Rule 17.1* of the Supreme Court rules, has original jurisdiction over actions at law.

The fine line determining applicability of the *Article III, §2, Clause I* "arising under" clause is the real party of interest. So long as an agent or agency of the United States (federal government) is carrying out an Article I delegated power within the several States, courts of the United States have jurisdiction by way of the "arising under" clause, whether as the complaining party or defendant.   However, if an agent or agency of the United States operates under Congress' Article IV legislative jurisdiction, which is exclusive to the geographical United States (read "the federal zone"), or to the United States (federal government), which is a foreign corporation with respect to the several States    the

"arising under" clause does not apply because the act is perpetrated under color of law.  In other words, the "Act of Congress" which is locally applicable only in the District of Columbia, Puerto Rico, etc., does not legitimately reach the several States or the population of State citizens inhabiting those several States.

Suppose a soldier stationed at Ft. Sill robbed a store or murdered someone in Lawton, Oklahoma.  The fact that he is in United States military service and might have even used an Army-issued gun does not affect the law he broke, or the sovereign territorial authority which originates there, and is responsible for enforcing the law.  In other words, immunity travels only so far as legislative jurisdiction and the precise limit of any given law.  Under Congress' Article I delegated authority, agents and officers of the United States have certain legitimate duties which reach the several States, but under Congress' Article IV authority in the geographical, self-interested United States (federal zone), the cloak of immunity is shed at borders of the several States, except on federal enclaves which have been ceded by legislatures of the States to the United States (federal government) for constitutional purposes only.

The distinction between United States "arising under" and admiralty jurisdiction is territorial in nature, particularly when admiralty jurisdiction is exercised under authority of Article IV in the geographical United States and when it represents United States (federal government) interests outside of Congress' role as the Article I legislative body for national government.  Even then, this authority must comply with the law of legislative jurisdiction.  If this is not the case, the limitations of the Tenth Amendment and of the Separation of Powers Doctrine are of no effect.

The Administrative Procedures Act, located at *5 U.S.C. §§552 et seq.,* provided the means for determining what statutes in any given Act of Congress are applicable where.  If a statute has general application, then the agency head responsible for carrying out whatever duties the statute prescribes is required to promulgate regulations disclosing the who, what, when, where and how, and have the regulation published in the Federal Register, if it has general application.  If regulations are not published in the Federal Register, they have at best limited application.  The controlling statute in the *Federal Register Act is 44 U.S.C. §1505(a):*

§1505.  Documents to be published in Federal Register.

(a)  Proclamations and Executive Orders; documents having general applicability and legal effect; documents required to be published by Congress.

- 32 -

There shall be published in the <u>Federal Register</u> --

(1) Presidential proclamations and Executive orders, except those not having general applicability and legal effect or effective only against Federal agencies or person in their capacity as officers, agents, or employees thereof:

(2) Documents or classes of documents that the President may determine from time to time have general applicability and legal effect; and

(3) Documents or classes of documents that may be required so to be published by Act of Congress.

FOR THE PURPOSES OF THIS CHAPTER *[44 U.S.C. §§1501 et seq.]* every document or order which prescribes a penalty has general applicability and legal effect.

At *44 U.S.C. §1507*, the provision is made that, "The contents of the <u>Federal Register</u> shall be judicially noticed . . . ", and at *§1510*, which establishes the Code of Federal Regulations, it provides at subsection (e) that, "The codified documents [in the Code of Federal Regulations] of the several agencies published in the supplemental edition of the <u>Federal Register</u> . . . shall be *prima facie* evidence of the text of the documents and of the fact that they are in effect on and after the date of publication."

In other words, where the several States and the general population are concerned, a statute created by Act of Congress is somewhat like a hot air balloon that will not get off the ground until someone pumps hot air into it (as if it does not have enough hot air already). Regulations are to statutes as hot air is to the balloon. As stated in *§1505(a)(1)*, if regulations for any given statute aren't published in the <u>Federal Register</u>, application is limited to Federal agencies or persons acting in the capacity as officers, agents, or employees of Federal agencies.

Provisions of *44 U.S.C. §1505(a)* are restated at *1 CFR §5.2;*

§5.2 Documents required to be filed for public inspection and published.

The following documents are required to be filed for public inspection with the Office of the <u>Federal Register</u> and published in the <u>Federal Register</u>:

(a) Presidential proclamations and Executive orders in the numbered series, and each other document that the President submits for publication or orders to be published

(b) Each document or class of documents required to be published by Act of Congress.

(c) Each document having general applicability and legal effect.

Citations of Authority requirements are as follows:

§21.40  General requirements:  Authority citations.

Each section in a document subject to codification must include, or be covered by, a complete citation of the authority under which the section is issued, including --

(a) General or specific authority delegated by statute; and

(b) Executive delegations, if any, necessary to link the statutory authority to the issuing agency.

§21.41  Agency responsibility.

(a) Each issuing agency is responsible for the accuracy and integrity of the citations of authority in the documents it issues.

(b) Each issuing agency shall formally amend the citations of authority in its codified material to reflect any changes thereto.

The Character of Federal Statutory Law, and the need for regulations, have been addressed time and again by the U.S. Supreme Court and Circuit Courts of Appeal. Many of the clearer statements relate to application of the Internal Revenue Code, as in *California Bankers Association v. Schultz, 416 U.S. 21 (1974), 26, 94 S.Ct. 1494, 1500, 39 L.Ed.2d 812:*

Because it has a bearing on our treatment of some of the issues raised by the parties, we think it important to note that the Act's civil and criminal penalties attach only upon violation of regulations promulgated by the Secretary; if the Secretary were to do nothing, the Act itself would impose no penalties on anyone.

In *Foley Brothers v. Filardo, 336 U.S. 281 (1949),* the high court said, "It is a well established principle of law that all federal legislation applies only within the territorial jurisdiction of the United States unless a contrary intent appears."  In order for a contrary intent to be facilitated, delegations of authority and implementing regulations must be published in the <u>Federal Register</u> and/or any given statute must clearly articulate application.

Fortunately, there is a reasonably easy way to discern what statutes in the United States Code have general application to the several States and to the population at large.  This is through the Parallel Table of Authorities and Rules, which begins on page 705 of the 1997 Index Volume to the Code of Federal Regulations.  Its authority is located at *1 CFR §8.5(a):*

> (a) *Parallel Tables of Statutory Authorities and Rules.*  In the Code of Federal Regulations Index or at some other place as the Director of the Federal Register considers appropriate, numerical lists of all sections of the current edition of the United States Code (except section 301 of Title 5) which are cited by issuing agencies as rule-making authority for currently effective regulations in the Code of Federal Regulations.  The lists shall be arranged in the order of the Titles and Sections of the United States Code with parallel citations to the pertinent titles and parts of the Code of Federal Regulations.

This handy finding aid lists United States Code statutes by title and section in the left-hand column, if implementing regulations have been published in the Federal Register, and applicable regulations by title and part, in the right-hand column.  If the statute doesn't appear, it doesn't have implementing regulations which have been published in the Federal Register, signifying that, in accordance with *44 U.S.C. §1505(a)(1)* provisions, the statute is applicable only to Federal agencies, or the officers, agents, and employees of federal agencies.  If the statute number does appear and a regulation is cited, the regulation must be consulted to determine application.

Where the instant matter is concerned, the table immediately resolves the matter of territorial jurisdiction for United States District Courts:  there are no implementing regulations for *18 U.S.C. §§7 & §3231.*  The absence of implementing regulations for these two statues confirms that the Special Maritime and Territorial authority of the United States District Court does not reach into the several States and to the population at large;  the authority applies *only* on federal enclaves which have been ceded to the United States for constitutional purposes, and as the second paragraph of *§ 3231* specifies, the laws and judicial authority of the several States are superior and govern within areas of the States which are not within federal enclaves that have been ceded to Congress by the legislatures of the several States.

Where the instant matter is concerned, the Federal statutory provisions under which the petitioner is charged, convicted and in-custody, fail to possess any published regulations in the Federal Register, or published implementing regulations in the Code of Federal Regulations

Positive law is the irrefutable law of the United States of America which has withstood the test of time   The United States

Code is a collection of 50 enumerated titles which contain positive and non-positive [Federal] laws.

If a statute is not published in the <u>Federal Register</u>, it indicates that the statute has a limited applicability (*e.g.* within purely federal areas only). A citizen of the District of Columbia, the Commonwealth of Puerto Rico, a territory or insular possession of the [federal] United States is subject to both positive and non-positive law.

In <u>*Hotch v. United States*</u>, *212 F.2d. 280 (9th cir. 1954)*, at p. 283, the court stated;

> "Under our system of law, no act is punishable as'a crime unless it is specifically condemned by the common law or by a statutory enactment of the Legislature (22 C.J.S., Crim. Law, see 17). Therefore, the Administrative Procedure Act and the Federal Register Act must be read as part of every congressional delegation of authority unless specifically excepted. Those Acts require publication, irrespective of actual notice, as a prerequisite to the "issuance" of a regulation making certain acts criminal. If certain acts have not been made crimes by duly enacted law, the knowledge of their contemplated administrative proscription can not subject the informed person to criminal prosecution. While ignorance of the law is no defense, it is conversely true that a law which has not been duly enacted into positive law, is not a law of general applicability and therefore, a person who does not comply with its provisions can not be guilty of any crime.

In <u>*Wei v. Robinson*</u>, *246 F.2d. 739 (7th Cir. 1957)*, cert. denied, *78 C.Ct. 144, 355 U.S. 879*, the Supreme Court stated, "Contents of the <u>Federal Register</u> and the Code of Federal Regulations are *prima facie* evidence of the original text and are required to be judicially noted."

In <u>*Wolfson v. United States*</u>, *492 F.2d. 1386, 204 Ct. Cl. 83 (1974)*. "When regulations are published in the <u>Federal Register</u>, they give legal notice of their contents to all who may be affected thereby."

In <u>*Northern States Power Co. vs. Rural Electrification Admin.,*</u> *248 F.Supp. 616 (1965)*, the court stated, "Rules by government agency of general applicability and published in accordance with the Federal Register Act have force and effect of statute or law and binding on those persons publishing them as well as the general public until such time as they be repealed or modified. Federal Register Act, *sec. 1 et. seq. 44 USCA § 301 et. seq.*"

In <u>*United States vs. Mersky*</u>, *361 US 431, 438 (1960)*, the Supreme Court stated;

"Once promulgated, these regulations called for by the statute itself have the force of law, and violation thereof incur criminal prosecutions just as if all the details have been incorporated into the Congressional language. The result is that neither the statute nor the Regulation are complete without the other, and only together do they have any force in effect; therefore, the construction of one necessarily involves the construction of the other." And in the context of criminal prosecutions, the rule of strict construction must be applied in the interpretation of an Administrative Regulation to which penal consequences attach under the statute authorizing the promulgation of the regulation, as well as the construction of the statute.

In *United States vs Reinis*, *794 F.2d 506 (9th Cir. 1986)*, the court state, "An individual can not be prosecuted for violating the Act unless he violates an implementing regulation." *See, also, United States vs. Two Hundred Thousand Dollars*, *590 F.Supp., 846 (S.D. FLA 1984)*, and specifically stated at *1 CFR 1.*, "All regulations must be published in the Federal Register to have general applicability and legal effect."

"Regulations published by the secretary at *26 CFR 601.-702(ii)* acknowledge the effect of failure to publish by stating, "Thus for example, any such matter which imposes an obligation and which is not so published or incorporated by reference will not adversely change or affect a person's rights."

The Supreme Court decided in *United States v. Welden*, *377 US 95 (1964)*, that, "Under *1. U.S.C. §204(a)*, which provides that the United States Code establishes *prima facie* the laws of the [federal] United States and that when Titles of the Code are enacted into positive law, the text thereof is legal evidence of the law contained therein, the very meaning of *"prima facie"* is that the Code cannot prevail over the statutes at large when the two are inconsistent.

If construction of a section of the United States Code, which has not been enacted into positive law is necessary, recourse must be had in the original statutes themselves and changed arrangement made by the codifier without the approval of Congress should be given no weight. *Stephan v. United States*, *319 US 423 (1943)*; *Best Foods v. United States*, *147 F.Supp. 749, 37 Cust. Ct. 1. (1956)*, and *Peart v. Motor Vessel Bering Explorer*, *373 F.Supp. 927 (1974)*.

The law provides that when implementing regulations are at variance with the statutory provision of which they are intended to promulgate that they fail to give proper notice under the due process clause of the National Constitution or the "Fair Notice Doctrine," set out under *United States v. Nevers*, *7 F.3d 59 (5th Cir. 1993)*.

Administrative regulations, in order to be valid, must also be consistent with, and not contrary to, "the statute under which they are promulgated." _United States v. Larionoff, 431 US 864, at 973, 97 S.Ct. 2150 at 2156, 53 L.Ed.2d 48 at 56._ A regulation beyond the scope of, or out of harmony with, underlying legislation "is a mere nullity." _Id. at 873 n.12, 97 S.Ct. at 2156 N.12, 53 (Ed. 2d. at 56 n.12,_ quoting Manhattan Gen. Equip. Co. v. C.I.R., 297 U.S. at 134: _Neel v. United States, 266 F.Supp. at 10._ To make this determination, it is necessary for the court to square the regulations against the statute that it purports to implement, comparing the sphere of authority of each. _Western Union Teleg. co. v. FCC, 541 F.2d. 346, 354 (3rd Cir. 1976), Cert. denied 429 US 1092 (1977)._ An Administration Regulation must be reasonably related to advancing"'the purpose of the enabling legislation.'"

The Constitution for the United States created a government which has jurisdiction over certain enumerated subject matter. It is only in these areas that Congress can enact laws, and when they do, the Federal Courts are to enforce the law. But when laws do not come from an enumerated power, the Federal Courts are to prevent the U.S. Government or Congress from applying them.

The Federal Constitution prescribes what the "jurisdiction" of the federal government is by the enumerated powers. That government can regulate foreign and interstate commerce, fix the standards of weights and measurements, establish uniform laws on bankruptcies, coin money and provide for the punishment of counterfeiting of the coins and securities of the United States, protect the arts and sciences by copyrights and patents, punish for piracies and felonies committed on the high seas, raise and support an army and navy, and lay and collect direct taxes by apportionment, and indirect taxes by excises, duties, or imports.

This is about the extent of the legitimate jurisdiction of the federal United States government. It is only in these areas, _supra,_ that a "crime (or offense) against the federal United States" can exist, and this is so only when Congress actually passes a Law in one of these areas. But an act committed within a State, whether for good or a bad purpose, or whether with honest or a criminal intent, cannot be made an offense against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States. _United States v. Fox, 95 U.S. 670, 672 (1877)._ [T]he courts of the United States, merely by virtue of this grant of judicial power, and in the absence of legislation by Congress, have no criminal jurisdiction whatever. The criminal jurisdiction of the courts of the United States is wholly derived from the statutes of the United States. _Manchester v. Massachusetts, 139 U.S. 240, 262 (1890); United States v. Flores, 289 U.S. 137, 151 (1932)._ Acts of Congress, as well as the Constitution, must generally unite to give jurisdiction to a particular court. _U.S. v. Bedford, 27 Fed. Cas., p.91, 103, Case No. 15,867 (1847)._

- 38 -

The Federal Courts only have jurisdiction in matters involving an "offense against the United States," and nothing can be an offense against the United States unless it is made so by Congressional Act pursuant to the U.S. Constitution.  There is no other source from which Congress can get authority to make Law, including the Common Law.  Thus, it has been said that, "There is no Federal Common Law."

But the better way of stating this is to say, "There are no Common Law offenses (or crimes) against the United States." _United States v. Britton_, 108 U.S. 199, 206 (1882); _United States v. Eaton_, 144 U.S. 677, 687 (1891); _United States v. Gradwell_, 243 U.S. 476, 485 (1916); _Donnelley v. United States_, 276 u.S. 505, 511 (1927); _Jerome v. United States_, 318 U.S. 101, 104 (1942); _Norton v. United States_, 92 Fed.2d 753 (1937).  In other words, the Common Law is not a source for criminal jurisdiction as it is in the States.  _United States v. Grossman_, 1.Fed.2d 941, 950-51 (1924)

By "jurisdiction" is meant the authority of the Federal courts to hear and decide a matter.  Thus, it is even more correct to say that, "The Federal Courts have no jurisdiction of Common Law offenses, and there is no jurisdiction of Common Law offenses, and there is no abstract pervading principle of the Common Law of the Union under which we (Federal Courts) can take jurisdiction.' _State of Pennsylvania v. The Wheeling E. Bridge Co._, 13 How. (54 U.S.) 518, 563 (1851)

If Congress tries to make a Common Law offense a crime (such as Libel, Drugs, Theft, burglary, Murder, Kidnapping, Arson, Rape, Abortion, Assault, Fraud, etc.), have no relation to an enumerated power it would simply be an "unconstitutional" act.  Congress can declare nothing to be a crime except where it is based upon a delegated power.  Thus, the only thing that can be a crime against the "United States" is that which comes from the U.S. Constitution. These concepts were stated early on by the U.S. Supreme Court:

> In relation to crimes and punishments, the objects of the delegated power of the United States are enumerated and fixed.  Congress may provide for the punishment of counterfeiting the securities and current coin of the United States, and may define and punish piracies and felonies committed on the high seas, and offenses against the law of Nations.  _Art. §8_ . . . but there is no reference to a Common Law Authority.  Every power is [a] matter of definite and positive grant; and the very power that are granted cannot take effect until they are exercised through the medium of a law.  _The United States v. Worrall_, 2 Dall. (2. U.S.) 384, 391 (1798)

A Constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances have so changed, as perhaps to make a different rule in the case seem desirable.  A principal share of the benefit expected from

written constitutions would be lost if the rules they establish were so flexible as to bend to circumstances or be modified by public opinion.   [A] court of legislature which should allow a change in public sentiment to influence it in giving to a written constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official Oath *(28 U.S.C. §453 - 18 U.S.C. §1621)* and public duty; and if its course could become a precedent, these instruments would be of little avail.   What a court is to do, therefore, is to declare the Law as written.   *T.M. Cooley, A Treatise on the Constitutional Limitations,5th Ed., pp.54, 55,* rather than be swayed by political ambition and the unlawful usurpation of police powers.   Chief Justice, John Marshall stated:

> We [Judges] have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.   The one or the other would be Treason to the Constitution.   *Cohens v. Virginia, 6 Wheat. (19 U.S.) 264, 404 (1821).*

The United States Code was approved by an Act of Congress on June 30, 1926 *(44 Stat. Part I)*.   The code is assembled and revised under the supervision of "The Committee on the Judiciary of the House of Representatives.   The main work of revision is done by a subcommittee or office of this committee called "the Office of the Law Revision Counsel of the House of Representatives." It consists of an appointed supervisor, some members of Congress, some volunteer lawyers, and persons from West Publishing of St. Paul, Minnesota.

When the U.S. Code was first published, it never was stated to be the official laws of the United States.   Rather, it was stated that the Code was a "Restatement" of law; or was only "prima facie evidence of the laws of the United States."   On this matter the court stated:

> The United States Code was not enacted as a statute, nor can it be construed as such.   It is only a prima facie statement of the statute law. . . .   If construction is necessary, recourse must be had to the original statutes themselves.

*Five Flags Pipe Line Co. v. Dept. of Transportation, 854 F.2d 1438, 1440 91988); Stephan v. United States, 319 U.S. 415, 426 91943); 44 Stat. Part 1, preface; Murrell v. Western Union Tel. Co., 160 F.2d 787, 788 (1947); United States v. Mercur Corp., 83 F.2d 178, 180 (1936)*

This tells us that the United States Code, as originally established, was not on an equal plain with the "original statutes" or the Statutes at Large.   Thus, the Code was not True Law.   With the start of regular use of the U.S. Code, numerous problems arose in that it contained mistakes, errors and inconsistencies as compared to the Statutes at Large.   Thus in 1947, Congress enacted several of the Titles into "positive law," such as the Act:   "To

4C

codify and enact into positive law, *Title 1 of the United States Code.*" In doing so they devised some new terminology; which is set out under *61 Stat. 633, 644-638; 1 U.S.C. §204(a).*

Looking back at the cases cited which stated that the criminal jurisdiction of the United States exists only by Acts of Congress pursuant to the Constitution. In the nature of a question of law, if a federal court were asked whether the Code cited in an indictment is an Act of Congress, the court could not rightfully say it is, because the Code citation contains no congressional enacting clause for that citation as required by *61 Stat. 633, 634 §101.* If no such enacting clause appears on the face of the law, it is not an Act of Congress and no criminal jurisdiction exists without a bona fide Act of Congress. The argument in such a case is that the indictment does not set forth a case arising under the Constitution, as there is no Act of Congress with a duly required enacting clause. Thus, there is no subject matter jurisdiction pursuant to the federal judicial power defined in the nature of *Article III, §2* of the Federal Constitution.

Nowhere does it say in the Code, or in the pronouncements by Congress or the Courts, that the laws in the U.S. Code are Acts of Congress. In fact, the Code is always regarded as something different from the Statutes at Large.

> But no one denies that the official source to find United States law is the Statutes at Large and the Code is only prima facie evidence of such laws.

*Roger's Inc. v. United States,* 265 F.2d 615, 618 (1959). The Statutes at Large are recognized by everyone to be the "Official" publication of Federal laws. Why is not the U.S. Code, even when enacted into "positive law," ever called the "Official source of United States (federal) Laws. Could it be because the "Laws" in the U.s. Code are merely the decrees of some committee?

An invalid, unconstitutional or non-existent statute affects the validity of the "charging document," that is, the complaint, indictment or information. If these documents are void or fatally defective, there is no subject matter jurisdiction since they are the basis of the court's jurisdiction. When an accused-party is indicted under a not-yet-effective or unenacted statute, the charging document is void.

The indictment or complaint can be invalid if it is not constructed in the particular mode of form prescribed by the Constitution or Statute *(42 C.J.S., "Indictments and Informations," §1, p.833).* But it also can be defective and void when it charges a violation of a law, and that law is void, unconstitutional, unenacted, or misapplied. If the charging document is void, the subject matter of a court does not exist. The want of a sufficient affidavit, complaint, or information goes to the jurisdiction of the court, . . . and renders all proceedings prior to the filing of a proper instrument void ab initio. *22 Corpus Juris Secundum, "Criminal Law," §324, p.390.*

Once way in which a complaint or indictment fails to charge a crime, is by its failure to have the charge based upon a valid or duly enacted law.  Complaints or indictments which cite invalid laws, or incomplete laws, or non-existent law are regarded as being invalid on their face, thus, fatally defective.

The crux then of this whole issue of jurisdiction revolves around law, that is, the law claimed to be violated.  If one is subject to a law, they are then under the jurisdiction of some authority.  If a crime is alleged but there is no law to form the basis of that crime, there is no jurisdiction to try and sentence one even though they are subject to the legislative body and the court.  There has to be a law, a valid law, for subject matter jurisdiction to exist.  Laws which lack an enacting clause are not laws of the legislative body to which we constitutionally subject. Thus if a complaint or information charges one with a violation of a law which has no enacting clause, the no valid law is cited.  If it cites no valid law·then the complaint charges no crime, and the court has no subject matter jurisdiction to try the Accused-party.

> [N]o authority need to be cited for the proposition that, when a court lacks jurisdiction, any judgment rendered by it is void and unenforceable, . . .  and without any force or effect whatever.

_Hooker v. Boles, 346 F.2d 285, 286 (1965)._  A judge or court may be in a legal sense immune from any claims that it is guilty of wrong because of its improper exercise of jurisdiction.  However, it has no such protection where it lacks jurisdiction and the issue has been raised and asserted.  When the lack of jurisdiction has been shown, a judgment 'rendered is not only void, but is also usurpation.  Jurisdiction is a fundamental prerequisite, and a usurpation thereof is a nullity.  _22 Corpus Juris Secundum, "Criminal Law," §150, p.183._  The excessive exercise of authority has reference to want of power over the subject matter, the result is void when challenged directly or collaterally.  If it has reference merely to the judicial method of the exercise of power, the result is binding upon the parties to the litigation till reversed . . .  The former is usurpation; the latter error in judgment.  _Voorhees v. The Bank of the United States, 35 U.S. 449, 474-75 (1836),_ the line which separates error in judgment from the usurpation of power is very definite.

_Morning vs. Family Publications Services, Inc., 411 US 356, 369 (1973)._  In the framework of criminal prosecution, unclarity in the statute or a regulation issued thereunder is, of itself, enough to resolve doubts in favor of the defendant.  _United States vs. Mersky, 361 US 431, supra._

Moreover, Pursuant to _FRCP Rule 54(c)_, it states in very clear language that an "Act of Congress" includes any Act of Congress locally applicable to, and in force in the District of Columbia, in the Commonwealth of Puerto Rico, in a territory, or in an insular possession.

Whereby, "Acts of Congress" are restricted to local application,, viz: purely federal areas, and may not be enlarged or expanded beyond their limited jurisdictional parameters.

The National Prohibition (Alcohol) Act required a constitutional amendment ratified by the sovereign states of the Union in order to have a "general" application. [emphasis added]

## Part V: Summary and Conclusion

Through the 1930's, evolution of the corporate United States federal government, under Congress' alleged Article IV legislative jurisdiction in the federal zone (*i.e.* the geographical, self-interested United States), was referred to as "corporatism". Presently, the U.S. Supreme Court and various other courts use the term "cooperative federalism" to refer to the *de facto* arrangement between the United States federal government and the governments of the several States (the latter operating under the presumption that they are federal "States", rather than independent republics subject only to Congress' Article I delegated authority). This diabolical scheme, from control of production and distribution of goods and services, to the mathematically impossible social welfare system and criminal enforcement, is premised on the notion that all activity is commercial in nature. The effect has been to treat the entire nation as a seamless garment which is under Congress' Article IV exclusive legislative jurisdiction, rather than as a patchwork of fifty independent republics which are subject *only* to Congress' Article I delegated constitutional authority.

Thankfully, in the last few years, the U.S. Supreme Court has provided footing which affords the possibility of correction. In *New York vs. United States* supra, the high Court reiterated principles framed by the Tenth Amendment and the Separation of Powers Doctrine; so far as the several States are concerned, Congress can exercise only those powers specifically delegated by the U.S. Constitution, and officers of the several States cannot accommodate a United States (federal government) power which is *not* delegated without first securing a Constitutional Amendment. Unrestricted application of the commerce clause has been taken to task in *Lopez* and other such cases which are cited in *Lopez*.

Unfortunately, judicially correcting the problem isn't as easy as it should be. Through the years, the U.S. Supreme Court has occasionally conveyed a message by way of decisions, or more appropriately, non-decisions. The maxim has been articulated when the Court has been presented with evidences such as the failed ratification of the Fourteenth and Sixteenth Amendments: ratification of amendments is a political, rather than a judicial, matter.

If we read history properly, the nation's high Court attempted to hold the line prior to acquiescence in *Julliard (1884),* and again resisted socialistic New Deal legislation until yielding in "Erie Railroad" (1938). The choice in both cases appears to have been

pragmatic, yielding constitutional principles to the political tide, further enhancing the probability and prospects of a hidden oligarchy in America.

In light of the current pervasive circumstance, it is necessary to revisit first causes in order to address the situation. As set forth in Part I of this Memorandum, American Founders proclaimed that the "Laws of Nature and Nature's God" govern Nations and Men, and that all Men are endowed with certain unalienable Rights by their Creator. This foundation is acknowledged in the preambles to state and federal constitutions: the sovereign American people, by way of their constitutions, have granted only certain, specifically enumerated powers to their state and federal governments.

In *New York vs. United States, supra*, the U.S. Supreme Court addressed the matter of authority. In the American system, the question isn't what power governments should have, but what powers have actually been delegated. The high Court further concluded that public servants who usurp powers which are not delegated invariably do so for self-serving ends. The problem, of course, is accountability.

As the development history presented in the movant's memorandum demonstrates, the several States preceded the "United States". The original thirteen colonies secured independence from English rule, and each thereby established sovereignty as an independent nation. The confederation which they maintained following the Revolution was, at best, weak, having precious little authority over the several new States. This arrangement threatened the harmony, and even the survival, of that Confederation. These difficulties spawned the Constitutional Convention in 1787, with the first States convening under the U.S. Constitution and with the U.S. Constitution vesting the United States (federal government) with only the authority necessary to carry out its expressly delegated responsibilities. However, the People and the several States did not surrender any more power than was delegated; they retained that which they did not delegate, including sovereignty over the territories within the respective States of the Union.

Thomas Jefferson, responding to the Alien and Sedition Acts, addressed this very problem, and the proper order of things in the American system of government, in the Kentucky Resolutions:

8th. Resolved, That a committee of conference and correspondence be appointed, who shall have in charge to communicate the preceding resolutions to the Legislatures of the several States; to assure them that this commonwealth continues in the same esteem of their friendship and union which it has manifested from the moment at which a common danger and particularly to those specified in their late federal compact, to be friendly to the peace, happiness and prosperity of all the States: that faithful to that compact, according to the plain

intent and meaning in which it was understood and acceded
to by the several parties, it is sincerely anxious for
its preservation: that it does also believe, that to
take from the government without regard to the special
delegations and reservations solemnly agreed to in that
compact, is not for the peace, happiness and prosperity
of these States; and that therefore this commonwealth is
determined, as it doubts not its co-States are, to submit
to undelegated, and consequently unlimited powers in no
man, or body of men on earth: that in cases of an abuse
of the delegated powers, the members of the general
government, being chosen by the people, a change by the
people would be the constitutional remedy; but, where
powers are assumed which have not been delegated, a
nullification of the act is the rightful remedy: that
every State has a natural right in cases not within the
compact -to nullify of their own authority all
assumptions of power by others within their limits: that
without this right, they would be under the domination,
absolute and unlimited, of whosoever might exercise this
right of judgment for them: that nevertheless, this
commonwealth, from motives of regard and respect for its
co-States, has wished to communicate with them on the
subject: that with them alone it is proper to
communicate, they alone being parties to the compact, and
solely authorized to judge in the last resort of the
powers exercised under it, Congress being not a party,
but merely the creature of the compact, and subject as to
its assumptions of power to the final judgment of those
by whom, and for whose use itself and its powers were all
created and modified: That if the acts before specified
should stand, these conclusions would flow from them;
that the general government may place any act they think
proper on the list of crimes, and punish it themselves
whether enumerated or not enumerated by the constitution
as cognizable by them: that they may transfer its
cognizance to the President, or any other person, who may
himself be the accuser, counsel, judge and jury, whose
suspicions may be the evidence, his order the sentence,
his officer the executioner, and his breast the sole
record of the transaction: that a very numerous and
valuable description of the inhabitants of these States
being, by this precedent, reduced, as outlaws, to the
absolute dominion of one man, and the barrier of the
Constitution thus swept away from us all, no rampart now
remains against the passions and the powers of a majority
in Congress to protect from a like exportation, or other
more grievous punishment, the minority of the same body,
the legislatures, judges, governors and counselors of the
States, nor their other peaceable inhabitants, who may
venture to reclaim the constitutional rights and
liberties of the States and the people, or who for other
causes, good or bad, may be obnoxious to the views, or
marked by the suspicions of the President, or be thought

45

        dangerous to his or their election, or other interests,
        public or personal . . . .

     Jefferson's argument is as valid in 1996 as it was in 1798:
Congress and the other branches of federal government are not
*parties* to the U.S. Constitution; they are *products* of it.   The
U.S. Constitution vests Congress with certain delegated authorities
under Article I, and nothing more.  Within its own borders, State
authority is antecedent to that of the United States and, as
parties to the U.S. Constitution, the several States have both the
right and responsibility to correct their agent, the United States
(federal government), when ambition seeks to abuse or expand the
powers which *have* been delegated.  Of more immediate importance
where the instant matter is concerned, those who exceed the law,
whether in the State governments or in the United States (federal
government), are accountable to the Law of the Land, and
ultimately, to the People of the Land, within the several States.
Operation under color of law is outlaw and criminal, and
accountability must be in Law.  Judges, magistrates, attorneys for
the Department of Justice, and other enforcement people do not have
immunity when they exceed the law as it is written.

     This memorandum conclusively demonstrates jurisdiction of
United States District Courts within the several States.
Implicitly, authority of the Department of Justice, and of the
United States (federal government) enforcement agencies attached to
that Department, is concurrent with that of United States District
Courts, because the lawful authority of any given agency extends
only so far as the legislative jurisdiction of the government it
serves.  All legislation is territorial in nature.

     By consulting the Parallel Tables of Authorities and Rules,
1997 Ed., at p.733, it is found that the implementing Regulations
for *18 U.S.C. §3551* are set out under *43 C.F.R. 9260*-public lands,
Alaska, *36 CFR 242*-subsistence management regulations for public
lands in Alaska, and *50 CFR 100*, (same as *36 CFR 242*).

     Where the instant matter is concerned, the accused committed
no violation of any properly enacted and/or duly promulgated
federal law within the legislative jurisdiction of the federal
United States, nor within the parameters defined under the
implementing regulations for the Federal Sentencing provisions,
thus, the sentencing provisions set out under *18 U.S.C. §3551* do
not apply to the accused.

     The court will find that the statutory provisions under which
the U.S. District court imposed the sentence against the accused
*(18 U.S.C. §3551),* apply not to Acts of Congress, which are
applicable only in the District of Columbia.  (<u>*See*</u>,   *Rule 54(c)*).

     The Congressional Controlled Substances Act., even though
"unenacted," is an Act of Congress.  It may further be shown that

the statutory provision *18 U.S.C. §3551*, is at variance with its published implementing regulations, thereby creating ambiguity as to its lawful authority and applicability over the accused.

It was held in *North Laramie Land Co. v. Hoffmann, et. al., 268 U.S. 276, 283, 69 L.Ed. (1925)*, as follows:   "All persons charges with knowledge of the provisions of the statutes must take note of the procedure adopted by them, and when that procedure is not unreasonable or arbitrary, there is no constitutional limitation relieving them from conforming to it."

As shown heretofore and by way of the attached exhibits, Petitioner is convicted and imprisoned unlawfully, in violation of Constitutional Rights, where the federal government lacked legislative jurisdiction over the locus in quo.   The governments charging instruments allege a geographical location, situated within the boundaries of a sovereign State, which has not been ceded by the legislature of the sovereign State, to the federal United States, thus, not within the jurisdiction of the federal government or a United States district court.

The government's charging instruments name an uninjured Plaintiff-Party, the United States of America, or more properly put, the 50 sovereign States United in America.   In the nature of *FRCP, Rule 10; 12(b)(1); 17(a), and 19(a)*, the real party in Interest must be named, and joined for just adjudication of the cause.   The real party in Interest is the federal "United States," corporation *28 U.S.C. §3002(15)(A),* who is un-named, or has the corporate representative (U.S. Attorney) established on the record his authority to 1) name an uninjured party as a plaintiff, or 2), to represent the Nation at Large, or 3) show that an alleged violation of Federal Statutory (U.S. Code citations) provision was committed against the Nation at Large, or 4) that such cause is cognizable in a legislative-territorial court.

In the nature of the 6th Article in Amendment of the Constitution of the United States of America, as amended, A.D. 1791, the Accused-party was not informed of the nature and cause, but instead prosecuted by an unnamed corporation, representing an uninjured party-plaintiff, over whom the accused-party committed no offense.

Likewise, the government's charging instruments fail to show any indicia of proof as to the origin or authority of the U.S. Code citation under which the government has alleged that the Accused-party violated.   The U.S. Code citations alleged to have violated, are shown in Exhibit B (attached) to have not been published in the Federal Register, whereby said statutory-code citations have legitimate application only, over federal agencies, officers, agents and employees of the federal government . . .   not the Nation at Large or private citizens domiciled within the geographical boundaries of the several sovereign States.   However,

through an inadvertent misapplication of these U.S. Code citation, the Accused-party is unlawfully convicted and imprisoned.

Wherefore, it is the duty of this Honorable Court to find as a matter of Law that the Accused-party is unlawfully convicted and incarcerated in the clear absence of Federal legislative and subject matter jurisdiction. Whereby, the Court is compelled to grant the instant writ and order Petitioner's immediate release from federal custody, forthwith

Petitioner, avers under penalty of perjury under the Laws of the sovereign State of *LOUISIANA*, that the foregoing is true, correct and complete to the best of his knowledge at this present time, and attests to such in the nature of *28 U.S.C. §1746(1),* by his signature, infra.

Dated this ___4th___ day of ___July___ :*2011* A.D.

Respectfully submitted,

L/S _Reggie L. McCoy #11732-018_

# EXHIBIT A

# THE

# STATUTES AT LARGE

OF THE

# UNITED STATES OF AMERICA

FROM

DECEMBER, 1905, TO MARCH, 1907

CONCURRENT RESOLUTIONS OF THE TWO HOUSES OF CONGRESS

AND

RECENT TREATIES, CONVENTIONS, AND EXECUTIVE
PROCLAMATIONS

———

EDITED, PRINTED, AND PUBLISHED BY AUTHORITY OF CONGRESS
UNDER THE DIRECTION OF THE SECRETARY OF STATE

———

# VOL. XXXIV—IN THREE PARTS

PART 1—Public Acts and Resolutions
PART 2—Private Acts and Resolution and Concurrent Resolutions
PART 3—Treaties and Proclamations

———

# PART 1

———

WASHINGTON
GOVERNMENT PRINTING OFFICE
1907

Report on expenditures.

That all moneys appropriated by this Act which the Jamestown Tercentennial Commission is authorized to expend shall be drawn out of the Treasury in such manner and under such regulations as such Commission may determine, subject to the approval of the Secretary of the Treasury; and at the close of the exposition period, and after the work of such Commission is completed, such Commission shall make a complete report of their actions hereunder and a complete statement of all expenditures for each of the purposes herein specified to the President of the United States for transmission to Congress.

Approved, June 30, 1906.

June 30, 1906.
[S. 88.]
[Public. No. 384.]

CHAP. 3915.—An Act For preventing the manufacture, sale, or transportation of adulterated or misbranded or poisonous or deleterious foods, drugs, medicines, and liquors, and for regulating traffic therein, and for other purposes.

Pure food act.
Manufacture of adulterated, etc., food or drugs in Territories and District of Columbia unlawful.
Penalty.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That it shall be unlawful for any person to manufacture within any Territory or the District of Columbia any article of food or drug which is adulterated or misbranded, within the meaning of this Act; and any person who shall violate any of the provisions of this section shall be guilty of a misdemeanor, and for each offense shall, upon conviction thereof, be fined not to exceed five hundred dollars or shall be sentenced to one year's imprisonment, or both such fine and imprisonment, in the discretion of the court, and for each subsequent offense and conviction thereof shall be fined not less than one thousand dollars or sentenced to one year's imprisonment, or both such fine and imprisonment, in the discretion of the court.

Interstate, etc., commerce of adulterated or misbranded goods prohibited.

Sec. 2. That the introduction into any State or Territory or the District of Columbia from any other State or Territory or the District of Columbia, or from any foreign country, or shipment to any foreign country of any article of food or drugs which is adulterated or misbranded, within the meaning of this Act, is hereby prohibited; and any person who shall ship or deliver for shipment from any State or Territory or the District of Columbia to any other State or Territory or the District of Columbia, or to a foreign country, or who shall receive in any State or Territory or the District of Columbia from any other State or Territory or the District of Columbia, or foreign country, and having so received, shall deliver, in original unbroken packages, for pay or otherwise, or offer to deliver to any other person, any such article so adulterated or misbranded within the meaning of this Act, or any person who shall sell or offer for sale in the District of Columbia or the Territories of the United States any such adulterated or misbranded foods or drugs, or export or offer to export the same to any foreign country, shall be guilty of a misdemeanor, and for such offense be fined not exceeding two hundred dollars for the first offense, and upon conviction for each subsequent offense not exceeding three hundred dollars or be imprisoned not exceeding one year, or both, in the discretion of the court: *Provided,* That no article shall be deemed misbranded or adulterated within the provisions of this Act when intended for export to any foreign country and prepared or packed according to the specifications or directions of the foreign purchaser when no substance is used in the preparation or packing thereof in conflict with the laws of the foreign country to which said article is intended to be shipped; but if said article shall be in fact sold or offered for sale for domestic use or consumption, then this proviso shall not exempt said article from the operation of any of the other provisions of this Act.

Penalty.

Proviso.
Articles for export.

Domestic consumption.

Rules and regulations to be made.

Sec. 3. That the Secretary of the Treasury, the Secretary of Agriculture, and the Secretary of Commerce and Labor shall make uniform

769

rules and regulations for carrying out the provisions of this Act, including the collection and examination of specimens of foods and drugs manufactured or offered for sale in the District of Columbia, or in any Territory of the United States, or which shall be offered for sale in unbroken packages in any State other than that in which they shall have been respectively manufactured or produced, or which shall be received from any foreign country, or intended for shipment to any foreign country, or which may be submitted for examination by the chief health, food, or drug officer of any State, Territory, or the District of Columbia, or at any domestic or foreign port through which such product is offered for interstate commerce, or for export or import between the United States and any foreign port or country.  *Scope.*

SEC. 4. That the examinations of specimens of foods and drugs shall be made in the Bureau of Chemistry of the Department of Agriculture, or under the direction and supervision of such Bureau, for the purpose of determining from such examinations whether such articles are adulterated or misbranded within the meaning of this Act; and if it shall appear from any such examination that any of such specimens is adulterated or misbranded within the meaning of this Act, the Secretary of Agriculture shall cause notice thereof to be given to the party from whom such sample was obtained. Any party so notified shall be given an opportunity to be heard, under such rules and regulations as may be prescribed as aforesaid, and if it appears that any of the provisions of this Act have been violated by such party, then the Secretary of Agriculture shall at once certify the facts to the proper United States district attorney, with a copy of the results of the analysis or the examination of such article duly authenticated by the analyst or officer making such examination, under the oath of such officer. After judgment of the court, notice shall be given by publication in such manner as may be prescribed by the rules and regulations aforesaid.  *Chemical examinations. Notice of result. Hearings. Certificate of violations to district attorney.*

SEC. 5. That it shall be the duty of each district attorney to whom the Secretary of Agriculture shall report any violation of this Act, or to whom any health or food or drug officer or agent of any State, Territory, or the District of Columbia shall present satisfactory evidence of any such violation, to cause appropriate proceedings to be commenced and prosecuted in the proper courts of the United States, without delay, for the enforcement of the penalties as in such case herein provided.  *Legal proceedings.*

SEC. 6. That the term "drug," as used in this Act, shall include all medicines and preparations recognized in the United States Pharmacopœia or National Formulary for internal or external use, and any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either man or other animals. The term "food," as used herein, shall include all articles used for food, drink, confectionery, or condiment by man or other animals, whether simple, mixed, or compound.  *Terms defined. "Drug." "Food."*

SEC. 7. That for the purposes of this Act an article shall be deemed to be adulterated:  *Adulterations defined.*

In case of drugs:  *Drugs.*

First. If, when a drug is sold under or by a name recognized in the United States Pharmacopœia or National Formulary, it differs from the standard of strength, quality, or purity, as determined by the test laid down in the United States Pharmacopœia or National Formulary official at the time of investigation: *Provided,* That no drug defined in the United States Pharmacopœia or National Formulary shall be deemed to be adulterated under this provision if the standard of strength, quality, or purity be plainly stated upon the bottle, box, or other container thereof although the standard may differ from that determined by the test laid down in the United States Pharmacopœia or National Formulary.  *Difference from recognized standards. Proviso. Exception.*

770          FIFTY-NINTH CONGRESS.  Sess. I.  Ch. 3915.  1906.

<div style="margin-left:2em">

Below professed standard.

Second. If its strength or purity fall below the professed standard or quality under which it is sold.

Confectionery.

In the case of confectionery:

Deleterious ingredients, narcotics, etc.

If it contain terra alba, barytes, talc, chrome yellow, or other mineral substance or poisonous color or flavor, or other ingredient deleterious or detrimental to health, or any vinous, malt or spirituous liquor or compound or narcotic drug.

Food.

In the case of food:

Injurious mixtures.

First. If any substance has been mixed and packed with it so as to reduce or lower or injuriously affect its quality or strength.

Substitutes.

Second. If any substance has been substituted wholly or in part for the article.

Constituents abstracted.

Third. If any valuable constituent of the article has been wholly or in part abstracted.

Damage, etc., concealed.

Fourth. If it be mixed, colored, powdered, coated, or stained in a manner whereby damage or inferiority is concealed.

Deleterious additions.
Proviso.
Preservatives for shipment allowed.

Fifth. If it contain any added poisonous or other added deleterious ingredient which may render such article injurious to health: *Provided*, That when in the preparation of food products for shipment they are preserved by any external application applied in such manner that the preservative is necessarily removed mechanically, or by maceration in water, or otherwise, and directions for the removal of said preservative shall be printed on the covering or the package, the provisions of this Act shall be construed as applying only when said products are ready for consumption.

Compositions prohibited.

Sixth. If it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter.

Misbranding defined.

SEC. 8. That the term "misbranded," as used herein, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device regarding such article, or the ingredients or substances contained therein which shall be false or misleading in any particular, and to any food or drug product which is falsely branded as to the State, Territory, or country in which it is manufactured or produced.

That for the purposes of this Act an article shall also be deemed to be misbranded:

Drugs.

In case of drugs:

False name.

First. If it be an imitation of or offered for sale under the name of another article.

False contents.

Second. If the contents of the package as originally put up shall have been removed, in whole or in part, and other contents shall have been placed in such package, or if the package fail to bear a statement on the label of the quantity or proportion of any alcohol, morphine, opium, cocaine, heroin, alpha or beta eucaine, chloroform, cannabis indica, chloral hydrate, or acetanilide, or any derivative or preparation of any such substances contained therein.

Failure to state narcotics, etc., used.

Food.

In the case of food:

Imitations.

First. If it be an imitation of or offered for sale under the distinctive name of another article.

False label, etc.

Second. If it be labeled or branded so as to deceive or mislead the purchaser, or purport to be a foreign product when not so, or if the contents of the package as originally put up shall have been removed in whole or in part and other contents shall have been placed in such package, or if it fail to bear a statement on the label of the quantity or proportion of any morphine, opium, cocaine, heroin, alpha or beta eucaine, chloroform, cannabis indica, chloral hydrate, or acetanilide, or any derivative or preparation of any of such substances contained therein.

Failure to state narcotics, etc., used.

</div>

Third. If in package form, and the contents are stated in terms of   *Incorrect weight or measure.*
weight or measure, they are not plainly and correctly stated on the
outside of the package.

Fourth. If the package containing it or its label shall bear any state-   *Misleading ingredients.*
ment, design, or device regarding the ingredients or the substances
contained therein, which statement, design, or device shall be false
or misleading in any particular: *Provided,* That an article of food   *Proviso. Exceptions.*
which does not contain any added poisonous or deleterious ingredients
shall not be deemed to be adulterated or misbranded in the following
cases:

First. In the case of mixtures or compounds which may be now or   *Compounds under distinctive names.*
from time to time hereafter known as articles of food, under their
own distinctive names, and not an imitation of or offered for sale
under the distinctive name of another article, if the name be accom-
panied on the same label or brand with a statement of the place where
said article has been manufactured or produced.

Second. In the case of articles labeled, branded, or tagged so as to   *If compound, etc., plainly stated.*
plainly indicate that they are compounds, imitations, or blends, and
the word "compound," "imitation," or "blend," as the case may be,
is plainly stated on the package in which it is offered for sale: *Provided,*   *Proviso. Meaning of blend.*
That the term blend as used herein shall be construed to mean a mix-
ture of like substances, not excluding harmless coloring or flavoring
ingredients used for the purpose of coloring and flavoring only: *And*   *Trade formulas.*
*provided further,* That nothing in this Act shall be construed as requir-
ing or compelling proprietors or manufacturers of proprietary foods
which contain no unwholesome added ingredient to disclose their trade
formulas, except in so far as the provisions of this Act may require to
secure freedom from adulteration or misbranding.

SEC. 9. That no dealer shall be prosecuted under the provisions of   *Guaranty from manufacturer.*
this Act when he can establish a guaranty signed by the wholesaler,
jobber, manufacturer, or other party residing in the United States,
from whom he purchases such articles, to the effect that the same is
not adulterated or misbranded within the meaning of this Act, desig-
nating it. Said guaranty, to afford protection, shall contain the name   *Contents.*
and address of the party or parties making the sale of such articles to
such dealer, and in such case said party or parties shall be amenable
to the prosecutions, fines, and other penalties which would attach, in
due course, to the dealer under the provisions of this Act.

SEC. 10. That any article of food, drug, or liquor that is adulterated   *Seizure of original packages in interstate and foreign commerce.*
or misbranded within the meaning of this Act, and is being transported
from one State, Territory, District, or insular possession to another
for sale, or, having been transported, remains unloaded, unsold, or in
original unbroken packages, or if it be sold or offered for sale in the
District of Columbia or the Territories, or insular possessions of the
United States, or if it be imported from a foreign country for sale, or if
it is intended for export to a foreign country, shall be liable to be pro-
ceeded against in any district court of the United States within the
district where the same is found, and seized for confiscation by a process
of libel for condemnation. And if such article is condemned as being   *Disposal, if condemned.*
adulterated or misbranded, or of a poisonous or deleterious character,
within the meaning of this Act, the same shall be disposed of by
destruction or sale, as the said court may direct, and the proceeds
thereof, if sold, less the legal costs and charges, shall be paid into the
Treasury of the United States, but such goods shall not be sold in any
jurisdiction contrary to the provisions of this Act or the laws of that
jurisdiction: *Provided, however,* That upon the payment of the costs   *Proviso. Delivery to owner if not to be sold, etc.*
of such libel proceedings and the execution and delivery of a good and
sufficient bond to the effect that such articles shall not be sold or other-
wise disposed of contrary to the provisions of this Act, or the laws of
any State, Territory, District, or insular possession, the court may by
order direct that such articles be delivered to the owner thereof. The   *Proceedings.*

772        FIFTY-NINTH CONGRESS. Sess. I. Chs. 3915, 3916.    1906.

proceedings of such libel cases shall conform, as near as may be, to the proceedings in admiralty, except that either party may demand trial by jury of any issue of fact joined in any such case, and all such proceedings shall be at the suit of and in the name of the United States.

<span style="float:left">Examination of imported foods and drugs.</span> SEC. 11. The Secretary of the Treasury shall deliver to the Secretary of Agriculture, upon his request from time to time, samples of foods and drugs which are being imported into the United States or offered for import, giving notice thereof to the owner or consignee, who may appear before the Secretary of Agriculture, and have the right to introduce testimony, and if it appear from the examination of such <span style="float:left">Admission denied adulterated or misbranded goods.</span> samples that any article of food or drug offered to be imported into the United States is adulterated or misbranded within the meaning of this Act, or is otherwise dangerous to the health of the people of the United States, or is of a kind forbidden entry into, or forbidden to be sold or restricted in sale in the country in which it is made or from which it is exported, or is otherwise falsely labeled in any respect, the said article shall be refused admission, and the Secretary of the Treasury shall refuse delivery to the consignee and <span style="float:left">Destruction, etc.</span> shall cause the destruction of any goods refused delivery which shall not be exported by the consignee within three months from the date of notice of such refusal under such regulations as the Secretary <span style="float:left">Proviso.<br>Delivery pending examination.<br>Bond required.</span> of the Treasury may prescribe: *Provided,* That the Secretary of the Treasury may deliver to the consignee such goods pending examination and decision in the matter on execution of a penal bond for the amount of the full invoice value of such goods, together with the duty thereon, and on refusal to return such goods for any cause to the custody of the Secretary of the Treasury, when demanded, for the purpose of excluding them from the country, or for any other purpose, said consignee shall forfeit the full amount of the bond : *And provided* <span style="float:left">Charges.</span> *further,* That all charges for storage, cartage, and labor on goods which are refused admission or delivery shall be paid by the owner or consignee, and in default of such payment shall constitute a lien against any future importation made by such owner or consignee.

<span style="float:left">Insular possessions included.<br>"Person" defined.</span> SEC. 12. That the term "Territory" as used in this Act shall include the insular possessions of the United States. The word "person" as used in this Act shall be construed to import both the plural and the singular, as the case demands, and shall include corporations, com- <span style="float:left">Liability of corporations, etc.</span> panies, societies and associations. When construing and enforcing the provisions of this Act, the act, omission, or failure of any officer, agent, or other person acting for or employed by any corporation, company, society, or association, within the scope of his employment or office, shall in every case be also deemed to be the act, omission, or failure of such corporation, company, society, or association as well as that of the person.

<span style="float:left">In effect January 1, 1907.</span> SEC. 13. That this Act shall be in force and effect from and after the first day of January, nineteen hundred and seven.

Approved, June 30, 1906.

---

<span style="float:left">June 30, 1906.<br>[H. R. 20410.]<br>[Public, No. 355.]</span> CHAP. 3916.—An Act To increase the limit of cost of certain public buildings, to authorize the purchase of sites for public buildings, to authorize the erection and completion of public buildings, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United* <span style="float:left">Omnibus public buildings act.<br>Limit of cost increased.<br>*Post,* p. 1236.</span> *States of America in Congress assembled,* That to enable the Secretary of the Treasury of the United States to give effect to and execute the provisions of existing legislation authorizing the purchase of sites and erection thereon of public buildings in the several cities hereinafter enumerated, the limit of cost heretofore fixed by Congress therefor

# UNITED STATES
# STATUTES AT LARGE

CONTAINING THE

LAWS AND CONCURRENT RESOLUTIONS
ENACTED DURING THE FIRST SESSION OF THE
EIGHTIETH CONGRESS
OF THE UNITED STATES OF AMERICA

## 1947

AND

PROCLAMATIONS, TREATIES, INTERNATIONAL
AGREEMENTS OTHER THAN TREATIES,
REORGANIZATION PLANS, AND PROPOSED
AMENDMENT TO THE CONSTITUTION

COMPILED, EDITED, INDEXED, AND PUBLISHED BY AUTHORITY OF LAW
UNDER THE DIRECTION OF THE SECRETARY OF STATE

## VOLUME 61

IN SIX PARTS

## PART 1

PUBLIC LAWS
REORGANIZATION PLANS
PROPOSED AMENDMENT TO THE CONSTITUTION



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1948

61 STAT.]       80TH CONG., 1ST SESS.—CH. 388—JULY 30, 1947                    **633**

[CHAPTER 388]

AN ACT

To codify and enact into positive law, title 1 of the United States Code, entitled
"General Provisions".

July 30, 1947
[H. R. 1945]
[Public Law 278]

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That title 1 of the
United States Code entitled "General Provisions", is codified and
enacted into positive law and may be cited as "1 U. S. C., § —",
as follows:

Title 1, U. S. Code.
Codification and en-
actment into positive
law.

## TITLE 1—GENERAL PROVISIONS

| Chap. | | Sec. |
|---|---|---|
| 1. Rules of construction | | 1 |
| 2. Acts and resolutions; formalities of enactment; repeals; sealing of instruments | | 101 |
| 3. Code of Laws of United States and Supplements; District of Columbia Code and Supplements | | 201 |

### CHAPTER 1—RULES OF CONSTRUCTION

§ 1. Words denoting number, gender, etc.
§ 2. "County" as including "parish", etc.
§ 3. "Vessel" as including all means of water transportation.
§ 4. "Vehicle" as including all means of land transportation.
§ 5. "Company" or "association" as including successors and assigns.
§ 6. Limitation of term "products of American fisheries."

#### WORDS DENOTING NUMBER, GENDER, AND SO FORTH

§ 1. In determining the meaning of any Act or resolution of Con-
gress importing words importing the singular number may extend and be
applied to several persons or things; words importing the plural
number may include the singular; words importing the masculine
gender may be applied to females; the words "insane person" and
"lunatic" shall include every idiot, non compos, lunatic, and insane
person; the word "person" may extend and be applied to partner-
ships and corporations, and the reference to any officer shall include
any person authorized by law to perform the duties of such office,
unless the context shows that such words were intended to be used
in a more limited sense; and a requirement of an "oath" shall be
deemed complied with by making affirmation in judicial form.

#### "COUNTY" AS INCLUDING "PARISH", AND SO FORTH

§ 2. The word "county" includes a parish, or any other equivalent
subdivision of a State or Territory of the United States.

#### "VESSEL" AS INCLUDING ALL MEANS OF WATER TRANSPORTATION

§ 3. The word "vessel" includes every description of watercraft or
other artificial contrivance used, or capable of being used, as a means
of transportation on water.

#### "VEHICLE" AS INCLUDING ALL MEANS OF LAND TRANSPORTATION

§ 4. The word "vehicle" includes every description of carriage or
other artificial contrivance used, or capable of being used, as a means
of transportation on land.

#### "COMPANY" OR "ASSOCIATION" AS INCLUDING SUCCESSORS AND ASSIGNS

§ 5. The word "company" or "association", when used in reference to
a . . . . . . . to embrace the words "successors and

### LIMITATION OF TERM "PRODUCTS OF AMERICAN FISHERIES"

§ 6. Wherever, in the statutes of the United States or in the rulings, regulations, or interpretations of various administrative bureaus and agencies of the United States there appears or may appear the term "products of American fisheries" said term shall not include fresh or frozen fish fillets, fresh or frozen fish steaks, or fresh or frozen slices of fish substantially free of bone (including any of the foregoing divided into sections), produced in a foreign country or its territorial waters, in whole or in part with the use of the labor of persons who are not residents of the United States.

## CHAPTER 2—ACTS AND RESOLUTIONS; FORMALITIES OF ENACTMENT; REPEALS; SEALING OF INSTRUMENTS

§ 101. Enacting clause.
§ 102. Resolving clause.
§ 103. Enacting or resolving words after first section.
§ 104. Numbering of sections; single proposition.
§ 105. Title of appropriation Acts.
§ 106. Printing bills and joint resolutions.
§ 107. Parchment or paper for printing enrolled bills or resolutions.
§ 108. Repeal of repealing act.
§ 109. Repeal of statutes as affecting existing liabilities.
§ 110. Saving clause of Revised Statutes.
§ 111. Repeals as evidence of prior effectiveness.
§ 112. Statutes at Large; contents; admissibility in evidence.
§ 113. "Little and Brown's" edition of laws and treaties; admissibility in evidence.
§ 114. Sealing of instruments.

### ENACTING CLAUSE

§ 101. The enacting clause of all Acts of Congress shall be in the following form: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled."

### RESOLVING CLAUSE

§ 102. The resolving clause of all joint resolutions shall be in the following form: "Resolved by the Senate and House of Representatives of the United States of America in Congress assembled."

### ENACTING OR RESOLVING WORDS AFTER FIRST SECTION

§ 103. No enacting or resolving words shall be used in any section of an Act or resolution of Congress except in the first.

### NUMBERING OF SECTIONS; SINGLE PROPOSITION

§ 104. Each section shall be numbered, and shall contain, as nearly as may be, a single proposition of enactment.

### TITLE OF APPROPRIATION ACTS

§ 105. The style and title of all Acts making appropriations for the support of Government shall be as follows: "An Act making appropriations (here insert the object) for the year ending June 30 (here insert the calendar year)."

### PRINTING BILLS AND JOINT RESOLUTIONS

§ 106. Every bill or joint resolution in each House of Congress

### § 901. Purpose

(a) The President shall from time to time examine the organization of all agencies and shall determine what changes therein are necessary to accomplish the following purposes:

(1) to promote the better execution of the laws, the more effective management of the executive branch and of its agencies and functions, and the expeditious administration of the public business;

(2) to reduce expenditures and promote economy to the fullest extent consistent with the efficient operation of the Government;

(3) to increase the efficiency of the operations of the Government to the fullest extent practicable;

(4) to group, coordinate, and consolidate agencies and functions of the Government, as nearly as may be, according to major purposes;

(5) to reduce the number of agencies by consolidating those having similar functions under a single head, and to abolish such agencies or functions thereof as may not be necessary for the efficient conduct of the Government; and

(6) to eliminate overlapping and duplication of effort.

(b) Congress declares that the public interest demands the carrying out of the purposes of subsection (a) of this section and that the purposes may be accomplished in great measure by proceeding under this chapter, and can be accomplished more speedily thereby than by the enactment of specific legislation.

### § 902. Definitions

For the purpose of this chapter—

(1) "agency" means—

(A) an Executive agency or part thereof;

(B) an office or officer in the civil service or uniformed services in or under an Executive agency; and

(C) the government of the District of Columbia or part thereof, except the courts;

but does not include the General Accounting Office or the Comptroller General of the United States; and

(2) "reorganization" means a transfer, consolidation, coordination, authorization, or abolition, referred to in section 903 of this title.

### § 903. Reorganization plans

(a) When the President, after investigation, finds that—

(1) the transfer of the whole or a part of an agency, or of the whole or a part of the functions thereof, to the jurisdiction and control of another agency;

(2) the abolition of all or a part of the functions of an agency;

(3) the consolidation or coordination of the whole or a part of an agency, or of the whole or a part of the functions thereof, with the whole or a part of another agency or the functions thereof;

(4) the consolidation or coordination of a part of an agency or the functions thereof with another part of the same agency or the functions thereof;

(5) the authorization of an officer in the civil service or uniformed services to delegate any of his functions; or

(6) the abolition of the whole or a part of an agency which

deemed as vested in the agency under which the function is placed by the plan.

(b) For the purpose of subsection (a) of this section, "regulation or other action" means a regulation, rule, order, policy, determination, directive, authorization, permit, privilege, requirement, designation, or other action.

(c) A suit, action, or other proceeding lawfully commenced by or against the head of an agency or other officer of the United States, in his official capacity or in relation to the discharge of his official duties, does not abate by reason of the taking effect of a reorganization plan under this chapter. On motion or supplemental petition filed at any time within 12 months after the reorganization plan takes effect, showing a necessity for a survival of the suit, action, or other proceeding to obtain a settlement of the questions involved, the court may allow the suit, action, or other proceeding to be maintained by or against the successor of the head or officer under the reorganization effected by the plan or, if there is no successor, against such agency or officer as the President designates.

(d) The appropriations or portions of appropriations unexpended by reason of the operation of this chapter may not be used for any purpose, but shall revert to the Treasury.

§ 908. Rules of Senate and House of Representatives on reorganization plans

Sections 909-913 of this title are enacted by Congress—

(1) as an exercise of the rule-making power of the Senate and the House of Representatives, respectively, and as such they are deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in that House in the case of resolutions described by section 909 of this title; and they supersede other rules only to the extent that they are inconsistent therewith; and

(2) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner and to the same extent as in the case of any other rule of that House.

§ 909. Terms of resolution

For the purpose of sections 908-913 of this title, "resolution" means only a resolution of either House of Congress, the matter after the resolving clause of which is as follows: "That the _____ does not favor the reorganization plan numbered _____ transmitted to Congress by the President on _____, 19____", the first blank space therein being filled with the name of the resolving House and the other blank spaces therein being appropriately filled; but does not include a resolution which specifies more than one reorganization plan.

§ 910. Reference of resolution to committee

A resolution with respect to a reorganization plan shall be referred to a committee (and all resolutions with respect to the same plan shall be referred to the same committee) by the President of the Senate or the Speaker of the House of Representatives, as the case may be.

§ 911. Discharge of committee considering resolution

(a) If the committee to which a resolution with respect to a reorganization plan has been referred has not reported it at the end of 10 calendar days after its introduction, it is in order to move either to discharge the committee from further consideration of the resolution

# E X H I B I T

# " A "

# THE

# "UNENACTED"

# CONGRESSIONAL

# CONTROLLED SUBSTANCES

# ACT

# UNITED STATES STATUTES AT LARGE

CONTAINING THE

LAWS AND CONCURRENT RESOLUTIONS
ENACTED DURING THE SECOND SESSION OF THE
NINETY-FIRST CONGRESS
OF THE UNITED STATES OF AMERICA

## 1970—1971

AND

REORGANIZATION PLANS AND PROCLAMATIONS

---

## VOLUME 84

IN TWO PARTS

---

## PART 1

PUBLIC LAWS 91–191 THROUGH 91–525



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1971

1242                    PUBLIC LAW 91-513—OCT. 27, 1970          [84 Stat.

## TITLE II—CONTROL AND ENFORCEMENT

### Part A—Short Title; Findings and Declaration; Definitions

#### SHORT TITLE

Citation of title.

Sec. 100. This title may be cited as the "Controlled Substances Act".

#### FINDINGS AND DECLARATIONS

Sec. 101. The Congress makes the following findings and declarations:

(1) Many of the drugs included within this title have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.

(2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.

(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because—

(A) after manufacture, many controlled substances are transported in interstate commerce,

(B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and

(C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.

(5) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.

(6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.

11 UST 1407.

(7) The United States is a party to the Single Convention on Narcotic Drugs, 1961, and other international conventions designed to establish effective control over international and domestic traffic in controlled substances.

#### DEFINITIONS

Sec. 102. As used in this title:

(1) The term "addict" means any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction.

(2) The term "administer" refers to the direct application of a controlled substance to the body of a patient or research subject by—

(A) a practitioner (or, in his presence, by his authorized agent), or

(B) the patient or research subject at the direction and in the presence of the practitioner.

1262                     PUBLIC LAW 91-513—OCT. 27, 1970          [84 STAT.

Marihuana, simple possession.

(4) Notwithstanding paragraph (1)(B) of this subsection, any person who violates subsection (a) of this section by distributing a small amount of marihuana for no remuneration shall be treated as provided in subsections (a) and (b) of section 404.

Special parole term.

(c) A special parole term imposed under this section or section 405 may be revoked if its terms and conditions are violated. In such circumstances the original term of imprisonment shall be increased by the period of the special parole term and the resulting new term of imprisonment shall not be diminished by the time which was spent on special parole. A person whose special parole term has been revoked may be required to serve all or part of the remainder of the new term of imprisonment. A special parole term provided for in this section or section 405 shall be in addition to, and not in lieu of, any other parole provided for by law.

#### PROHIBITED ACTS B—PENALTIES

SEC. 402. (a) It shall be unlawful for any person—

(1) who is subject to the requirements of part C to distribute or dispense a controlled substance in violation of section 309;

(2) who is a registrant to distribute or dispense a controlled substance not authorized by his registration to another registrant or other authorized person or to manufacture a controlled substance not authorized by his registration;

(3) who is a registrant to distribute a controlled substance in violation of section 305 of this title;

(4) to remove, alter, or obliterate a symbol or label required by section 305 of this title;

(5) to refuse or fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under this title or title III;

Post, p. 1285.

(6) to refuse any entry into any premises or inspection authorized by this title or title III;

Ante, p. 1256.
Post, p. 1276.

(7) to remove, break, injure, or deface a seal placed upon controlled substances pursuant to section 304(f) or 511 or to remove or dispose of substances so placed under seal; or

(8) to use, to his own advantage, or to reveal, other than to duly authorized officers or employees of the United States, or to the courts when relevant in any judicial proceeding under this title or title III, any information acquired in the course of an inspection authorized by this title concerning any method or process which as a trade secret is entitled to protection.

(b) It shall be unlawful for any person who is a registrant to manufacture a controlled substance in schedule I or II which is—

(1) not expressly authorized by his registration and by a quota assigned to him pursuant to section 306; or

(2) in excess of a quota assigned to him pursuant to section 306.

Penalty.

(c)(1) Except as provided in paragraph (2), any person who violates this section shall, with respect to any such violation, be subject

Jurisdiction.

to a civil penalty of not more than $25,000. The district courts of the United States (or, where there is no such court in the case of any territory or possession of the United States, then the court in such territory or possession having the jurisdiction of a district court of the United States in cases arising under the Constitution and laws of the United States) shall have jurisdiction in accordance with section 1355

62 Stat. 934.

of title 28 of the United States Code to enforce this paragraph.

# TITLE III—IMPORTATION AND EXPORTATION; AMEND-MENTS AND REPEALS OF REVENUE LAWS

## SHORT TITLE

Sec. 1000. This title may be cited as the "Controlled Substances Import and Export Act". *Citation of title*

## PART A—IMPORTATION AND EXPORTATION

### DEFINITIONS

Sec. 1001. (a) For purposes of this part—
(1) The term "import" means, with respect to any article, any bringing in or introduction of such article into any area (whether or not such bringing in or introduction constitutes an importation within the meaning of the tariff laws of the United States).

(2) The term "customs territory of the United States" has the meaning assigned to such term by general headnote 2 to the Tariff Schedules of the United States (19 U.S.C. 1202). *77A Stat. 11.*
*Ante, p. 1242.*

(b) Each term defined in section 102 of title II shall have the same meaning for purposes of this title as such term has for purposes of title II.

### IMPORTATION OF CONTROLLED SUBSTANCES

Sec. 1002. (a) It shall be unlawful to import into the customs terri- *Unlawful acts.* tory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of title *Ante, p. 1248.* II, or any narcotic drug in schedule III, IV, or V of title II, except that—

(1) such amounts of crude opium and coca leaves as the Attor- *Exceptions.* ney General finds to be necessary to provide for medical, scien- tific, or other legitimate purposes, and

(2) such amounts of any controlled substance in schedule I or II or any narcotic drug in schedule III, IV, or V that the Attor- ney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States—

(A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate, or

(B) in any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under sec- *Ante, p. 1253.* tion 303,

may be so imported under such regulations as the Attorney General shall prescribe. No crude opium may be so imported for the purpose of manufacturing heroin or smoking opium.

(b) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any nonnarcotic controlled substance in schedule III, IV, or V, unless such nonnarcotic controlled substance—

(d) Any orders, rules, and regulations which have been promulgated under any law affected by this title and which are in effect on the day preceding enactment of this title shall continue in effect until modified, superseded, or repealed.

## TITLE IV—REPORT ON ADVISORY COUNCILS

### REPORT ON ADVISORY COUNCILS

Reports to Congress.

SEC. 1200. (a) Not later than March 31 of each calendar year after 1970, the Secretary of the Department of Health, Education, and Welfare shall submit a report on the activities of advisory councils (established or organized pursuant to any applicable statute of the Public Health Service Act, Public Law 410, Seventy-eighth Congress, as amended, or the Mental Retardation Facilities and Community Mental Health Centers Construction Act of 1963, Public Law 88-164, as amended) to the Committee on Labor and Public Welfare of the Senate and the Committee on Interstate and Foreign Commerce of the House of Representatives. Such report shall contain, at least, a list of all such advisory councils, the names and occupations of their members, a description of the function of each advisory council, and a statement of the dates of the meetings of each advisory council.

58 Stat. 682.
42 USC 201
note.
77 Stat. 287.
42 USC 2661
note.

(b) If the Secretary determines that a statutory advisory council is not needed or that the functions of two or more statutory advisory councils should be combined, he shall include in the report a recommendation that such advisory council be abolished or that such functions be combined.

"Statutory advisory council."

(c) As used in this section, the term "statutory advisory council" means any committee, board, commission, council, or other similar group established or organized pursuant to any applicable statute to advise and make recommendations with respect to the administration or improvement of an applicable program or other related matter.

Approved October 27, 1970.

## Public Law 91-514

October 27, 1970
[H. R. 14678]

### AN ACT

To strengthen the penalties for illegal fishing in the territorial waters and the contiguous fishery zone of the United States, and for other purposes.

U.S. territorial
waters.
Illegal fishing,
penalties.

78 Stat. 195.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 2 of the Act entitled "An Act to prohibit fishing in the territorial waters of the United States and in certain other areas by vessels other than vessels of the United States and by persons in charge of such vessels", approved May 20, 1964 (16 U.S.C. 1082), is amended—

(1) by striking out "$10,000" in subsection (a) thereof and inserting in lieu thereof "$100,000", and

(2) by adding at the end of subsection (b) the following new sentence: "For the purposes of this Act, it shall be a rebuttable presumption that all fish found aboard a vessel seized in connection with such violation of this Act were taken or retained in violation of this Act."

tions be combined.

"Statutory ad-
visory council."

(c) As used in this section, the term "statutory advisory council" means any committee, board, commission, council, or other similar group established or organized pursuant to any applicable statute to advise and make recommendations with respect to the administration or improvement of an applicable program or other related matter.

Approved October 27, 1970.

## Public Law 91-514

AN ACT

October 27, 1970
[H. R. 14678]

To strengthen the penalties for illegal fishing in the territorial waters and the contiguous fishery zone of the United States, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 2 of the Act entitled "An Act to prohibit fishing in the territorial waters of the United States and in certain other areas by vessels other than vessels of the United States and by persons in charge of such vessels", approved May 20, 1964 (16 U.S.C. 1082), is amended—

U.S. territorial
waters.
Illegal fishing,
penalties.

78 Stat. 195.

(1) by striking out "$10,000" in subsection (a) thereof and inserting in lieu thereof "$100,000", and

(2) by adding at the end of subsection (b) the following new sentence: "For the purposes of this Act, it shall be a rebuttable presumption that all fish found aboard a vessel seized in connection with such violation of this Act were taken or retained in violation of this Act."

CFR Index

# UNITED STATES CODE ANNOTATED

Title 21

Food and Drugs

Sections 1 to 800

Comprising All Laws of a General and Permanent Nature
Under Arrangement of Official Code of
the Laws of the United States

with

Annotations from Federal and State Courts

ST. PAUL, MINN.
WEST PUBLISHING CO.

TITLES OF
UNITED STATES CODE
AND
UNITED STATES CODE ANNOTATED

Provisions.
...ress.
...ent.
...eal, Seat of Gov-
... and the States.
...t Organization
...loyees.
...d Penal Bonds.
... Nationality.
... Forces.
...ce.
...pp.
... Banking.
...d.
... and Trade.
...ion.
...d Criminal
... Duties.
... Drugs.
...elations and
...rse.
...nys.
...als, Asylums, and
...eteries.
...ns.
...nal Revenue Code.

28. Judiciary and Judicial Procedure.
29. Labor.
30. Mineral Lands and Mining.
31. Money and Finance.
32. National Guard.
33. Navigation and Navigable Waters.
34. Navy (See Title 10, Armed Forces).
35. Patents.
36. Patriotic Societies and Observances.
37. Pay and Allowances of the Uniformed Services.
38. Veterans' Benefits.
39. Postal Service.
40. Public Buildings, Property, and Works.
41. Public Contracts.
42. The Public Health and Welfare.
43. Public Lands.
44. Public Printing and Documents.
45. Railroads.
46. Shipping.
47. Telegraphs, Telephones, and Radiotelegraphs.
48. Territories and Insular Possessions.
49. Transportation.

# PREFACE

## UNITED STATES CODE 1970 EDITION

———————

This eighth edition of the United States Code was prepared and published pursuant to section 202(c) of Title 1 of the Code. It contains a consolidation and codification of all the general and permanent laws of the United States which are in force on January 20, 1971. By statutory authority this edition may be cited "U.S.C. 1970 ed." Previous editions were published in 1926, 1934, 1940, 1946, 1952, 1958, and 1964.

Inasmuch as many of the general and permanent laws which are required to be incorporated in this Code are inconsistent, redundant, and obsolete, the Committee on the Judiciary is engaged in a comprehensive project of revising and enacting the Code into law, title by title. In furtherance of this plan, bills have been enacted to revise, codify and enact into law Titles 1, 3, 4, 5, 6, 9, 10, 13, 14, 17, 18, 23, 28, 32, 35, 37, 38, 39, and 44. In addition, bills relating to other titles are also being prepared for introduction. When this work is completed all the titles of the Code will be legal evidence of the general and permanent law and recourse to the numerous volumes of the Statutes at Large for this purpose will be unnecessary.

The title and chapter structure of the 1964 edition, together with Supplement V thereto, has been substantially preserved, the only changes made having been necessitated by the enactment of legislation since 1964.

In this edition numerous notes have been added captioned "Section referred to in other sections". These notes have been inserted following each section that is referred to in the text of another section, indicating the section that contains the internal reference. They should be extremely useful to the Congress, the bench and bar, and the public.

The actual work of preparing and editing the material for this edition was done by the West Publishing Co. of St. Paul, Minnesota, under the supervision of the Committee on the Judiciary of the House of Representatives. West Publishing Co. prepared the original Code which Congress enacted in 1926 and has continuously served the Committee since that time in the preparation of the authorized new editions and Supplements to the Code. Grateful acknowledgment is made to the editorial and manuscript staffs of the publishing company and of Joseph Fischer, Esq., the law revision counsel for the Committee, and his staff for their untiring efforts to make this edition as nearly perfect as possible. Acknowledgment of valuable assistance is made also to various officers of Government departments and agencies and the Government Printing Office for their helpful suggestions and criticisms.

The Committee on the Judiciary invites criticisms or suggestions with the view of improving the Code wherever possible. It is hoped that the program of enacting the entire Code, title by title, to improve its present status as merely prima facie evidence of the law, will meet with early success.

EMANUEL CELLER
*Chairman,*
*Committee on the Judiciary.*
ROBERT W. KASTENMEIER
*Chairman, Subcommittee No. 3,*
*Committee on the Judiciary.*

WASHINGTON, D. C., *January 2, 1971.*

# UNITED STATES CODE

# ANNOTATED

## Title 21

Food and Drugs

Sections 801 to 950

Comprising All Laws of a General and Permanent Nature
Under Arrangement of Official Code of
the Laws of the United States

with

Annotations from Federal and State Courts

ST. PAUL, MINN.
WEST PUBLISHING CO.

---

TITLES OF

UNITED STATES CODE

AND

UNITED STATES CODE ANNOTATED

28. Judiciary and Judicial Procedure.
29. Labor.
30. Mineral Lands and Mining.
31. Money and Finance.
32. National Guard.
33. Navigation and Navigable Waters.
34. Navy (See Title 10, Armed Forces).
35. Patents.
36. Patriotic Societies and Observances.
37. Pay and Allowances of the Uniformed Services.
38. Veterans' Benefits.
39. Postal Service.
40. Public Buildings, Property, and Works.
41. Public Contracts.
42. The Public Health and Welfare.
43. Public Lands.
44. Public Printing and Documents.
45. Railroads.
46. Shipping.
47. Telegraphs, Telephones, and Radiotelegraphs.
48. Territories and Insular Possessions.
49. Transportation.
50. War and National Defense.

Cite This Book

Thus:  21 U.S.C.A. § —

# THE CODE OF THE LAWS

OF THE

# UNITED STATES OF AMERICA

## TITLE 21

## FOOD AND DRUGS

Sections 801 to 950 appear in this volume

Chap.                                                                          Sec.
1.  Adulterated or Misbranded Foods or Drugs [See Chapter 9] ......        1
2.  Teas ...................................................................      41
3.  Filled Milk ...........................................................      61
4.  Animals, Meats, and Meat and Dairy Products ...................       71
5.  Viruses, Serums, Toxins, Antitoxins, and Analogous Products ...      151
6.  Bureau of Narcotics [Omitted] ......................................     151
6A. Narcotic Drugs .......................................................     171
7.  Practice of Pharmacy and Sale of Poisons in Consular Districts in
      China .................................................................     201
8.  Narcotic Farms [Repealed] ..........................................     221
9.  Federal Food, Drug, and Cosmetic Act ............................     301
10. Poultry and Poultry Products Inspection ..........................     451
11. Manufacture of Narcotic Drugs [Repealed] ......................       501
12. Meat Inspection ...................................................       601
13. Drug Abuse Prevention and Control ...............................     801
14. Alcohol and Drug Abuse Educational Programs and Activities ....      1001
15. Egg Products Inspection ...........................................     1031
16. Drug Abuse Prevention, Treatment, and Rehabilitation ........ ....    1101


## EXPLANATION

### Index to Text

A separate index to the text of the laws contained in Title 21 is set out in the volume containing the end of Title 21 to assist subscribers in quickly locating particular subjects in which they are interested.

July, 1981                    THE PUBLISHER

## PREFACE
## UNITED STATES CODE 1976 EDITION

This ninth edition of the United States Code was prepared and published pursuant to section 285b of Title 2 of the Code. It contains a consolidation and codification of all the general and permanent laws of the United States which are in force on January 3, 1977. By statutory authority this edition may be cited "U.S.C. 1976 ed." Previous editions were published in 1926, 1934, 1940, 1946, 1952, 1958, 1964, and 1970.

Inasmuch as many of the general and permanent laws which are required to be incorporated in this Code are inconsistent, redundant, and obsolete, the Office of the Law Revision Counsel is engaged in a comprehensive project of revising and enacting the Code into law, title by title. Since 1947, bills have been enacted to revise, codify and enact into law Titles 1, 3, 4, 5, 6, 9, 10, 11, 13, 14, 17, 18, 23, 32, 35, 37, 38, 39, and 44. In addition, bills relating to other titles are also being prepared for introduction. When this work is completed all the titles of the Code will be legal evidence of the general and permanent law and recourse to the numerous volumes of the Statutes at Large for this purpose will be unnecessary.

The title and chapter structure of the 1970 edition, together with Supplement V thereto, has been substantially preserved, the only changes made having been necessitated by the enactment of legislation since 1970.

This edition continues the practice of setting out notes explained "Section referred to in other sections". These notes have been inserted following each section that is referred to in the text of another section, indicating the section that contains the internal reference. In addition, there is included in this edition, for the first time, a comprehensive Table of Internal References which appears in the Tables volume. This Table consolidates all internal reference contained in the individual "Sections referred to in other sections" notes.

This edition has been prepared and published under the supervision of Edward F. Willett, Jr., Law Revision Counsel of the House of Representatives, with the assistance of the West Publishing Company, of St. Paul, Minnesota, which assisted in preparing all prior editions and supplements of the Code. Grateful acknowledgement is made of the cooperation by all who have helped in this work, particularly by the staffs of the publishing company and of the Office of the Law Revision Counsel, and by the Government Printing Office.

*Thomas P. O'Neill*

Speaker of the House of Representatives

WASHINGTON, D.C., January 3, 1977.

# EXPLANATION

These volumes, comprising sections 801 to End of Title 21 of the United States Code, contain laws of a general and permanent nature relating to Food and Drugs, including all amendments enacted to May 1, 1981.

Far-ranging in consequences, the drug abuse problem does not lend itself to quick and easy resolution. Drug abuse touches on the lives of a large number of young people, afflicts urban, suburban, and rural areas, and affects such diverse parts of American society as education and industry. Over the years, while the communications media has vividly and dramatically highlighted the violent and destructive by-products, task forces, Congressional committees, and commissions have proposed comprehensive and long-term solutions to the problem. Their in-depth investigations, analyses, and reports, in many cases, resulted in contradictory conclusions as well as innovative answers. The basic legislation set out in these volumes incorporates recommendations for several different approaches to the problem of drug abuse.

Confronting the criminal aspects of the drug abuse problem were the Comprehensive Drug Abuse Prevention and Control Act of 1970, Controlled Substances Act, and the Controlled Substances Import and Export Act. These enactments established wide-reaching and coordinated programs of law enforcement against the illegal importation, manufacture, distribution, possession and use of controlled substances. In view of the substantial time, effort and monies currently being expended by Federal, State and local judicial and criminal agencies and personnel to bring the illegal trafficking in controlled substances within manageable proportions, many problem areas still remain. Typical of a continuing and difficult to resolve drug problem is the use of substances capable of exerting an effect on the mind, thereby altering or modifying mental activity and ability, psychotropic substances. With any effective control of such substances not confined to the borders of one country, recent national and international attention has resulted in the enactment of the Psychotropic Substances Act of 1978. This legislation, which makes major amendments in the comprehensive 1970 Act, coordinates American and multinational implementation of the Convention on Psychotropic Substances by providing additional statutory authority to control the manufacture, distribution and use of psychotropic substances.

COPYRIGHT © 1981
By
WEST PUBLISHING CO.

# EXPLANATION

The basic Federal enactments for non-criminal responses to the drug abuse problem were significantly amended since the last revision of these volumes a decade ago. Educational programs and activities under the Alcohol and Drug Abuse Education Act have been extended and improved. Amendatory legislation established and funded bilingual and school and community service programs, pre-service and in-service training for school personnel, law enforcement officers and community leaders, and public education programs for parents and other concerned persons, in reaction to the behavioral complexities of the abuse problem and need for prevention and early intervention. The Drug Abuse Prevention, Treatment, and Rehabilitation Act was restructured, redirected and reorganized with particular stress placed on providing treatment and services for minorities. Present policies and program under the Act emphasize evaluation, occupational training, and prevention, better Federal, State, and local planning, adaptability to changing demographic and use patterns, domestic and international coordination and municipal involvement. Whatever the thrust of the legislation—regulation of criminal conduct or the development of education, etc., programs—these volumes contain complete and up-to-date judicial constructions of the Federal enactment directed toward the pervasive problem of drug abuse.

## Popular Name Table

For convenient reference, a table of popular names of the laws covered in Title 21, showing the sections where the laws are found, has been included.

## Library References

A feature included in these volumes as an aid to research consists of Library References which facilitate finding the pertinent law embodied in the Key Number Digests and Corpus Juris Secundum.

## Historical Notes and Cross References

In addition to the latest statutes and court constructions, these volumes contain complete historical notes and cross references to related subjects.

## Annotations or Notes of Decisions

The case annotations or constructions of the courts are arranged under numbered notes so that the user, by referring to the same note number in the supplementary pamphlets and pocket parts, can readily locate the latest decisions on any phase of the law.

# EXPLANATION

The annotations are complete, covering all decisions of the Federal and State courts and the opinions of the Attorney General construing and applying the laws, in the following:

| Reports | Abbreviations |
| --- | --- |
| Supreme Court Reporter | S.Ct. |
| United States Reports | U.S. |
| Lawyers' Edition | L.Ed. |
| Lawyers' Edition, Second Series | L.Ed.2d |
| Federal Cases | Fed.Cas.No. |
| Federal Reporter | F. |
| Federal Reporter, Second Series | F.2d |
| Appeal Cases, District of Columbia | App.D.C. |
| U.S. Court of Appeals, District of Columbia | U.S.App.D.C. |
| Federal Supplement | F.Supp. |
| Federal Rules Decisions | F.R.D. |
| Atlantic Reporter | A. |
| Atlantic Reporter, Second Series | A.2d |
| California Reporter | Cal.Rptr. |
| New York Supplement | N.Y.S. |
| New York Supplement, Second Series | N.Y.S.2d |
| North Eastern Reporter | N.E. |
| North Eastern Reporter, Second Series | N.E.2d |
| North Western Reporter | N.W. |
| North Western Reporter, Second Series | N.W.2d |
| Pacific Reporter | P. |
| Pacific Reporter, Second Series | P.2d |
| South Eastern Reporter | S.E. |
| South Eastern Reporter, Second Series | S.E.2d |
| Southern Reporter | So. |
| Southern Reporter, Second Series | So.2d |
| South Western Reporter | S.W. |
| South Western Reporter, Second Series | S.W.2d |
| Opinions Attorney General | Op.Atty.Gen. |
| Court of Claims | Ct.Cl. |
| Court of Customs and Patent Appeals | C.C.P.A. |
| Court of International Trade | C.I.T. |
| Customs Court | Cust.Ct. |
| United States Tax Court | T.C. |
| Board of Tax Appeals | B.T.A. |
| Military Justice Reporter | M.J. |
| Bankruptcy Reporter | B.R. |
| American Bankruptcy Reports | Am.Bankr.Rep. |
| New Series | Am.Bankr.Rep.N.S. |
| Other Standard Reports | |

granting of an exemption under this section; and

(5) Certification by the applicant that the product may be lawfully marketed or distributed under the Food, Drug, and Cosmetic Act.

(6) The identification of any information on the application which is considered by the applicant to be a trade secret or confidential and entitled to protection under U.S. laws restricting the public disclosure of such information by government employees.

(c) The Administrator may require the applicant to submit such additional documents or written statements of fact relevant to the application which he deems necessary for determining if the application should be granted.

(d) Within a reasonable period of time after the receipt of a completed application for an exemption under this section, the Administrator shall notify the applicant of acceptance or non-acceptance of the application. If the application is not accepted, an explanation will be provided. The Administrator is not required to accept an application if any of the information required in paragraph (b) of this section or requested pursuant to paragraph (c) of this section is lacking or not readily understood. The applicant may, however, amend the application to meet the requirements of paragraphs (b) and (c) of this section. If the application is accepted for filing, the Administrator shall issue and publish in the FEDERAL REGISTER an order on the application, which shall include a reference to the legal authority under which the order is based. This order shall specify the date on which it shall take effect. The Administrator shall permit any interested person to file written comments on or objections to the order. If any comments or objections raise significant issues regarding any findings of fact or law upon which the order is based, the Administrator shall immediately suspend the effectiveness of the order until he may reconsider the application in light of the comments and objections filed. Thereafter, the Administrator shall reinstate, revoke, or amend the original order as deemed appropriate.

[60 FR 32463, June 22, 1995, as amended at 62 FR 13968, Mar. 24, 1997]

§ 1310.16 Exempt drug products containing ephedrine and therapeutically significant quantities of another active medicinal ingredient.

(a) The drug products containing ephedrine and therapeutically significant quantities of another active medicinal ingredient listed in paragraph (e) of this section have been exempted by the Administrator from application of sections 302, 303, 310, 1007, and 1008 of the Act (21 U.S.C. 822–3, 830, and 957–8) to the extent described in paragraphs (b), (c), and (d) of this section.

(b) No exemption granted pursuant to 1310.14 affects the criminal liability for illegal possession or · distribution of listed chemicals contained in the exempt drug product.

(c) Changes in drug product compositions: Any change in the quantitative or qualitative composition of an exempt drug product listed in paragraph (d) requires a new application for exemption.

(d) In addition to the drug products listed in the compendium set forth in § 1310.01(b)(28)(1)(D)(1), the following drug products, in the form and quantity listed in the application submitted (indicated as the "date") are designated as exempt drug products for the purposes set forth in this section:

EXEMPT DRUG PRODUCTS CONTAINING EPHEDRINE AND THERAPEUTICALLY SIGNIFICANT QUANTITIES OF ANOTHER ACTIVE MEDICINAL INGREDIENT

| Supplier | Product name | Form | Date |
|----------|--------------|------|------|
| Reserved ___ |  |  | ___ |

[60 FR 32463, June 22, 1995, as amended at 62 FR 13968, Mar. 24, 1997]

## PARTS 1311 [RESERVED]

## PART 1312—IMPORTATION AND EXPORTATION OF CONTROLLED SUBSTANCES

Sec.
1312.01   Scope of part 1312.
1312.02   Definitions.

IMPORTATION OF CONTROLLED SUBSTANCES

1312.11   Requirement of authorization to import.
1312.12   Application for import permit.

Drug Enforcement Administration, Justice                    §1312.12

1312.13  Issuance of import permit.
1312.14  Distribution of copies of import permit.
1312.15  Shipments in greater or less amount than authorized.
1312.16  Cancellation of permit; expiration date.
1312.17  Special report from importers.
1312.18  Contents of import declaration.
1312.19  Distribution of import declaration.

EXPORTATION OF CONTROLLED SUBSTANCES

1312.21  Requirement of authorization to export.
1312.22  Application for export permit.
1312.23  Issuance of export permit.
1312.24  Distribution of copies of export permit.
1312.25  Expiration date.
1312.26  Records required of exporter.
1312.27  Contents of special controlled substances invoice.
1312.28  Distribution of special controlled substances invoice.
1312.29  Domestic release prohibited.
1312.30  Schedule III, IV, and V non-narcotic controlled substances requiring an import and export permit.

TRANSSHIPMENT AND IN-TRANSIT SHIPMENT OF CONTROLLED SUBSTANCES

1312.31  Schedule I: Application for prior written approval.
1312.32  Schedules II, III, IV: Advance notice.

HEARINGS

1312.41  Hearings generally.
1312.42  Purpose of hearing.
1312.43  Waiver or modification of rules.
1312.44  Request for hearing or appearance; waiver.
1312.45  Burden of proof.
1312.46  Time and place of hearing.
1312.47  Final order.

AUTHORITY: 21 U S C. 952, 953, 954, 957, 958.

SOURCE: 36 FR 7815, Apr. 24, 1971, unless otherwise noted. Redesignated at 38 FR 26609, Sept. 24, 1973.

§1312.01  Scope of part 1312.

Procedures governing the importation, exportation, transshipment and intransit shipment of controlled substances pursuant to section 1002, 1003, and 1004 of the Act (21 U.S.C. 952, 953, and 954) are governed generally by those sections and specifically by the sections of this part.

§1312.02  Definitions.

Any term contained in this part shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter.

[62 FR 13969, Mar. 24, 1977]

IMPORTATION OF CONTROLLED SUBSTANCES

§1312.11  Requirement of authorization to import.

(a) No person shall import or cause to be imported any controlled substance listed in Schedule I or II or any narcotic controlled substance listed in Schedule III, IV or V or any non-narcotic controlled substance in Schedule III which the Administrator has specifically designated by regulation in §1312.30 of this part or any non-narcotic controlled substance in Schedule IV or V which is also listed in Schedule I or II of the Convention on Psychotropic Substances unless and until such person is properly registered under the Act (or exempt from registration) and the Administrator has issued him a permit to do so pursuant to §1312.13 of this part.

(b) No person shall import or cause to be imported any non-narcotic controlled substance listed in Schedule III, IV or V, excluding those described in paragraph (a) of this section, unless and until such person is properly registered under the Act (or exempt from registration) and has filed an import declaration to do so with the Administrator, pursuant to §1312.18 of this part.

(c) When an import permit or declaration is required, a separate permit or declaration must be obtained for each consignment of controlled substances to be imported.

[36 FR 7815, Apr. 24, 1971, as amended at 37 FR 15923, Aug. 8, 1972. Redesignated at 38 FR 26609, Sept. 24, 1973, and amended at 52 FR 17289, May 7, 1987]

§1312.12  Application for import permit.

(a) An application for a permit to import controlled substances shall be made on DEA Form 357. DEA Form 357 may be obtained from, and shall be filed with, the Drug Enforcement Administration, Drug Operations Section, Washington, DC 20537. Each application shall show the date of execution; the registration number of the importer; a detailed description of each controlled

117

CFR Index

Executive Order—Continued

Authority

TITLE 5—APPENDIX 1

cies, and more reliable precautions against threats to the national security. The leaner and less diffuse Presidential staff structure which would result would enhance the President's ability to do his job and would advance the interests of the Congress as well.

I am confident that this reorganization plan would significantly increase the overall efficiency and effectiveness of the Federal Government. I urge the Congress to allow it to become effective.

RICHARD NIXON.

THE WHITE HOUSE, January 26, 1973.

REORGANIZATION PLAN NO. 2 OF 1973

Eff. July 1, 1973, 38 F.R. 15932, 87 Stat. 1091, as amended Pub.L. 93-253, § 1, Mar. 16, 1974, 88 Stat. 50

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, March 28, 1973, pursuant to the provisions of Chapter 9 of Title 5 of the United States Code.

LAW ENFORCEMENT IN ILLICIT DRUG ACTIVITIES

Section 1.   Transfers to the Attorney General.   There are hereby transferred from the Secretary of the Treasury, the Department of the Treasury, and any other officer or any agency of the Department of the Treasury, to the Attorney General all intelligence, investigative, and law enforcement functions, vested by law in the Secretary, the Department, officers, or agencies which relate to the suppression of illicit traffic in narcotics, dangerous drugs, or marihuana, except that the Secretary shall retain, and continue to perform, those functions, to the extent that they relate to searches and seizures of illicit narcotics, dangerous drugs, or marihuana or to the apprehension or detention of persons in connection therewith, at regular inspection stations at ports of entry or anywhere along the land or water borders of the United States: *Provided*, that any illicit narcotics, dangerous drugs, marihuana, or related evidence seized, and any person apprehended or detained by the Secretary or any officer of the Department of the Treasury, pursuant to the authority retained in item by virtue of this section, shall be turned over forthwith to the jurisdiction of the Attorney General; *Provided further*, that nothing in this section shall be construed as limiting in any way any authority vested by law in the Secretary of the Treasury, the Department or the Treasury, or any other officer or any agency of that Department on the effective date of this Plan with respect to contraband other than illicit narcotics, dangerous drugs, and marihuana; and *Provided other*, that nothing in this section shall be construed as limiting in any way any authority the Attorney General, the Department of Justice, or any other officer or any agency of that Department may otherwise have to make investigations or engage in law enforcement activities, including activities relating to the suppression of illicit traffic in narcotics, dangerous drugs, and marihuana, at ports of entry or along the land and water borders of the United States.

## TITLE 5—APPENDIX 1

Sec. 3. Abolition. The Bureau of Narcotics and Dangerous Drugs, including the Office of Director thereof, is hereby abolished, and section 3(a) of Reorganization Plan No. 1 of 1968 is hereby repealed. The Attorney General shall make such provisions as he may deem necessary with respect to terminating those affairs of the Bureau of Narcotics and Dangerous Drugs not otherwise provided for in this Reorganization Plan.

Sec. 4. Drug Enforcement Administration. There is established in the Department of Justice an agency which shall be known as the Drug Enforcement Administration, hereinafter referred to as "the Administration."

Sec. 5. Officers of the Administration. (a) There shall be at the head of the Administration the Administrator of Drug Enforcement, hereinafter referred to as "the Administrator." The Administrator shall be appointed by the President by and with the advice and consent of the Senate, and shall receive compensation at the rate now or hereafter prescribed by law for positions of level III of the Executive Schedule Pay Rates (5 U.S.C. 5314). He shall perform such functions as the Attorney General shall from time to time direct.

(b) There shall be in the Administration a Deputy Administrator of the Drug Enforcement Administration, hereinafter referred to as "the Deputy Administrator," who shall be appointed by the President by and with the advice and consent of the Senate, shall perform such functions as the Attorney General may from time to time direct, and shall receive compensation at the rate now or hereafter prescribed by law for positions of level V of the Executive Schedule Pay Rates (5 U.S.C. 5316).

(c) The Deputy Administrator or such other official of the Department of Justice as the Attorney General shall from time to time designate shall act as Administrator during the absence or disability of the Administrator or in the event of a vacancy in the office of Administrator.

Sec. 6. Performance of transferred functions. The Attorney General may, from time to time make such provisions as he shall deem appropriate authorizing the performance of any of the functions transferred to him by the provisions of this Reorganization Plan by any officer, employee, or agency of the Department of Justice.

Sec. 7. Coordination. The Attorney General, acting through the Administrator and such other officials of the Department of Justice as he may designate, shall provide for the coordination of all drug law enforcement functions vested in the Attorney General so as to assure maximum cooperation between and among the Administration, the

## REORGANIZATION PLAN NO. 2 OF 1973

Federal Bureau of Investigation, and other units of the Department involved in the performance of these and related functions.

Sec. 8. Incidental transfers. (a) So much of the personnel, property, records, and unexpended balances of appropriations, allocations, and other funds employed, used, held, available or to be made available in connection with the functions transferred to the Attorney General by this Reorganization Plan as the Director of the Office of Management and Budget shall determine shall be transferred to the Department of Justice at such time or times as the Director shall direct.

(b) Such further measures and dispositions as the Director of the Office of Management and Budget shall deem to be necessary in order to effectuate transfers referred to in subsection (a) of this section shall be carried out in such manner as he shall direct and by such Federal agencies as he shall designate.

Sec. 9. Interim Officers. (a) The President may authorize any person who, immediately prior to the effective date of this Reorganization Plan, held a position in the Executive Branch of the Government to act as Administrator until the office of Administrator is for the first time filled pursuant to the provisions of this Reorganization Plan or by recess appointment as the case may be.

(b) The President may similarly authorize any such person to act as Deputy Administrator.

(c) The President may authorize any person who serves in an acting capacity under the foregoing provisions of this section to receive the compensation attached to the office in respect to which he so serves. Such compensation, if authorized, shall be in lieu of but not in addition to, other compensation from the United States to which such person may be entitled.

Sec. 10. Effective date. The provisions of this Reorganization Plan shall take effect as provided by section 906(a) of title 5 of the United States Code or on July 1, 1973, whichever is later.

## MESSAGE OF THE PRESIDENT

To the Congress of the United States:

Drug abuse is one of the most vicious and corrosive forces attacking the foundations of American society today. It is a major cause of crime and a merciless destroyer of human lives. We must fight it with all of the resources at our command.

This Administration has declared all-out, global war on the drug menace. As I reported to the Congress

State of the Union message, there is evidence of significant progress on a number of fronts in that war.

Both the rate of new addiction to heroin and the number of narcotic-related deaths showed an encouraging downturn last year. More drug addicts and abusers are in treatment and rehabilitation programs than ever before.

Progress in pinching off the supply of illicit drugs was evident in last year's stepped-up volume of drug seizures worldwide—which more than doubled in 1972 over the 1971 level.

Arrests of traffickers have risen by more than one-third since 1971. Prompt Congressional action on my proposal for mandatory minimum sentences for pushers of hard drugs will help ensure that convictions stemming from such arrests lead to actual imprisonment of the guilty.

Notwithstanding these gains, much more must be done. The resilience of the international drug trade remains grimly impressive—current estimates suggest that we still intercept only a small fraction of all the heroin and cocaine entering this country. Local police still find that more than one of every three suspects arrested for street crimes is a narcotic abuser or addict. And the total number of Americans addicted to narcotics, suffering terribly themselves and inflicting their suffering on countless others, still stands in the hundreds of thousands.

## A UNIFIED COMMAND FOR DRUG ENFORCEMENT

Seeking ways to intensify our counter-offensive against this menace, I am asking the Congress today to join with this Administration in strengthening and streamlining the Federal drug law enforcement effort.

Funding for this effort has increased sevenfold during the past five years, from $36 million in fiscal year 1969 to $257 million in fiscal year 1974—more money is not the most pressing enforcement need at present. Nor is there a primary need for more manpower working on the problem, over 2100 new agents having already been added to the Federal drug enforcement agencies under this Administration, an increase of more than 250 percent over the 1969 level.

The enforcement work could benefit significantly, however, from consolidation of our anti-drug forces under a single unified command. Right now the Federal Government is fighting the war on drug abuse under a distinct handicap, for its efforts are those of a loosely confederated alliance facing a resourceful, elusive, worldwide enemy. Admiral Mahan, the master naval strategist, described this handicap precisely when he wrote that "Granting the same aggregate

REORGANIZATION PLAN NO. 2 OF 1973

of force, it is never as great in two hands as in one, because it is not perfectly concentrated."

More specifically, the drug law enforcement activities of the United States now are not merely in two hands but in half a dozen. Within the Department of Justice, with no overall direction below the level of the Attorney General, these fragmented forces include the Bureau of Narcotics and Dangerous Drugs, the Office for Drug Abuse Law Enforcement, the Office of National Narcotics Intelligence, and certain activities of the Law Enforcement Assistance Administration. The Treasury Department is also heavily engaged in enforcement work through the Bureau of Customs.

This aggregation of Federal activities has grown up rapidly over the past few years in response to the urgent need for stronger anti-drug measures. It has enabled us to make a very encouraging beginning in the accelerated drug enforcement drive of this Administration.

But it also has serious operational and organizational shortcomings. Certainly the cold-blooded underworld networks that funnel narcotics from suppliers all over the world into the veins of American drug victims are no respecters of the bureaucratic dividing lines that now complicate our anti-drug efforts. On the contrary, these modern-day slave traders can derive only advantage from the limitations of the existing organizational patchwork. Experience has now given us a good basis for correcting those limitations, and it is time to do so.

I therefore propose creation of a single, comprehensive Federal agency within the Department of Justice to lead the war against illicit drug traffic.

Reorganization Plan No. 2 of 1973, which I am transmitting to the Congress with this message, would establish such an agency, to be called the Drug Enforcement Administration. It would be headed by an Administrator reporting directly to the Attorney General.

The Drug Enforcement Administration would carry out the following anti-drug functions, and would absorb the associated manpower and budgets:

—All functions of the Bureau of Narcotics and Dangerous Drugs (which would be abolished as a separate entity by the reorganization plan);

—Those functions of the Bureau of Customs pertaining to drug investigations and intelligence (to be transferred from the Treasury Department to the Attorney General by the reorganization plan);

431

—All functions of the Office for Drug Abuse Law Enforcement; and

—All functions of the Office of National Narcotics Intelligence.

Merger of the latter two organizations into the new agency would be effected by an executive order dissolving them and transferring their functions, to take effect upon approval of Reorganization Plan No. 2 by the Congress.  Drug law enforcement research currently funded by the Law Enforcement Assistance Administration and other agencies would also be transferred to the new agency by executive action.

The major responsibilities of the Drug Enforcement Administration would thus include:

—development of overall Federal drug law enforcement strategy, programs, planning, and evaluation;

—full investigation and preparation for prosecution of suspects for violations under all Federal drug trafficking laws;

—full investigation and preparation for prosecution of suspects connected with illicit drugs seized at U.S. ports-of-entry and international borders;

—conduct of all relations with drug law enforcement officials of foreign governments, under the policy guidance of the Cabinet Committee on International Narcotics Control;

—full coordination and cooperation with State and local law enforcement officials on joint drug enforcement efforts; and

—regulation of the legal manufacture of drugs and other controlled substances under Federal regulations.

The Attorney General, working closely with the Administrator of this new agency, would have authority to make needed program adjustments.  He would take steps within the Department of Justice to ensure that high priority emphasis is placed on the prosecution and sentencing of drug traffickers following their apprehension by the enforcement organization.  He would also have the authority and responsibility for securing the fullest possible cooperation—particularly with respect to collection of drug intelligence—from all Federal departments and agencies which can contribute to the anti-drug work, including the Internal Revenue Service and the Federal Bureau of Investigation.

My proposals would make possible a more effective anti-drug role for the FBI, especially in dealing with the relationship between drug trafficking and organized crime.  I intend to see that the resources of the FBI are fully committed to assist in supporting the new Drug Enforcement Administration.

432



importation. The careful and complete inspection of all persons and goods coming into the United States is therefore an integral part of effective Federal drug law enforcement.

At the present time, however, Federal responsibility for conducting port-of-entry inspections is awkwardly divided among several Cabinet departments. The principal agencies involved are the Treasury Department's Bureau of Customs, which inspects goods, and the Justice Department's Immigration and Naturalization Service, which inspects persons and their papers. The two utilize separate inspection procedures, hold differing views of inspection priorities, and employ dissimilar personnel management practices.

To reduce the possibility that illicit drugs will escape detection at ports-of-entry because of divided responsibility, and to enhance the effectiveness of the Drug Enforcement Administration, the reorganization plan which I am proposing today would transfer to the Secretary of the Treasury all functions currently vested in Justice Department officials to inspect persons, or the documents of persons.

When the plan takes effect, it is my intention to direct the Secretary of the Treasury to use the resources so transferred—including some 1,000 employees of the Immigration and Naturalization Service—to augment the staff and budget of the Bureau of Customs. The Bureau's primary responsibilities would then include:

—inspection of all persons and goods entering the United States;

—valuation of goods being imported, and assessment of appropriate tariff duties;

—interception of contraband being smuggled into the United States;

—enforcement of U.S. laws governing the international movement of goods, except the investigation of contraband drugs and narcotics; and

—turning over the investigation responsibility for all drug law enforcement cases to the Department of Justice.

The reorganization would thus group most port-of-entry inspection functions in a single Cabinet department. It would reduce the need for much day-to-day interdepartmental coordination, allow more efficient staffing at some field locations, and remove the basis for damaging inter-agency rivalries. It would also give the Secretary of the Treasury the authority and flexibility to meet changing requirements in inspecting the international flow of people and goods. An important by-product of the change would be more convenient service for travellers entering and leaving the country.

REORGANIZATION PLAN NO. 2 OF 1973

For these reasons, I am convinced that inspection activities at U.S. ports-of-entry can more effectively support our drug law enforcement efforts if concentrated in a single agency. The processing of persons at ports-of-entry is too closely interrelated with the inspection of goods to remain organizationally separated from it any longer. Both types of inspections have numerous objectives besides, drug law enforcement, so it is logical to vest them in the Treasury Department, which has long had the principal responsibility for port-of-entry inspection of goods, including goods being transported in connection with persons. As long as the inspections are conducted with full awareness of related drug concerns it is neither necessary nor desirable that they be made a responsibility of the primary drug enforcement organization.

## DECLARATIONS

After investigation, I have found that each action included in Reorganization Plan No. 2 of 1973 is necessary to accomplish one or more of the purposes set forth in Section 901(a) of Title 5 of the United States Code. In particular, the plan is responsive to the intention of the Congress as expressed in Section 901(a)(1): "to promote better execution of the laws, more effective management of the executive branch and of its agencies and functions, and expeditious administration of the public business;" Section 901(a)(3): "to increase the efficiency of the operations of the Government to the fullest extent practicable;" Section 901(a)(5): "to reduce the number of agencies by consolidating those having similar functions under a single head, and to abolish such agencies or functions as may not be necessary for the efficient conduct of the Government;" and Section 901(a)(6): "to eliminate overlapping and duplication of effort."

As required by law, the plan has one logically consistent subject matter: consolidation of Federal drug law enforcement activities in a manner designed to increase their effectiveness.

The plan would establish in the Department of Justice a new Administration designated as the Drug Enforcement Administration. The reorganizations provided for in the plan make necessary the appointment and compensation of new officers as specified in Section 5 of the plan. The rates of compensation fixed for these officers would be comparable to those fixed for officers in the executive branch who have similar responsibilities.

While it is not practicable to specify all of the expenditure reductions and other economies which may result from the actions proposed, some savings may be anticipated in administrative costs now associated with the functions being transferred and consolidated.

435

The proposed reorganization is a necessary step in upgrading the effectiveness of our Nation's drug law enforcement effort. Both of the proposed changes would build on the strengths of established agencies, yielding maximum gains in the battle against drug abuse with minimum loss of time and momentum in the transition.

I am confident that this reorganization plan would significantly increase the overall efficiency and effectiveness of the Federal Government. I urge the Congress to allow it to become effective.

RICHARD NIXON.

THE WHITE HOUSE, March 28, 1973.

436

## REORGANIZATION PLAN NO. 1 OF 1977

42 F.R. 56101, 91 Stat. 1633, as amended Pub.L. 97–195,
§ 1(c)(5), June 16, 1982, 96 Stat. 115

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, July 15, 1977, pursuant to the provisions of Chapter 9 of Title 5 of the United States Code.[1]

### EXECUTIVE OFFICE OF THE PRESIDENT

Section 1.   Redesignation of Domestic Council Staff

The Domestic Council staff is hereby designated the Domestic Policy Staff and shall consist of such staff personnel as are determined by the President to be necessary to assure that the needs of the President for prompt and comprehensive advice are met with respect to matters of economic and domestic policy. The staff shall continue to be headed by an Executive Director who shall be an Assistant to the President, designated by the President, as provided in Section 203 of Reorganization Plan No. 2 of 1970. The Executive Director shall perform such functions as the President may from time to time direct.

Section 2.   Establishment of an Office of Administration

There is hereby established in the Executive Office of the President the Office of Administration which shall be headed by the President. There shall be a Director of the Office of Administration. The Director shall be appointed by the President and shall serve as chief administrative officer of the Office of Administration. The President is authorized to fix the compensation and duties of the Director.

The Office of Administration shall provide components of the Executive Office of the President with such administrative services as the President shall from time to time direct.

Section 3.   Abolition of components

The following components of the Executive Office of the President are hereby abolished:

  A.   The Domestic Council;

  B.   The Office of Drug Abuse Policy,

  C.   The Office of Telecommunications Policy, and

  D.   The Economic Opportunity Council.

Section 4.   Appointment of the Assistant Secretary of Commerce for Communications and Information

CHAPTER II—EMERGENCY REGULATIONS
Plan of operation during a national emergency.

Chapter III—Social Security Administration (Parts 400-499)

Disclosure of official records and information.
Quality control in the Federal-State unemployment insurance system.
Federal old-age, survivors and disability insurance (1950- ).
Federal Coal Mine Health and Safety Act of 1969, Title IV—Black Lung Benefits (1969- ).
Supplemental security income for the aged, blind, and disabled.
Organization and procedures.
Service of process.
Civil monetary penalties, assessments and recommended exclusions.

Chapter IV—Employees' Compensation Appeals Board, Department of Labor (Parts 500-599)

Rules of procedure.

Chapter V—Employment and Training Administration, Department of Labor (Parts 600-699)

Administrative procedure.
Quality control in the Federal-State unemployment insurance system.
Grant...
Tax credit under the Federal Unemployment Tax Act; advances under Title XII of the Social Security Act.
Unemployment compensation for Federal civilian employees.
Unemployment compensation for ex-servicemembers.
Extended benefits in the Federal-State unemployment compensation program.
Interstate arrangement for combining employment and wages.
Trade adjustment assistance for workers under the Trade Act of 1981.
Disaster unemployment assistance.
General provisions governing programs under the Job Training Partnership Act.
Programs under Title I of the Job Training Partnership Act.
Programs under Title II of the Job Training Partnership Act.
Programs under Title III of the Job Training Partnership Act.
Indian and Native American employment and training programs.
Migrant and seasonal farmworker programs.
Labor market information program under Title IV, Part E of the Job Training Partnership Act.
Comprehensive... regulations under the Job Training Partnership Act.
Programs under Title IV of the Job Training Partnership Act.
Job Corps program under Title IV-B of the Job Training Partnership Act.
Worker adjustment and retraining notification.
Standards for benefit payment promptness—unemployment compensation.
Senior community service employment program.
Standards for appeals promptness—unemployment compensation.
General provisions governing the Federal-State Employment Services System.
Establishment and functioning of State employment service.
Services of the employment service system.
Special responsibilities of the Employment Service System.
Temporary employment of aliens in the United States.
Labor certification process for permanent employment of aliens in the United States.
Provisions governing grants to State agencies for employment services activities.

Chapter VII—Employment Standards Administration, Department of Labor (Parts 700-799)

SUBCHAPTER A—LONGSHOREMEN'S AND HARBOR WORKERS' COMPENSATION ACT AND RELATED STATUTES
General.
Administrative... and procedures.

SUBCHAPTER B—FEDERAL COAL MINE HEALTH AND SAFETY ACT OF 1969, AS AMENDED

718  Standards for determining coal miner's total disability or death due to pneumoconiosis.
719  Criteria for determining whether State workmen's compensation laws provide adequate coverage for pneumoconiosis and listing of approved State laws.
722  Criteria for...
725  Claims for benefits under Part C of Title IV of the Federal Mine Safety and Health Act, as amended.
726  Black lung benefits; requirements for coal mine operator's insurance.
727  Review of pending and denied claims under the Black Lung Benefits Reform Act of 1977.

Chapter VII—Benefits Review Board, Department of Labor (Parts 800-899)
801  Establishment and operation of the Board.
802  Rules of practice and procedure.

Chapter VIII—Joint Board for the Enrollment of Actuaries (Parts 900-999)
900  Statement of organization.
901  Regulations governing the performance of actuarial services under the Employee Retirement Income Security Act of 1974.
902  Rules regarding availability of information.
903  Access to records.

Chapter IX—Office of the Assistant Secretary for Veterans' Employment and Training, Department of Labor (Parts 1000-1099)
1000  Services for veterans.

TITLE 21—FOOD AND DRUGS

Chapter I—Food and Drug Administration, Department of Health and Human Services (Parts 1-1299)

SUBCHAPTER A—GENERAL
Part
1   General enforcement regulations.
2   General administrative rulings and decisions.
3   Product jurisdiction.
5   Delegations of authority and organization.
7   Enforcement policy.
10  Administrative practices and procedures.
11  ...
12  Formal evidentiary public hearing.
13  Public hearing before a Public Board of Inquiry.
14  Public hearing before a public advisory committee.
15  Public hearing before the Commissioner.
16  Regulatory hearing before the Food and Drug Administration.
17  Civil money penalties hearings.
19  Standards of conduct and conflicts of interest.
20  Public information.
21  Protection of privacy.
25  Environmental impact considerations.
26  ...
50  Protection of human subjects.
56  Institutional review boards.
58  Good laboratory practice for nonclinical laboratory studies.
60  Patent term restoration.
70  Color additives.
71  Color additive petitions.
73  Listing of color additives exempt from certification.
74  Listing of color additives subject to certification.
80  Color additive certification.
81  General specifications and general restrictions for provisional color additives for...

# TITLE 21—FOOD AND DRUGS—Continued

## CHAPTER B—FOOD FOR HUMAN CONSUMPTION

| Part | |
|---|---|
| 100 | General. |
| 101 | Food labeling. |
| 102 | Common or usual name for nonstandardized foods. |
| 104 | Nutritional quality guidelines for foods. |
| 106 | Current good manufacturing practice for foods. |
| 105 | Foods for special dietary use. |
| 106 | Infant formula quality control procedures. |
| 107 | Infant formula. |
| 108 | Emergency permit control. |
| 109 | Unavoidable contaminants in food for human consumption and food-packaging material. |
| 113 | Thermally processed low-acid foods packed in hermetically sealed containers. |
| 114 | Acidified foods. |
| 110 | Current good manufacturing practice in manufacturing, packing, or holding human food. |
| 129 | Processing and bottling of bottled drinking water. |
| 130 | Food standards: General. |
| 131 | Milk and cream. |
| 133 | Cheeses and related cheese products. |
| 135 | Frozen desserts. |
| 136 | Bakery products. |
| 137 | Cereal flours and related products. |
| 139 | Macaroni and noodle products. |
| 145 | Canned fruits. |
| 146 | Canned fruit juices. |
| 150 | Fruit butters, jellies, preserves, and related products. |
| 152 | Fruit pies. |
| 164 | Tree nut and peanut products. |
| 165 | Beverages. |
| 155 | Canned vegetables. |
| 156 | Vegetable juices. |
| 158 | Frozen vegetables. |
| 160 | Eggs and egg products. |
| 161 | Fish and shellfish. |
| 163 | Cacao products. |
| 168 | Sweeteners and table sirups. |
| 169 | Food dressings and flavorings. |
| 170 | Food additives. |
| 171 | Food additive petitions. |
| 172 | Food additives permitted for direct addition to food for human consumption. |
| 173 | Secondary direct food additives permitted in food for human consumption. |
| 174 | Indirect food additives: General. |
| 175 | Indirect food additives: Adhesives and components of coatings. |
| 176 | Indirect food additives: Paper and paperboard components. |
| 177 | Indirect food additives: Polymers. |
| 178 | Indirect food additives: Adjuvants, production aids, and sanitizers. |
| 179 | Irradiation in the production, processing and handling of food. |
| 180 | Food additives permitted in food or in contact with food on an interim basis pending additional study. |
| 181 | Prior-sanctioned food ingredients. |
| 182 | Substances generally recognized as safe. |
| 184 | Direct food substances affirmed as generally recognized as safe. |
| 186 | Indirect food substances affirmed as generally recognized as safe. |
| 189 | Substances prohibited from use in human food. |

## SUBCHAPTER C—DRUGS: GENERAL

| Part | |
|---|---|
| 200 | General. |
| 201 | Labeling. |
| 202 | Prescription drug advertising. |
| 205 | Guidelines for State licensing of wholesale prescription drug distributors. |
| 210 | Current good manufacturing practice in manufacturing, processing, packing, or holding of drugs; general. |
| 211 | Current good manufacturing practice for finished pharmaceuticals. |
| 225 | Current good manufacturing practice for medicated feeds. |
| 226 | Current good manufacturing practice for Type A medicated articles. |
| 250 | Special requirements for specific human drugs. |
| 290 | Controlled drugs. |
| 291 | Drugs used for treatment of narcotic addicts. |
| 299 | Drugs; official names and established names. |

## SUBCHAPTER D—DRUGS FOR HUMAN USE

| Part | |
|---|---|
| 300 | General. |
| 310 | New drugs. |
| 312 | Investigational new drug application. |
| 314 | Applications for FDA approval to market a new drug or an antibiotic drug. |
| 316 | Orphan drugs. |
| 320 | Bioavailability and bioequivalence requirements. |
| 328 | Over-the-counter drug products intended for oral ingestion that contain alcohol. |
| 330 | Over-the-counter (OTC) human drugs which are generally recognized as safe and effective and not misbranded. |
| 331 | Antacid products for over-the-counter (OTC) human use. |
| 332 | Antiflatulent products for over-the-counter human use. |
| 333 | Topical Antimicrobial drug products for over-the-counter human use. |
| 334 | Antitussive drug products for over-the-counter human use. |
| 335 | Antiemetic drug products for over-the-counter human use. |
| 336 | Nighttime sleep-aid drug products for over-the-counter human use. |
| 340 | Stimulant drug products for over-the-counter human use. |
| 341 | Cold, cough, allergy, bronchodilator, and antiasthmatic drug products for over-the-counter human use. |
| 344 | Topical otic drug products for over-the-counter human use. |
| 346 | Anorectal drug products for over-the-counter human use. |
| 347 | Skin protectant drug products for over-the-counter human use. |
| 348 | External analgesic drug products for over-the-counter human use. |
| 349 | Ophthalmic drug products for over-the-counter human use. |
| 350 | Antiperspirant drug products for over-the-counter human use. |
| 357 | Miscellaneous internal drug products for over-the-counter human use. |
| 358 | Miscellaneous external drug products for over-the-counter human use. |
| 361 | Prescription drugs for human use generally recognized as safe and not misbranded; drugs used in research. |
| 369 | Interpretative statements re: warnings on drugs and devices for over-the-counter use. |
| 429 | Drugs composed wholly or partly of insulin. |
| 430 | Antibiotic drugs; general. |
| 431 | Certification of antibiotic drugs. |
| 432 | Repacking and labeling of antibiotic drugs. |
| 433 | Exemptions from antibiotic certification and labeling requirements. |
| 436 | Tests and methods of assay of antibiotic and antibiotic-containing drugs. |
| 440 | Penicillin antibiotic drugs. |
| 441 | Penem antibiotic drugs. |
| 442 | Cephalosporin antibiotic drugs. |
| 443 | Carbacephem antibiotic drugs. |
| 446 | Oligosaccharide antibiotic drugs. |
| 446 | Tetracycline antibiotic drugs. |
| 448 | Peptide antibiotic drugs. |
| 449 | Aminoglycoside antibiotic drugs. |
| 452 | Antifungal antibiotic drugs. |
| 453 | Antitumor antibiotic drugs. |
| 455 | Macrolide antibiotic drugs. |
| 456 | Antibiotic drugs composed of ... |
| 458 | Certain other antibiotic drugs. |
| 459 | Lincomycin antibiotic drugs. |
| 460 | Antibiotic drugs intended for use in laboratory diagnosis of disease. |

## SUBCHAPTER E—ANIMAL DRUGS, FEEDS, AND RELATED PRODUCTS

| Part | |
|---|---|
| 500 | General. |

TITLE 21—FOOD AND DRUGS—Continued

Unavoidable contaminants in animal food and food-packaging material.
New animal drugs.
New animal drugs for investigational use.
New animal drug applications.
Oral dosage form new animal drugs.
Implantation or injectable dosage form new animal drugs.
Ophthalmic and topical dosage form new animal drugs.
Intramammary dosage forms.
Certain other dosage forms.
Extralabel drug use in animals.
Tolerances for residues of new animal drugs in food.
New animal drugs for use in animal feeds.
Definitions and standards for animal food.
Food additives.

571    Food additive petitions.
573    Food additives permitted in feed and drinking water of animals.
579    Irradiation in the production, processing, and handling of animal feed and pet food.
582    Substances generally recognized as safe.
584    Food substances affirmed as generally recognized as safe in feed and drinking water of animals.
589    Substances prohibited from use in animal food or feed.

SUBCHAPTER F—BIOLOGICS
600    Biological products: general.
606    Current good manufacturing practice for blood and blood components.
607    Establishment registration and product listing for manufacturers of human blood and blood products.
610    General biological products standards.
630    Additional standards for human blood and blood products.
640    Additional standards for human blood and blood products.
660    Additional standards for diagnostic substances for laboratory tests.
680    Additional standards for miscellaneous products.

SUBCHAPTER G—COSMETICS
700    General.
701    Cosmetic labeling.
710    Voluntary registration of cosmetic product establishments.
720    Voluntary filing of cosmetic product ingredient and cosmetic raw material composition statements.
740    Cosmetic product warning statements.

SUBCHAPTER H—MEDICAL DEVICES
800    General.
801    Labeling.
803    Medical device reporting.
806    Medical devices; reports of corrections and removals.
807    Establishment registration and device listing for manufacturers and distributors of devices.
808    Exemptions from Federal preemption of State and local medical device requirements.
809    In vitro diagnostic products for human use.
810    Medical device recall authority.
812    Investigational device exemptions.
813    Investigational exemptions for intraocular lenses.
814    Premarket approval of medical devices.
820    Good manufacturing practice for medical devices: General.
821    Medical device tracking requirements.

872    Dental devices.
874    Ear, nose, and throat devices.
876    Gastroenterology-urology devices.
878    General and plastic surgery devices.
880    General hospital and personal use devices.
882    Neurological devices.
884    Obstetrical and gynecological devices.
886    Ophthalmic devices.
888    Orthopedic devices.
890    Physical medicine devices.
892    Radiology devices.
895    Banned devices.

SUBCHAPTER I—MAMMOGRAPHY QUALITY STANDARDS ACT
900    Mammography.

SUBCHAPTER J—RADIOLOGICAL HEALTH
1000   General.
1002   Records and reports.
1003   Notification of defects or failure to comply.
1004   Repurchase, repairs, or replacement of electronic products.
1005   Importation of electronic products.
1010   Performance standards for electronic products: General.
1020   Performance standards for ionizing radiation emitting products.
1030   Performance standards for microwave and radio frequency emitting products.
1040   Performance standards for light-emitting products.
1050   Performance standards for sonic, infrasonic, and ultrasonic radiation-emitting products.

SUBCHAPTER L—REGULATIONS UNDER CERTAIN OTHER ACTS ADMINISTERED BY THE FOOD AND DRUG ADMINISTRATION
1210   Regulations under the Federal Import Milk Act.
1230   Regulations under the Tea Importation Act.
1240   Control of communicable diseases.
1250   Interstate conveyance sanitation.
1270   Human tissue intended for transplantation.

Chapter II—Drug Enforcement Administration, Department of Justice (Parts 1300—1399)
1300   Definitions.
1301   Registration of manufacturers, distributors, and dispensers of controlled substances.
1302   Labeling and packaging requirements for controlled substances.
1303   Quotas.
1304   Records and reports of registrants.
1305   Order forms.
1306   Prescriptions.
1307   Miscellaneous.
1308   Schedules of controlled substances.
1309   Registration of manufacturers, distributors, importers and exporters and List 1 chemicals.
1310   Records and reports of listed chemicals and certain machines.
1311   Registration of imports and exports of controlled substances.
1312   Importation and exportation of controlled substances.
1313   Importation and exportation of precursors and essential chemicals.
1316   Administrative functions, practices, and procedures.

Chapter III—Office of National Drug Control Policy (Parts 1400—1499)
1401   Public availability of information.
1402   Mandatory declassification review.
1403   Uniform administrative requirements for grants and cooperative agreements to...

TITLE 21—FOOD AND DRUGS—Continued

Public Law 93-253

March 16, 1974
H. R. 8245

AN ACT

To amend Reorganization Plan Numbered 2 of 1973, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) Reorganization Plan Numbered 2 of 1973 is amended by—

Reorganization Plan No. 2 of 1973, amendments.
5 USC app. II.
Repeals.

(1) repealing section 2;

(2) repealing section 6(b) and redesignating section 6(a) as section 6; and

(3) striking "and to the Secretary of the Treasury", and "and to the Department of the Treasury, respectively," from section 8.

Effective date.

(b) The repeals and amendments made by subsection (a) shall be effective as of July 1, 1973.

SEC. 2. Section 2680(h) of title 28, United States Code, is amended by striking out the period at the end thereof and inserting in lieu thereof a colon and the following: "*Provided,* That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.".

Approved March 16, 1974.

Public Law 93-254

March 22, 1974
H. R. 5450

AN ACT

To amend the Marine Protection, Research, and Sanctuaries Act of 1972 in order to implement the provisions of the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Marine Protection, Research, and Sanctuaries Act of 1972 (86 Stat. 1052) is amended as follows:

Marine Protection, Research, and Sanctuaries Act of 1972, amendments.
33 USC 1401.

(1) Section 2 is amended by deleting the last sentence thereof and by adding a new subsection to read as follows:

"(c) It is the purpose of this Act to regulate (1) the transportation by any person of material from the United States and, in the case of United States vessels, aircraft, or agencies, the transportation of material from a location outside the United States, when in either case the transportation is for the purpose of dumping the material into ocean waters, and (2) the dumping of material transported by any person from a location outside the United States, if the dumping occurs in the territorial sea or the contiguous zone of the United States.".

33 USC 1402.

(2) Section 3 is amended—

(A) in subsection (c), by deleting "oil within the meaning of section 11 of the Federal Water Pollution Control Act, as amended (33 U.S.C. 1161), and does not mean sewage from vessels within the meaning of section 13 of such Act (33 U.S.C. 1163)," and inserting in lieu thereof "sewage from vessels within the meaning of section 312 of the Federal Water Pollution Control Act, as amended (33 U.S.C. 1322). Oil within the meaning of



Office of the Attorney General
Washington D. C. 20530

MAY - 6 1997

OFFICE OF THE
GOVERNOR

May 1, 1997

BY CERTIFIED MAIL

The Honorable Frank Keating
Governor of Oklahoma
Oklahoma City, Oklahoma . 73105

Dear Governor Keating:

On behalf of the United States, I hereby accept concurrent legislative jurisdiction over the land that presently is the site of the Federal Transfer Center (FTC) in Oklahoma City.

The State of Oklahoma recently enacted Senate Bill No. 283 to cede to the United States concurrent legislative jurisdiction over the FTC site. That bill, styled "An Act Relating to the United States; Ceding Concurrent Jurisdiction Over Certain Real Property to the United States; Reserving Concurrent Jurisdiction for Certain Purposes; Providing for the Termination of Such Jurisdiction; Providing for Codification; and Declaring an Emergency," was signed by you on April 9, 1997. Section 1 of the Bill provides, in relevant part:

Notwithstanding any other provision of law, concurrent jurisdiction is hereby ceded to the United States over the tract of land comprised and any tracts of land hereafter comprised within the limits of the Oklahoma City Federal Transfer Center, a facility which is leased to the United States and located at Will Rogers World Airport in Oklahoma City, County of Oklahoma. . . . The jurisdiction so ceded shall continue no longer than the United States shall lease or own such lands or portions thereof.

Federal law provides that a state's cession of legislative jurisdiction to the United States does not take effect until accepted by the head of the federal department that has custody over the land. 40 U.S.C. § 255. This letter constitutes the United States' acceptance of concurrent criminal and civil legislative jurisdiction over the tracts of land presently comprised within the limits of the FTC. Enclosed is a copy of the property description for the land over which the United States accepts concurrent jurisdiction.

The Honorable Frank Keating
Page 2


Please execute the acknowledgment of receipt of this letter
on the enclosed copy, and return that copy to:

Michael E. Wall
United States Department of Justice
Environment & Natural Resources Division
Policy, Legislation and Special Litigation Section
950 Pennsylvania Avenue, NW, Room 2133
P.O. Box 4390
Washington, DC  20044-4390

Should you need any further information, please have your staff
contact Mr. Wall on (202) 514-1442, or Jane Crowell, an attorney
with the Federal Bureau of Prisons, on (202) 307-1240.

I appreciate your assistance in this important area of
federal-state cooperation.

Sincerely,

Janet Reno

Enclosure


Receipt of the above notice of acceptance of concurrent
legislative jurisdiction over the site of the Federal Transfer
Center in Oklahoma City, Oklahoma, is hereby acknowledged this
___ day of _____, 199_.

Governor of Oklahoma

Federal Records Centers Federal agencies retire certain noncurrent records in low-cost storage in Federal Records Centers in accordance with established disposition schedules. The centers provide reference services, including loan or return of records in the agency of origin; prepare authenticated reproductions of documents; and furnish information from records. The centers dispose of records of transitory value and transfer to the Office of the National Archives those that have enduring value. The centers also offer technical assistance workshops and advice on the maintenance, storage, records disposition practices, and vital records. Reimbursable microfilming services are available from most centers.

## Federal Records Centers—National Archives and Records Administration

| City/State | Director | Telephone |
| --- | --- | --- |
| Anchorage, AK (654 W. Third Ave., 99501) | Karen L. Lewis, Acting | 907-271-2441 |
| Atlanta, GA (1557 St. Joseph Ave., East Point, 30344) | Charles Reeves | 404-763-7477 |
| Boston, MA (380 Trapelo Rd., Waltham, 02154) | James W. Owens | 617-647-8100 |

For further information, contact the Office of Federal Records Centers. Phone, 301–713–7200.

Records Administration To ensure proper documentation of the organization, policies, and activities of the Government, NARA develops standards and guidelines for the management and disposition of recorded information. It appraises Federal records and approves records disposition schedules. It also monitors archival records not in NARA custody, inspects agency records and records management practices, develops records management training programs, and provides guidance and assistance on proper records management.

Each Federal workday, the *Federal Register* publishes (in both paper and electronic format) current Presidential proclamations and Executive orders, Federal agency regulations having general applicability and legal effect, proposed agency rules, and documents required by statute to be published. All Federal regulations in force are codified annually in the *Code of Federal Regulations*.

Presidential speeches, news conferences, messages, and other materials released by the White House Office of the Press Secretary are published each week in the *Weekly Compilation of Presidential Documents* and annually in the *Public Papers of the Presidents*.

The *United States Government Manual*, published annually, serves as the official handbook of the Federal Government, providing extensive information on agencies of the legislative, judicial, and executive

## Documents

The agency prepares and publishes a wide variety of public documents. Upon issuance, acts of Congress are published immediately in slip law (pamphlet) form and then cumulated and published in each session of Congress in the *United States Statutes at Large*.

## Laws, Regulations, and Presidential

Public Programs The agency has extensive education, exhibit, and publications programs that serve the general public, researchers, scholars, educators and their students, and Government. The Declaration of Independence, the Constitution, and the Bill of Rights are on permanent display in the Rotunda of the National Archives building in Washington, DC, and numerous other Federal documents on a wide variety of historical themes are exhibited in its other facilities nationwide. Educational programs vary from the elementary to the college and professional teaching levels, stressing the use of primary sources. Free and fee publications based on the holdings of the agency are available in both print and electronic formats, and range from general information leaflets to archival finding aids. Many of the high-interest subject area records are published in microform.

For further information, contact the Office of Public Programs. Phone, 202–501–5200. Fax, 202–219–1596.

## Other Activities

National Archives Trust Fund Board The National Archives Trust Fund Board receives funds from the sale of reproductions of historic documents and publications about the records, as well as from gifts and bequests. The Board invests these funds and uses income to support archival functions such as the preparation of publications that make information about historic records more widely available. Members of the Board are the Archivist of the United States, the Secretary of the Treasury, and the Chairman of the National Endowment for the Humanities.

For further information, contact the National Archives Trust Fund Board. Phone, 301–713–6405.

National Historical Publications and Records Commission The agency

For further information, contact the Office of the Federal Register. Phone, 202–523; 202–523–5227; fax, 202–523–6866.

and recommendations for historical works and in cooperating with and encouraging various non-Federal agencies and institutions in gathering and publishing papers and other documents important to the study of American history. The Commission award grants to promote a variety of historically oriented projects, such as publication projects, documentary editing, and archival and editorial education.

The Commission provides grant money for printed and microfilm editions of the papers of important Americans (diplomats, politicians, reformers, scientists, and labor figures, as well as corporate and organizational records. A subsidy program provides grants to nonprofit presses to help support publication costs of sponsored editions.

The Commission makes grants to State and local governments, historical societies, archives, libraries, and associations for the preservation, arrangement, and description of historical records.

Educational programs sponsored by the Commission include an Institute to train archivists in documentary editing and fellowships in the fields of documentary editing and archival administration.

For further information, contact the National Historical Publications and Record Commission. Phone, 202–501–5600.

## Sources of Information

Calendar of Events The National Archives Calendar of Events is published monthly. To be added to the mailing list, call 202–501–5525. For a recorded announcement of events at the National Archives at College Park, call 202–501–5000. For the hearing impaired, call 202–501–5450 for the announcement of events at the National Archives building and 301–713–7143 for events at the College Park building. Congressional Affairs The

(1) Presidential proclamations and Executive orders, except those not having general applicability and legal effect or effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof;

(2) documents or classes of documents that the President may determine from time to time have general applicability and legal effect; and

(3) documents or classes of documents that may be required so to be published by Act of Congress.

For the purposes of this chapter every document or order which prescribes a penalty has general applicability and legal effect.

(b) Documents authorized to be published by regulations; comments and news items excluded. In addition to the foregoing there shall also be published in the Federal Register other documents or classes of documents authorized to be published by the President, but comments or news items of any character may not be published in the Federal Register.

(c) Suspension of requirements for filing of documents; alternate systems for promulgating, filing, or publishing documents; preservation of originals. In the event of an attack or threatened attack upon the continental United States and a determination by the President that as a result of an attack or threatened attack—

(1) publication of the Federal Register or filing of documents with the Office of the Federal Register is impracticable, or

(2) under existing conditions publication in the Federal Register would not serve to give appropriate notice to the public of the contents of documents, the President may, without regard to any other provision of law, suspend all or part of the requirements of law or regulation for filing with the Office or publication in the Federal Register of documents or classes of documents.

The suspensions shall remain in effect until revoked by the President, or by concurrent resolution of the Congress. The President shall establish alternate systems for promulgating, filing, or publishing documents or classes of documents affected by such suspensions, including requirements relating to their effectiveness or validity, that may be considered under the then existing circumstances practicable to provide public notice of the issuance and of the contents of the documents. The alternate systems may, without limitation, provide for the use of regional or specialized publications or depositories for documents, or of the press, the radio, or similar mediums of general communication. Compliance with

alternate systems of filing or publication shall have the same effect as filing with the Office or publication in the Federal Register under this chapter or other law or regulation. With respect to documents promulgated under alternate systems, each agency shall preserve the original and two duplicate originals or two certified copies for filing with the Office when the President determines that it is practicable.

(Pub.L. 90–620, Oct. 22, 1968, 82 Stat. 1274.)

## HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports**

1968 Act. Based on 44 U.S.C. 1961, 1964 ed., § 305 (July 26, 1935, c. 417, § 5, 49 Stat. 501; June 25, 1936, c. 44, 20 Stat. 317).

Senate Report No. 1621, see 1968 U.S. Code Cong. and Adm.News, p. 4438.

**Delegation of Functions**

For delegation of functions, vested in the President by § 5(a) of the Federal

Register Act [now subsec. (a) of this section] to the Attorney General and Archivist of the United States, see § 6(a) of Ex.Ord. No. 10530, May 11, 1954, 19 F.R. 2709, set out as a note under section 301 of Title 3, The President. See also, section 10(f)(1) of Pub.L. 98–497, set out as a note under section 2102 of this title.

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11030

June 19, 1962, 27 F.R. 5847, as amended by Ex.Ord. No. 11354, May 23, 1967, 32 F.R. 7695; Ex.Ord. No. 12080, Sept. 18, 1978, 43 F.R. 42235; Ex.Ord.No. 12608, Sept. 9, 1987, 52 F.R. 34617

PREPARATION, PRESENTATION, FILING, AND PUBLICATION OF EXECUTIVE ORDERS AND PROCLAMATIONS

By virtue of the authority vested in me by the Federal Register Act (49 Stat. 500, as amended; 44 U.S.C. former] 301 et seq.) [now this chapter] and as President of the United States, I hereby prescribe the following regulations governing the preparation, presentation, filing, and publication of Executive orders and proclamations:

Section 1. Form. Proposed Executive orders and proclamations shall be prepared in accordance with the following requirements:

(a) The order or proclamation shall be given a suitable title.

(b) The order or proclamation shall contain a citation of the authority under which it is issued.

(c) Punctuation, capitalization, spelling, and other matters of style shall, in general, conform to the most recent edition of the Style Manual of the

United States Government Printing Office.

(d) The spelling of geographic names shall conform to the decisions of the Board on Geographic Names, established under Section 2 of the Act of July 25, 1947, 61 Stat. 456 (43 U.S.C. 364a et seq.) of Title 43 [Public Lands].

(e) Descriptions of tracts of land shall conform, so far as practicable, to the most recent edition of the "Specifications for Descriptions of Tracts of Land for Use in Executive Orders and Proclamations," prepared by the Bureau of Land Management, Department of the Interior.

(f) Proposed Executive orders and proclamations shall be typewritten on paper approximately $8 \times 11$ inches, and shall have a left-hand margin of approximately 1 inch, and shall be double spaced, except that the cap-

parallel citations to the pertinent titles and parts of the Code of Federal Regulations.

(b) *Parallel tables of Presidential documents and agency rules.* In the Code of Federal Regulations Index, or at such other place as the Director of the Federal Register considers appropriate, tables of proclamations, Executive orders, and similar Presidential documents which are cited as rulemaking authority in currently effective regulations in the Code of Federal Regulations.

(c) *List of CFR sections affected.* Following the text of each Code of Federal Regulations volume, a numerical list of sections which are affected by documents published in the FEDERAL REGISTER. (Separate volumes, "List of Sections Affected, 1949–1963" and "List of CFR Sections Affected, 1964–1972", list all sections of the Code which have been affected by documents published during the period January 1, 1949, to December 31, 1963, and January 1, 1964, to December 31, 1972, respectively.)[1] Listings shall refer to FEDERAL REGISTER pages and shall be designed to enable the user of the Code to find the precise text that was in effect on a given date in the period covered.

[37 FR 23605, Nov. 4, 1972, as amended at 54 FR 9577, Mar. 7, 1989]

§ 8.6   General format and binding.

The Director of the Federal Register shall provide for the binding of the Code into as many separate books as are indicated by the needs of users and compatible with the facilities of the Government Printing Office.

§ 8.7   *Agency cooperation.*

Each agency shall cooperate in keeping publication of the Code current by complying promptly with deadlines set by the Director of the Federal Register and the Public Printer.

§ 8.9   *Form of citation.*

The Code of Federal Regulations may be cited by title and section, and the short form "CFR" may be used for

"Code of Federal Regulations." For example, "1 CFR 10.2" refers to title 1, Code of Federal Regulations, part 10, section 2.

# PART 9—THE UNITED STATES GOVERNMENT MANUAL

Sec.
9.1   Publication required.
9.2   Scope.

AUTHORITY: 44 U.S.C. 1506; sec. 6, E.O. 10530, 19 FR 2709; 3 CFR, 1954–1958 Comp., p. 189.

SOURCE: 37 FR 23606, Nov. 4, 1972, unless otherwise noted.

§ 9.1   Publication required.

The Director of the Federal Register shall separately publish annually or at times designated by the Administrative Committee of the Federal Register a special edition of the FEDERAL REGISTER called "The United States Government Manual" or any other title that the Administrative Committee of the Federal Register considers appropriate. The Director of the Federal Register may issue special supplements to the Manual when such supplementation is considered to be in the public interest.

[54 FR 9577, Mar. 7, 1989]

§ 9.2   Scope.

(a) The Manual shall contain appropriate information about the Executive, Legislative, and Judicial branches of the Federal Government, which for the major Executive agencies shall include—

(1) Descriptions of the agency's public purposes, programs and functions;

(2) Established places and methods whereby the public may obtain information and make submittals or requests; and

(3) Lists of officials heading major operating units.

(b) Brief information about quasiofficial agencies and supplemental information that in the opinion of the Director of the Federal Register is of enough public interest to warrant inclusion shall also be published in the Manual.

---

[1] A three volume set, "List of CFR Sections Affected, 1973–1985", lists all sections of the Code which have been affected during the period January 1, 1973 to December 31, 1985.

## 1 § 202

### HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports**

1947 Acts. House Report No. 251, see 1947 U.S. Code Cong. Service, p. 1511.

---

### GENERAL PROVISIONS   Ch. 3

Pub.L. 94-386, Aug. 14, 1976, 90 Stat. 1170, set out as a note under section 285b of Title 2, The Congress.

Council of District of Columbia.
Functions relating to the Council of the
District of Columbia, see section 2 of

### CROSS REFERENCES

Authorization of appropriations, see 1 USCA § 213.
Avoidance of duplication and waste, see 1 USCA § 211.
Copies as conclusive evidence of original, see 1 USCA § 209.
Copies to members of Congress, see 1 USCA § 209.
Delegation of functions from time to time as directed by Congress, see 1 USCA § 208.
Distribution of copies, exception for slip and pamphlet copies, see 1 USCA § 210.
Office of the Law Revision Counsel, functions respecting preparation, revision, publication, etc., see 2 USCA § 285b.
Printing at Government Printing Office, form and style, ancillaries, see 1 USCA § 205.

### LIBRARY REFERENCES

**American Digest System**

Compilation or preparation of revision of statutes or Code, see Statutes ⊆144.

**Encyclopedias**

Compilation or preparation of revision of statutes or Code, see C.J.S. Statutes § 271 et seq.

### WESTLAW ELECTRONIC RESEARCH

Statutes cases: 361k[all] key number].
See, also, WESTLAW guide following the Explanation pages of this volume.

## § 203.   District of Columbia Code; preparation and publication; cumulative supplements

The Committee on the Judiciary of the House of Representatives is authorized to print bills to codify, revise, and reenact the general and permanent laws relating to the District of Columbia and cumulative supplements thereto, similar in style, respectively, to the Code of Laws of the United States, and supplements thereto, and to so continue until final enactment thereof in both Houses of the Congress.

July 30, 1947, c. 388, 61 Stat. 638.)

### HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports**

1947 Acts. House Report No. 251, see 1947 U.S. Code Cong. Service, p. 1511.

Committee on Revision of the Criminal Laws of the District of Columbia.
Table, 90-216, Title X, §§ 1001 in 1009, Dec. 27, 1967, 81 Stat. 747 which

---

### Ch. 3   CODES AND SUPPLEMENTS

ecommendation with reference to revised code of criminal law and procedure for the District of Columbia, provided by Pub.L. 94-386, Aug. 14, 1976, 90 Stat. 1170, Title VI, § 601, July 29, 1970, 84 Stat. 667, as amended Pub.L. 91-530, 94 Stat. 7, Nov. 21, 1980, set out as a note under section 285b of Title 2, the Congress.

Council of District of Columbia.
Functions relating to the Council of the District of Columbia, see section 2 of Pub.L. 91-386, Aug. 14, 1976, 90 Stat. 1170, set out as a note under section 285b of Title 2, the Congress.

### CROSS REFERENCES

Authorization of appropriations, see 1 USCA § 213.
Avoidance of duplication and waste, see 1 USCA § 211.
Copies as conclusive evidence of original, see 1 USCA § 209.
Copies to members of Congress, see 1 USCA § 209.
Delegation of functions from time to time as directed by Congress, see 1 USCA § 213.
Distribution of copies, exception for slip and pamphlet copies, see 1 USCA § 210.
Office of Law Revision Counsel, functions respecting preparation, revision, publication, etc., see 2 USCA § 285b.
Printing at Government Printing Office, form and style, ancillaries, see 1 USCA § 205.

### LIBRARY REFERENCES

**American Digest System**

Compilation or preparation of revision of statutes or Code, see Statutes ⊆144.

**Encyclopedias**

Compilation or preparation of revision of statutes or Code, see C.J.S. Statutes § 271 et seq.

### WESTLAW ELECTRONIC RESEARCH

Statutes cases: 361k[all] key number].
See, also, WESTLAW guide following the Explanation pages of this volume.

## § 204.   Codes and Supplements as evidence of the Laws of United States and District of Columbia; citation of Codes and Supplements

In all courts, tribunals, and public offices of the United States, at home or abroad, of the District of Columbia, and of each State, Territory, or insular possession of the United States—

(a) United States Code.—The matter set forth in the edition of the Code of Laws of the United States current at any time shall, together with the then current supplement, if any, establish prima facie the laws of the United States, general and permanent in their nature, in force on the day preceding the commencement of the session following the last session the legislation of which is included: Provided, however, That whenever titles of such Code shall have been enacted into positive law the text thereof shall be legal evidence of the laws therein contained, in

---

### 1 § 204

at large.

1     84 Stat. 1242, Sec. 100, the commencement of the Congressional
2  Controlled Substances Act fails to contain the required "enacting" clause
3  as required under 61 Stat. 633, Sec. 101, thus the Act fails to show its
4  authority on its face, whereby the Act must be regarded as policy, not
5  law.

6     84 Stat. 1262, Sec. 402(c)(1), sets jurisdiction of the Act
7  and its enumerated provisions within the judicial domain of an Article
8  III, District Court of the United States.  The "arising under" clause con-
9  tained in this section is found in Article III, Sec. 2 of the National
10  Constitution, identifying the party of interest.  When an agent or agency
11  of the Federal United States, Corporation [28 USC 3002(15)(A)] is carrying
12  out an Article I, delegated power within the several sovereign states,
13  the District Courts of the United States have jurisdiction by way of the
14  "arising under" clause, whether as the complaining party or as a defendant.
15  If, however, an agent or agency of the Federal United States, Corporation,
16  operates under Congress' Article IV legislative jurisdiction, exclusive
17  to the geographical "United States," or federal government, the "arising
18  under" clause does not apply, as the act is perpetrated "under color of
19  law."  In other words, an "Act of Congress," which is locally applicable
20  to and in force only in the District of Columbia, the Commonwealth of Puerto
21  Rico, U.S. Virgin Islands, Guam, and American Samoa, does not legitimately
22  reach the several sovereign states and population at large.  See: FRCr.P,
23  Rule 54(C) and 54(2).

24     84 Stat. 1296, Sec. 1200, (C) of the Congressional Controlled
25  Substances Act, concludes with no "resolving" clause, as required under
26  61 Stat. 634, Sec. 102.

27     PARALLEL TABLES OF AUTHORITIES AND RULES ('96 Ed.) at p. 758

1  under which the accused is charged, convicted, and falsely imprisoned,

2  are not cited, indicating that the statutory provisions are not published

3  in the Federal Register or are there any published implementing regulations

4  in the Code of Federal Regulations.

5  PARALLEL TABLES OF AUTHORITIES AND RULES ('96 Ed.) at p. 811

6  where it is revealed that 84 Stat. 1242-1285 is not cited, thus the Congres-

7  sional Controlled Substances Act possesses no published regulations in

8  the Federal Register or does the Act possess any published implementing

9  regulations in the Code of Federal Regulations.

10  21 C.F.R. 1311.02(a) and (h) — implementing authorities for

11  the Federal Drug Enforcement Administration, which at (a) operate under

12  the non-positive law provision 84 Stat. 1242-1285, and at (h) may lawfully

13  be applied within specifically defined and circumscribed jurisdictional

14  parameters ... out of the jurisdiction of any particular sovereign state.

15  104 Stat. 4933, the congressional progeny to 28 USC 3002(15)(a),

16  defines the "United States" as a Federal Corporation, however, in violation

17  of the Sixth Amendment of the National Constitution (Nature and Cause),

18  and FRCP, Rules 7(c)(1), 10, 11(c)(1), 12(b)(7); 17(a) and (b), and 19,

19  the federal government has fraudulently concealed and misrepresented itself

20  as being other than a federal corporation, while lacking the authority

21  to name or represent the nation at large as an injured party.

22  18 USC 1 thru 12, have not been promulgated in either the Federal

23  Register or the Code of Federal Regulations.

24  18 USC 922-925, have not been promulgated in either the Federal

25  Register or the Code of Federal Regulations.

26  18 USC 3231, (62 Stat. 826), has not been promulgated in either

27  the Federal Register or the Code of Federal Regulations.

28

1   provide. for. civil. penalties for those who import.into. the U.S. Customs

2   Territories of the federal United States, contraband, without a permit

3   or who fail to pay a specified tax, set out under Subsection 1584 of

4   Title 19.

5         26 USC 4721, 4722, 4751, 4753, in accordance with provisions

6   of the Federal Narcotic Law, any person who produces, manufactures,

7   imports, compounds, deals in, sells, dispenses, or gives away narcotic

8   drugs, as defined, must register with the Secretary of the Treasury

9   or his delegate, and pay a special occupational tax.  The same is true

10   with respect to persons who traffic in marijuana.

11         The original statute, known commonly as the Harrison Nar-

12   cotic Act or the Harrison Anti-Narcotic Act, and subsequent amendments,

13   render unlawful all traffic in narcotics by unregistered persons (21

14   USC 171) and impose a tax, represented by appropriate stamps on con-

15   tainers or order form, on all transfers of narcotics and marijuana.

16   See 25 Am.Jur. 2d. 35.

17

18

19

20

21

22

23

24

25

26

# SUBCHAPTER C—SPECIAL EDITIONS OF THE FEDERAL REGISTER

## PART 8—CODE OF FEDERAL REGULATIONS

Sec.
8.1  Policy.
8.2  Orderly development.
8.3  Periodic updating.
8.4  Indexes.
8.5  Ancillaries.
8.6  General format and binding.
8.7  Agency cooperation.
8.9  Form of citation.

AUTHORITY: 44 U.S.C. 1506, 1510; sec. 6, E.O. 10530, 19 FR 2709; 3 CFR, 1954–1958 Comp., p. 189.

SOURCE: 37 FR 23605, Nov. 4, 1972, unless otherwise noted.

### § 8.1  Policy.

(a) Pursuant to chapter 15 of title 44, United States Code, the Director of the Federal Register shall publish periodically a special edition of the FEDERAL REGISTER to present a compact and practical code called the "Code of Federal Regulations", to contain each Federal regulation of general applicability and legal effect.

(b) The Administrative Committee intends that every practical means be used to keep the Code as current and readily usable as possible, within limitations imposed by dependability and reasonable costs.

[37 FR 23605, Nov. 4, 1972, as amended at 54 FR 9677, Mar. 7, 1989]

### § 8.2  Orderly development.

To assure orderly development of the Code of Federal Regulations along practical lines, the Director of the Federal Register may establish new titles in the Code and rearrange existing titles and subordinate assignments. However, before taking an action under this section, the Director shall consult with each agency directly affected by the proposed change.

### § 8.3  Periodic updating.

(a) Criteria. Each book of the Code shall be updated at least once each calendar year. If no change in its contents has occurred during the year, a simple

notation to that effect may serve as the supplement for that year. More frequent updating of any unit of the Code may be made whenever the Director of the Federal Register determines that the content of the unit has been substantially superseded or otherwise determines that such action would be consistent with the intent and purpose of the Administrative Committee as stated in § 8.1.

(b) Staggered publication. The Code will be produced over a 12-month period under a staggered publication system to be determined by the Director of the Federal Register.

(c) Cutoff dates. Each updated title of the Code will reflect each amendment to that title published as a codified regulation in the FEDERAL REGISTER on or before the "As of" date. Thus, each title updated as of July 1 each year will reflect all amendatory documents appearing in the daily FEDERAL REGISTER on or before July 1.

[37 FR 23605, Nov. 4, 1972, as amended at 54 FR 9677, Mar. 7, 1989]

### § 8.4  Indexes.

A subject index to the entire Code shall be annually revised and separately published. An agency-prepared index for any individual book may be published with the approval of the Director of the Federal Register.

### § 8.5  Ancillaries.

The Code shall provide, among others, the following-described finding aids:

(a) Parallel tables of statutory authorities and rules. In the Code of Federal Regulations Index or at such other place as the Director of the Federal Register considers appropriate, numerical lists of all sections of the current edition of the United States Code (except section 301 of title 5) which are cited by issuing agencies as rulemaking authority for currently effective regulations in the Code of Federal Regulations. The lists shall be arranged in the order of the titles and sections of the United States Code with

Drug Enforcement Administration, Justice

§ 1311.25

## FEES FOR REGISTRATION AND REREGISTRATION

### § 1311.11 Fee amounts.

(a) For each registration or reregistration to import controlled substances, the registrant shall pay an application fee of $438 for an annual registration.

(b) For each registration or reregistration to export controlled substances, the registrant shall pay an application fee of $438 for an annual registration.

[58 FR 15274, Mar. 22, 1993]

### § 1311.12 Time and method of payment; refund.

The time and method of payment of application fees and refunds of application fees shall be as provided in § 1301.12 of this chapter.

[53 FR 4963, Feb. 19, 1988]

## REQUIREMENTS OF REGISTRATION

### § 1311.21 Persons required to register.

Every person who imports any controlled substance, or who exports any controlled substance, or who proposes to engage in such importation or exportation, shall obtain annually a registration unless exempted by law or pursuant to §§ 1311.24 through 1311.27. Only persons actually engaged in such activities are required to obtain registration; related or affiliated persons who are not engaged in such activities are not required to be registered. (For example, a stockholder or parent corporation importing controlled substances is not required to obtain a registration.)

[52 FR 17283, May 7, 1987]

### § 1311.22 Separate registration for independent activities.

(a) Every person who engages in more than one group of independent activities, as described in § 1301.22 of this chapter shall obtain a separate registration for each group of activities as required by that section.

(b) A single registration to engage in any group of independent activities may include one or more controlled substances listed in the schedules authorized in that group of independent

activities. A person registered to conduct research with controlled substances listed in schedule I may conduct research with any substance listed in schedule I for which he has filed and had approved a research protocol.

[36 FR 7612, Apr. 24, 1971, as amended at 36 FR 18734, Sept. 21, 1971. Redesignated at 38 FR 26609, Sept. 24, 1973]

### § 1311.23 Separate registrations for separate locations.

(a) A separate registration is required for each principal place of business at one general physical location where controlled substances are imported or exported by a person.

(b) The following locations shall be deemed not to be places where controlled substances are imported or exported:

(1) A warehouse where controlled substances are stored on behalf of a registered person, unless such substances are distributed directly from such warehouse to persons other than the registered person or persons not required to register by virtue of subsection 1007(b)(1)(B) (21 U.S.C. 957(b)(1)(B)); and

(2) An office used by agents of a registrant where sales of controlled substances are solicited, made, or supervised but which neither contains such substances (other than substances for display purposes) nor serves as a distribution point for filling sales orders.

### § 1311.24 Exemption of certain military personnel.

The requirement of registration is waived for any official or agency of the U.S. Army, Navy, Marine Corps, Air Force, Coast Guard, or Public Health Service who or which is authorized to import or export controlled substances in the course of his official duties.

[36 FR 7612, Apr. 24, 1971, as amended at 36 FR 18734, Sept. 21, 1971. Redesignated at 38 FR 26609, Sept. 24, 1973]

### § 1311.25 Exemption of law enforcement officials.

The requirement of registration is waived for any officer or employee of the Administration, any officer of the U.S. Customs Service, any officer or employee of the U.S. Food and Drug Administration, and any other Federal

# EXHIBIT B

_Reginald Leon McCoy #11732-018_
Full Name/Prisoner Number

_FCI Oakdale, P.O. Box 5050_
Complete Prison Address (Place of Confinement)
_209 E. Fifth Ave._
_Oakdale, LA 71463_

IN THE UNITED STATES DISTRICT OF COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

Civil Action No. _____
                (To be supplied by the Court)

_Reginald L. McCoy #11732-018_ , Applicant
Full Name and Prisoner Number

                v.

_Mr. Joseph Young_ , Respondent
(Name of Warden, Superintendent,

        and

_Harley G. Lappin_  Dir.
FEDERAL BUREAU OF PRISONS

        and

_Eric B. Holder_  Esq.,
ATTORNEY'S GEN. OF THE "UNITED STATES."

- 2 -

APPLICATION FOR A WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241
BY A PERSON IN FEDERAL CUSTODY

CONVICTION UNDER ATTACK

1)   Name and location of the court which entered the judgment of conviction under attack:

*United States District Court For The Middle District of Florida, Tampa Division*

2)   Date judgment of conviction was entered *March 15, 1991*

3)   Case number *#90-132-Cr-T-17(a)*

4)   Type and length of sentence imposed *LIFE*

5)   Are you presently serving a sentence imposed for a conviction other than the conviction under attack in this motion? Yes _____ No *✓*

6)   Nature of the offense involved (all counts) *Consp./Poss. with intent to distribute 50 or more Gr. of cocaine base.*

7)   What was your plea?   (check one)

Not Guilty *X*     Guilty _____     Nolo Contendere _____

8)   If you entered a guilty plea to one count or indictment, and a not guilty plea to another court or indictment, give details:

*N/A*

9)   If you entered a plea of guilty pursuant to a plea bargain, state the terms and conditions of the agreement:

*N/A*

10)  Kind of trial (check one)  Jury *X*     Judge only _____

11)  Did you testify at trial?  Yes *X*     No _____

-3-

DIRECT APPEAL

12)  Did you appeal from the judgment of conviction?
Yes  *X*   No _____

13)  If you did appeal, give the name and location of the court
where the appeal was filed, the result, the case number and date of
the court's decision (or attach a copy of the court's opinion or
order):

*Eleventh Cir. Court of Appeals; Denied; unk*

_____

_____

14)  If you did not appeal, explain briefly why you did not:

_____

_____ *N/A* _____

a)  Did you seek permission to file a late appeal?
Yes _____   No _____

POST-CONVICTION PROCEEDINGS

15)  Other than a direct appeal from the judgment of conviction and
sentence, have you previously filed any petitions,
applications, or motions with respect to this judgment in any
federal court? Yes  *X*   No _____

16)  If your answer to 15 was "Yes," give the following
information:

a)  FIRST petition, application or motion.

1.  Name of court  *U.S. Dist. Ct. Middle Dist. of Fla.*

2.  Nature of proceeding  *§ 2255*

_____

3.  Claims raised _____
_____ *unk* _____

4.  Did you receive an evidentiary hearing on your
petition, application or motion?
Yes _____   No  *X*

5.  Result  *Denied*

6.  Date of result  *unk*

· 4 ·

7.  Did you appeal the result to the federal appellate court having jurisdiction? Yes _____ No _✓_. If you did appeal, give the name of the court where the appeal was filed, the result, the case number, citation and date of the court's decision (or attach a copy of the court's opinion or order):

_____ *N/A* _____

8.  If you did not appeal, briefly explain why you did not: _____
_____ *Frivolous* _____

b)  As to any SECOND petition, application or motion, give the following information:

1.  Name of court _____ *Same* _____

2.  Nature of proceeding _____
_____ *Same* _____

3.  Claims raised _____
_____ *unk* _____

4.  Did you receive an evidentiary hearing on your petition, application or motion?
    Yes _____ No _✓_

5.  Result _____ *Denied* _____

6.  Date of result _____ *unk* _____

7.  Did you appeal the result to the federal appellate court having jurisdiction? Yes _____ No _✓_. If you did appeal, give the name of the court where the appeal was filed, the result, the case number, citation and date of the court's decision (or attach a copy of the court's opinion or order):

_____ *N/A* _____

8.  If you did not appeal, briefly explain why you did not: _____
_____ *N/A* _____

c)   As to any THIRD petition, application or motion, give the following information:

1.   Name of court _____ *Same* _____

2.   Nature of proceeding _____ *Same* _____

3.   Claims raised _____ *unth* _____

4.   Did you receive an evidentiary hearing on your petition, application or motion? Yes ____ No ✓

5.   Result____ *Denied* _____

6.   Date of result _____ *unth* _____

7.   Did you appeal the result to the federal appellate court having jurisdiction? Yes ____ No ✓. If you did appeal, give the name of the court where the appeal was filed, the result, the case number, citation and date of the court's decision (or attach a copy of the court's opinion or order):

_____
_____ *Frivolous* _____

8.   If you did not appeal, briefly explain why you did not:

_____
_____ *N/A* _____

CLAIMS

17)  State concisely every claim that you are being held unlawfully.  Summarize briefly the facts supporting each claim.  If necessary, you may attach extra pages stating additional claims and supporting facts.  You should raise in the application all claims for relief which relate to the conviction under attack.

In order to proceed in federal court, you ordinarily must exhaust the administrative remedies available to you as to each claim on which you request action by the federal court.

CLAIM ONE: Lack of Federal subject matter jurisdiction

(1)  Supporting Facts: (Without citing legal authorities or argument state briefly the facts in support of this claim) *See*, Attached Brief and Exhibits,
_____

- 6 -

*See Affidavit/ Ground One*

_____

(2)  Did you seek administrative relief as to claim one?
     Yes _____ No _X_. If your answer is "Yes," describe the
     procedure followed and the result.  If your answer is
     "No," explain why you did not seek administrative relief:

_____

*N/A*

_____

Administrative grievance policy and procedure provides no
authority in law to redress the challenges raised herein or
the power to grant relief therefrom.  Administrative grievance
procedure is inapplicable to address or provide a remedy for
relief of the issue(s) raised herein.

CLAIM TWO: *See Ground Two/Exhibits*

_____

_____

(1)  Supporting Facts:  (Without citing legal authorities or
     argument state briefly the facts in support of this
     claim)

_____

*Ground Two, attached*

_____

(2)  Did you seek administrative relief as to claim two?
     Yes _____ No _X_. If your answer is "Yes," describe the
     procedure followed and the result.  If your answer is
     "No," explain why you did not seek administrative relief:

_____

*N/A*

_____

CLAIM THREE: _____

*N/A*

_____

(1)   Supporting Facts: (Without citing legal authorities or argument state briefly the facts in support of this claim)

_N/A_

(2)   Did you seek administrative relief as to claim three? Yes _____ No _X_. If your answer is "Yes," describe the procedure followed and the result.  If your answer is "No," explain why you did not seek administrative relief:

_N/A_

CLAIM FOUR:_____

_N/A_

(1)   Supporting Facts: (Without citing legal authorities or argument state briefly the facts in support of this claim)_____

_N/A_

(2)   Did you seek administrative relief as to claim four? Yes _____ No _____. If your answer is "Yes," describe the procedure followed and the result.  If your answer is "No," explain why you did not seek administrative relief:

_N/A_

18)   Do you have any petition, application, motion or appeal now pending in any court, either state or federal, regarding the conviction under attack? Yes _____ No _____. If "Yes," state

- 8

the name of the court, case file number (if known), and the
nature of the proceeding:

_____

_____

_____

19)   State briefly why you believe that the remedy provided by 28
      U.S.C. § 2255 (Motion to Vacate Sentence) is inadequate or
      ineffective to test the legality of your detention:

*Petitioner is convicted of an offense the law does not make criminal.
He is actually innocent. His detention is a fundamentally unjust incarceration;
a complete miscarriage of justice. Davis v. U.S., 94 S.Ct. 2298, 2299, 41 L.Ed.2d
109 (1974). Only § 2241(c)(3) can remedy lack of subject matter jurisdiction.*

Wherefore, applicant prays that the court grant him such relief to
which he may be entitled in this proceeding.


_____          *Reggie L. McCoy*
Signature of Attorney (if any)            APPLICANT'S ORIGINAL SIGNATURE


_____
              *N/A*
_____

Attorney's Full Address and
Telephone Number

                DECLARATION UNDER PENALTY OF PERJURY

      The undersigned declares under penalty of perjury that he/she
is the applicant in this action, that he/she has read this
application and that the information contained in the application
is true and correct.  *28 U.S.C. § 1746: 18 U.S.C. § 1621.*

      Executed at *FCI Oakdale*              on *7-14-2011*
                    (Location)                    (Date)

                         *Reggie L. McCoy*
                    Applicant's Original Signature

# DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he/she is the applicant in this action, that he/she has read this application and that the information contained in the application is true and correct.  28 U.S.C. §1746, 18 U.S.C. §1621.

Executed at  _Oakdale FCI_  on  _7-14-2011_
                    (Location)                      (Date)

_Kelsie L. McCoy_
Applicant's Original Signature

- 10 -

CERTIFICATE OF SERVICE

I, the undersigned, aver under penalty of perjury that a true and correct copy of the foregoing has this _14ᵗʰ_ day _July_ , 2011 A.D., has been deposited into the outgoing prison "Legal Mail" system, with sufficient First Class postage affixed and properly addressed to the following named parties:

1. Warden Joseph Young, FCI Oakdale SMW, P.O. Box 5050, 209 E Fifth Ave, Oakdale, LA 71463

2. U.S. Atty. Gen. Eric B. Holder, U.S. Department of Justice 950 Pennsylvania Avenue, N.W. Washington, DC 20530-0001

Respectfully Submitted;

Reggie L. McCoy
#11732-018

cc: file
    enclosures

— 11 —

## Ground One Intro.

Movant avers that his conviction clearly qualify for an unbias and unobstructed review by this Hon. court. Through proceedings generally extended under collateral review doctrine or <u>habeas corpus</u> procedures; particularly where direct appeal has been exhausted, the new evidence is only discovered thereafter, and where as herein the evid. is of an exculpatory nature. See <u>Schlup v. Delo</u>, 51 3 U.S. 298, 322 (1995) ( noting that in interpreting the law of collateral review, courts should "accommodate [ ] both the systematic interest of finality . . . and conservation of judicial resources, and the overriding individual interest in doing justice in the "extraordinary case"). Apart from finality, in the interest of justice, it has been the historical function of the criminal courts and their subsequent habeas proceedings to operate with care that only the guilty are imprisoned - "concern about the injustice that result from the conviction of an innocent person has long been at the core of our criminal justice system." <u>id</u>. at 325. And "[I]n appropriate cases," the principles of comity and finality . . . "must yield to the imperative of correcting

1.

a fundamentally unjust incarceration." <u>Murray v. Carrier</u>, 477 U.S. 478, 496 (1986). The Supreme Court has observed in <u>Sawyer v. Whitley</u>, 505 U.S. 333, 340-41 (1992) "[A] prototypical example of "actual innocence" in a colloquial sense is the case where the state has convicted the wrong person of the crime. Such claims are of course regularly made on motions for new trial after conviction in both state and federal courts, and quite regularly denied because the evidence adduced in support of them fails to meet the rigorous standards for granting such motions. But in rare instances, it may turn out later, for example, that another person has credibly confessed to the crime, and it is evident that the law has made a mistake. [thus] in the context of a noncapital case, the concept of "actual innocence" is easy to grasp.

Should this Hon. court allow movant the fair opportunity he will be able to demonstrate his evidence of actual innocence sufficiently meeting the criteria as defined by law. See <u>Kuhlmann</u>, 477 U.S. at 455 (1986)(holding, "the prisoner must show

a fair probability that in light of all of the evid. including what has become available only after trial the trier of facts would have entertained a reasonable doubt of his guilt").

And where, as herein, with due course or through an exercise of exceptional diligence the movant asserts a "freestanding claim of actual innocence", supported by a testimonial scientific statement wherein the government avers that they wrongfully misrepresented as a serious drug offense the underlining crime, and further exculpates movant from being a serious drug trafficker. Herrara v. Collins, 506 U.S. 390, 405 (1993)(quoting Kuhlmann, Supra, at 454 explaining where a defendant claims that he is factually innocent alone would be entitled to relief if he presented newly-discovered evidence)). Indeed, movant need no additional constitutional claims in order to compel relief from the habeas court.

Unlike any of the foregoing authorities the evidence in support of Govt. case as produced at trial remains woefully lacking. Supra, at pgs. 4-6, Ground One, thus,

an "inquiry" (evidentiary hearing) by the
habeas court would not only be warranted
given the nature of the overall claim
Herrera, id. at 401-402. As here, Aug. 3, 20-
10 Congress amended (b)(1)(A)(iii) of §841
U.S.C.. Title 21 to 280 grams of cocaine
base to eliminate the racially discriminate
100:1 ratio between crack/powder cocaine.
namely, 50 or more grams of cocaine base
to prescribe 10 yr. mandatory minimum pena-
lty. [1]

Respectfully,

Reggie L. McCoy

Reginald L. McCoy

#11732-018


Footnote
[1] Particularly where Govt. evidence adduc-
ed at trial included Agent Brahnsen's test-
imony under direct examination failing to
describe the racial disparaty between cr-
ack/powder cocaine and its sameness or
scientificly proven less serious drug offense
than a serious drug trafficking crime as
described under AntiDrug Abuse Act of 1986.
Declared unconstitutional on its face. Ex Parte

Siebold, 100 U.S. 371, 25 L.Ed. 717, 1879 WL 16559 (1879); Bond v. United States, 180 L. Ed. 2d 269 (2011).

2/ See United States v. Brisbane, 367 F.3d 910 (D.C. Cir. 2004).

5

This Petitioner advances before this Hon. Court simple but reliable and cognizable authority defining criteria for review upon which the court could consider grant of relief as sought, such that cuts to the heart of instant matter. Otherwise, with faith Petition-[er] relies on this Honorable court prudential gate-keeping praying that it bring to a cease a fundamental miscarriage of justice, where petitioner can demonstrate that he's innocent of underlying convic-tion; a "Gateway Claim".

The United States Supreme Court has held:

"[U]nder actual innocence exception to procedural bar rule, habeas Petitioner asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt."

*                    *                    *

"Although to be credible, a gateway claim by habeas Petitioner seeking to invoke the actual innocence exception to procedural bar rule requires new reliable evidence that was not presented at trial, the habeas court must assess the likely impact of all the evidence on reasonable juror."

*                    *                    *

"Rather than requiring absolute certainty about guilt or innocence in a habeas case in which, the actual innocence exception to procedural bar rule is invoked, a habeas Petitioner's burden at the gateway stage is to demonstrate that more likely than not, no reasonable juror would find him guilty beyond a reasonable doubt."

*                    *                    *

"... the inquiry requires the [] habeas court to assess how reasonable jurors would react to the overall newly supplemental record."

House v. Bell, 165 L.Ed.2d 1, 126 S.Ct. 2064 (2006).

And:

> "[H]abeas Petitioner made strongest showing required by actual
> innocence exception ... particularly where petitioner called
> into question semen and blood evidence which, was central for-
> ensic proof connecting him to Murder, and <u>put forward substan-
> tial evidence of another suspect</u>".

<u>Id.</u>

Additionally, the District Of Columbia Court Of Appeals has
specifically held:

> "[I]n order to be entitled to a new trial based on newly
> discovered evidence, the defendant must show that (1)
> the evidence proffered is newly discovered; (2) the mov-
> ing party must show diligence in his efforts to obtain
> the new evidence; (3) the evidence must not be merely
> cumulative or impeaching; (4) it must be material to the
> issues involved; and (5) it must be of such a nature that
> an acquittal would likely result from use."

<u>ARRINGTON V. U.S.</u>, 804 A.2d 1068, fn.13 (D.C. 2002)(quoting <u>Dantzler</u>,
696 A.2d at 1355-56 (D.C.1997) explaining "there are, however, cir-
cumstances in which it serves the interest of justice to consider a
new motion containing significant and potentially exculpatory infor-
mation not previously available to the defendant)).

State of Louisiana   }  Know All Persons By These
Allen Parish        }       Presents

_Affidavit In Support of Ineffective_
_Assistance of Counsel Ld. One_
     §2241 (c)(3) Writ of Habeas Corpus

     I, Reginald L. McCoy, am the affiant herein
the affidavit at hand. I am over the legal age
of 21 yrs. old. I am competent enough and
intelligent to testify at any trial or hearing
to the truths herein stated without force, thre-
ats, intimidation or promises of consideration.

     I do state to the best of my personal knowledge:

     1.) At no time before did Attorney Adrian
R. Castro, Esq. advise me that the district
court lacked jurisdiction because the grand
jury did not charge 2,848.5 grams of cocai-
ne base nor invoke (b)(1)(A)(iii),(b)(1)(B) or
§960 (b)(2) of 21 U.S.C. §841 to notify me of
the penalty, or to grant authority to the court
to proceed to trial. He never mentioned this to
me. Mr. Castro told me I was facing 15 yrs.
if found guilty by jury. We never talked plea.

     2.) Had Castro advised me I was facing a
mandatory life sentence of imprisonment bey-
ond a maximum of 5 yrs. under (b)(1)(B),
I would have pled guilty to 5 yrs. for Lt. 1

Cons. to poss. with intent to distribute 50 or more grams of cocaine base. I would not have pled not guilty and went to trial. I would have concurred with the courts determination.

3) I believe I have been a 21 yr. victim of outrageous government misconduct that has tainted the publics confidence in the reputation of the judicial proceeding. Its integrity has been tarnished by an outright abuse of authority and power. United States v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 1642-43, 36 L.Ed 2d 366 (1973).

I, Reginald L. McCoy, do certify and verify that the above statements under the penalty of perjury are true and factual to the best of my knowledge and belief, sworn and admitted on this 19. day of June, 2011. Pursuant to 18 U.S. C. §1746 and §1001 (a).

Affiant,

Reggie L. McCoy
Reginald L. McCoy
FCI Oakdale #11732.018
209 E. Fifth Ave.
P.O. Box 5050
Oakdale, LA 71463

## Ground Two

Whether Atty. Adrian R. Castro. Esq.'s failure to advise movant and object to the district court's lack of jurisdiction to convict and to impose a mandatory maximum sentence of life imprisonment under 21 U.S.C. § 841 absent notice of subsections (b)(1)(A)(iii) cited in Ct. 1 and 2 of the grand jury indictment before trial rendered him ineffective assistance of counsel in violation movant's 6th Amendment right to effective assistance of counsel (2) fair trial by jury and 5th Amendment right to notice (2) indictment by grand jury (3) liberty and (4) equal protection clause, as guaranteed by the U.S. Const. and due process of law?

## Facts

Before trial, Mr. Castro substantially and reasonably investigated and reviewed the evidence and discovery material the government intended to use against movant at trial.

After reviewing the indictment and the grand jury charges, Mr. Castro knew or should have known, since it was obvious on its face, that subsections (b)(1)(A)(iii), (b)(1)(B) nor § 960(b)(2) was not cited or invoked by the grand jury, and the government did not amend the indictment to notify movant of the penalty provision it intended to recommend at sentencing. Know-

ing the district court had no authority or power to act absent jurisdiction. Mr. Castro failed to object or warn movant of the enhanced penalties he faced if found guilty by jury at trial. Instead. Mr. Castro chose to say nothing about the jurisdictional defect of the indictment, nor did he try to reason with movant about negotiating a plea for a lesser sentence than mandatory life without parole. He told movant he faced 15 yrs. And with that, he put up no strategic defense. But misled the district court and movant to believe that it had authority to proceed to trial with the power to penalize or punish. Thereby, causing movant to be prejudiced by his unreasonably deficient performance, with no justification whatsoever. See United States v. Cabrera-Teran, 168 F.3d 141 (5ᵗʰ Cir. 1999)

In Stirone v. United States, 361 U.S. 212, 4 L. Ed. 2d 252, 80 S. Ct. 270 (1960). the Supreme Court stated, "The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment".

Here, Mr. Adrian R. Castro, Esq. allowed the district court to proceed with the trial on Cts. 1 and 2 of the defective indictment that failed to invoke or notify movant of subsections (b)(1)(A)(iii) and (b)(2)(B) or §960(b)(2) or the 2,848.5 grams of cocaine base not charg-

ed by the grand jury without objection, grant-
ing the court jurisdiction over the subject
matter, when the district court had no power
or authority to hear or decide the case. Nor
to amend it to serve the government's purpose.
But Castro consented to it by his waiver.

A claim of ineffective assistance of counsel
is reviewed pursuant to the two-pronged stan-
dard set forth in Strickland v. Washington. 466
U.S. 668 (1984). First, a defendant must show
that counsel's performance was deficient and
"fell below an objective standard of reasona-
bleness." Medina v. Diguglielmo, 461 F.3d 417, 427-28
(3rd Cir. 2006)(quoting Strickland, 466 U.S. at 687-88).
Second, the defendant must establish that counsel's
deficient performance prejudiced his defense. Id.
at 428. A defendant may establish prejudice by
demonstrating that there is a reasonable pro-
bability that, but for counsel's unprofessional
errors, the result of the proceeding would
have been different. A reasonable probability is
a probability sufficient to undermine the confi-
dence in the outcome." Counsel, however, "is str-
ongly presumed to have rendered adequate ass-
istance and made all significant decisions in
the exercise of reasonable professional judgment."
Strickland, 466 U.S. at 690.

Demonstration of Prejudice

At trial, Mr. Castro did not attempt to motion the court for cautionary jury instructions or to explain to the jury that the government had spread false reports about the severe dangers of crack cocaine and its addictive affects and threats of violence on the community as opposed to powder cocaine to the public, and that even Congress was skeptical about the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207, Title 21 U.S.C. § 841 (b)(1)(A) it passed because of the dangers of racial discrimination in penalties it imposed on black drug traffickers in America's societies than white people who conspire and possess with intent to distribute powder cocaine; he could have shown the jury that the 50 or more grams of cocaine base charged in Cts. 1 and 2 of the grand jury indictment was 100:1 ratio and was being presented and used by the government to deceive and mislead the jury to believe that crack was more dangerous than powder cocaine whose penalty was less severe than crack because it was a different form of cocaine. But scientifically, both forms of cocaine are practically the same drug and has the same affect on the

human brain. The jury was misled to believe crack and powder was different. And that the defendants in this case was more dangerous to the community than powder cocaine offenders charged under § 841 (b)(1)(B), who took 5,000 grams of powder, to trigger the mandatory minimum penalty of 10 yrs. opposed to the 50 grams of crack cocaine to trigger the mandatory minimum penalty of 10 yrs. under § 841 (b)(1)(A)(iii) for crack cocaine offenders. But this rationality was withheld from the jury. And the fact that the 100:1 ratio created a racial disparity against blacks were concealed from the jury. But a scientific clarification of the affect, potency and additiveness of the two different forms of cocaine could have dispelled the mental prejudice that had been formed in the minds of the jury from the early 1980's- late 1990's. Because whether smokable crack form or nonsmokable powder form, powder cocaine and crack cocaine had the same affect on our communities. See Appx. B.

On April 29, 2009, the Assistant Attorney General, Criminal Division, Larry D. Breuer testified before the United States Senate Committee on the Judiciary Subco-

mmittee on Crime and Drugs. He stated
on page 9 para 1.

"But we cannot ignore the mounting
evidence that the current cocaine sentenc-
ing disparity is difficult to justify based
on the facts and science, including eviden-
ce that crack is not an inherently more
addictive substance than powder cocaine.
We know of no other controlled substance
where the penalty structure differs so
dramatically because of the drug's form."
(Please read the complete testimony Pg. 1-12).

This testimony should have been and
should be presented to the jury as newly-
discovered evidence contradicting the gove-
rnments witnesses testimonies and misrep-
resentations of crack cocaine as more da-
ngerous to our community than powder
cocaine at trial. The govt. did not even pro-
ve evidence sufficient to establish that Mr.
Roy had ownership, dominion or control over
the premises in which the alleged subst-
ances were located. The only evidence the
govt presented to the jury was Aretha Wil-
liams and DEA Agent Larry Brahnsen test-
imony to a telephone conversation between

Reggie and Sherina Mitchell misinterpreting their conversation of $150.00 dollars referred to as apples, to mean 150 pieces of crack cocaine. But McCoy contends the conversation referred to dollars and not crack. And that he was never in control, dominion or had ownership of Aretha's residence or drugs. He only slept over on occasions with his sons mother Sherina. <u>United States v. Marrero</u>, 496 F.3d 1354 (5th Cir. 1974).

Assuming that McCoy had sold drugs at one time or another, there was no dangerous weapons, assaults, death or serious bodily injury during the commission of the crime nor as a result of the use of the crack cocaine. As is in the instant case, the govt. had no evidence of violence or physical harm or danger to anyone in the community. Therefore, the true nature of the charge was in reality a nonviolent offense. But the govt. used the term drug trafficking crime to deceive and mislead the jury to believe that McCoy was involved in a violent criminal enterprise distributing crack cocaine in and around Manatee County, which was false.

The government knew the penalty for crack cocaine was racially disproportionate to cocaine powder and had a more bias

impact on young black males, and to
charge blacks with crack nine times
out of TEN the jury would return a guil-
ty verdict because of the highly reported
threats and danger crack cocaine pose on
our communities. Mylan. 7 F.3d 1130 (4th Cir. 1993)

This is why to deprive the jury of Mr.
Brewer's testimony would be highly prejud-
icial because the probative value of these
facts about crack/powder cocaine demands
the jury's knowledge. Without it, the jurors
were confused. Or better yet, ignorant of the
law and facts of the case.

Let us think reasonably now; if the jury
had known that they were trying a young
21 yr. old blackman under a Congressional-
ly enacted racially profiled drug statute
under §841 subsections (b)(1)(A)(iii) for cocaine
base (crack): 50 or more grams that was
based on a 100:1 ratio, and if the facts
proved 50 grams of crack, he was actually
being convicted by the jury of 5,000 grams
of powder cocaine, without the jury's knowle-
dge of McCoy having possessed or consp-
ired with intent to distribute 5,000 grams
of powder cocaine; or for that matter, having
even been charged by the grand jury, and
that the penalty for 50 grams of crack

8

would be twice the punishment or equal the penalty for 5,000 grams of powder cocaine which is a mandatory minimum of 10 yrs. and mandatory maximum penalty of life imprisonment; not because McCoy committed a drug crime against the laws of the United States but because he was black in the United States. And because McCoy was black, he was subject to mandatory maximum penalty of life imprisonment for crack.

But had counsel objected to the govt. lack of authority and unfairness in the judicial process or to cautionarily instruct the jury, there is a reasonable probability that, but for counsel's unprofessional errors, the one black female juror out of the 12, perhaps even the Latino, seeing that blacks 82% and Hispanics 58% were being deliberately discriminated against to the 9% whites charged with crack cocaine under the United States federal drug laws; culturally conscious, those two jurors would have disagreed and refused to return a guilty verdict based on the racial profile alone. The doubt was inevitable. A unanimous verdict of guilt would have failed considering all the evidence as a whole, and 2 out of 12 jurors would have returned a not guilty verdict and

9

acquitted McKoy of Ct. One and Ct. Two of the indictment. Kimbrough v. United States, 128 N.S. ___ , 169 L. Ed. 2d 481 (2007).*

Assist. Atty. Gen. Larry D. Breuer, stated, "Ensuring fairness in the criminal justice system is also critically important. Public trust and confidence are essential elements of an effective criminal justice system - our laws and their enforcement must not only be fair, but they must also be perceived as fair. The perception of unfairness undermines governmental authority in the criminal justice process. It leads victims and witnesses of crimes to think twice before cooperating with law enforcement, tempts jurors to ignore the law and facts when judging a criminal case, and draws the public into questioning the motives of governmental officials." Pg. 1 Para 3

And even if the government assumed that the movant should be convicted of the lesser included offense, the court must consider the fact that the indictment is fatally defective and such defects cannot be cured by confession of guilt of a lesser included offense or by agreement of the parties. Love v. Turlington, 733 F. 2d 1562, 1564 (11th Cir. 1984); U. S. v. Baucum, 80 F. 3d 539 (D.C. Cir. 1996)

10

HOWEVER, had Mr. Castro advised and warned movant to plea guilty to the conspiracy to possess with intent to distribute 50 or more grams of cocaine base in Ct. 1 of the indictment, and objected to the court's lack of jurisdiction, movant would not have pled not guilty but would have negotiated a guilty plea to Ct. 1 with the government acknowledging its defections. The government agreeing to a 10 yr. sentence binding on the court, upon defendant's plea.

The court taking judicial notice of the fatal defects of Cts. 1 and 2 of the indictment and its failure to notify movant of the specific quantity of cocaine base, namely, 2,848.5 grams, and omission of subsections (b)(1)(A)(iii), (b)(1)(B) and §960(b)(2) under which the court derives its authority. See Fitzgerald v. Seaboard Sys. R.R., 760 F.2d 1249, 1250 (11th Cir. 1985)("It is a well known fact that parties cannot confer jurisdiction upon the federal courts."); Love v. Turlington, 733 F.2d 1562, 1564 (11th Cir. 1984)("It is an established principle of law that subject matter jurisdiction cannot be created or waived by agreement of the parties."); its a reasonable probability that, but for counsel's unprofessional errors, the perceiving the government's intent to impose an enhanced life sentence beyond the statutory maximum penalty of 5 yrs., the court, on its own motion, would have moved to dismiss the indictment with prejudice for lack of personal and subject matter jurisdict-

ion. See Philbrook v. Glodgett, 421 U.S. 707 (1975)

## Argument

Mr. McKay contends that the grand jury indictment, Judgment of conviction and statutory enhanced mandatory maximum term of life imprisonment is void because the district court had no authority or jurisdiction to impose such conviction. See Fay v. NOIA, 372 U.S. 391, 91 L.Ed.2d 837, 83 S.Ct. 822(1963): Kolender v. Lawson, 461 U.S. 352, 75 L.Ed.2d 903, 103 S.Ct. 1855(1982): Lane v. Williams, 455 U.S. 624, 71 L.Ed.2d 508, 102 S.Ct. 1322 (1982): United States v. Stone, 139 F.3d 822(11th Cir. 1998): Henry v. Henkel, 235 U.S. 219, 35 S.Ct. 54, 59 L.Ed. 203 (1914): Ex parte Fredrich, 149 U.S. 70, 13 S.Ct. 793, 37 L.Ed. 653(1893): In re Crockett, 159 Cal. App. 4th 751, 71 Cal. Rptr. 3d 632 (1st Dist. 2008): Ex parte Bain, 121 U.S. 1, 12-13, 7 S.Ct. 781, 30 L.Ed. 849(1887). There was no probable cause.

## Relief Demanded

Wherefore, for good cause shown above, movant demands this Hon. district court to issue an order for his immediate release from illegal detention due to a void criminal proceeding that renders his custody unlawful, where the court had no authority or power to proceed due to lack of personal

and subject matter jurisdiction. See Ex parte Wilson, 144 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89 (1885); Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717, 1879 WL 16559 (1879); Hepburn v. Chapman, 109 Fla. 133, 149 So. 196 (1933); In re Gregory, 219 U.S. 210, 31 S.Ct. 143, 55 L.Ed. 184 (1911). Therefore, justice and fairness would best be served to protect the fairness, integrity and public's reputation of the judicial proceeding.

Respectfully,

Reggie L. McCoy

Reginald L. McCoy
#11732-018
FCI Oakdale SMU
209 E. Fifth Ave.
P.O. Box 5050
Oakdale, LA 71463

6.19.2011

Footnote
1/ See Superseding Grand Jury Indictment Cts. 1 and 2 Pg. 1-4, Exhibit "A", attached.

2/ See Criminal Judgment/Commitment Order Pg. 1-4, Exhibit "B", attached.

3/ See Governments §851 Notice of intent to seek enhancement Pg. 1-3, Exhibit "C" attached.

Footnote

4/ See Statement of Larry D. Brewer,
Assist. Atty. Gen., Criminal Division,
U.S. Dept. of Justice, attached Exhibit "D."

5/ Govt. presented no evid. or proof of
importation or exportation of crack co-
caine or relating to any other narcotic
drug trafficking in the state, United Sta-
tes or foreign country. Such facts were not
and could not be proven at trial beyond
a reasonable doubt, as the Govt. falsely
stated in its § 851 Notice pg. 2 para 3
to mislead and deceive the court.
        This is why no statutory citations of
subsections (b)(1)(A)(iii), (b)(1)(B) of 21
21.S.C. § 841 or (b)(2) of § 960 were not
cited or invoked to notify movant in the
grand jury indictment. The govt. could not
prove the seriousness of the crimes to
the jury. And (b)(1)(A)(iii) was unconstititional.
Bond v. United States, 180 L.Ed.2d 269 (2011).
* See Kimbrough is only cited to show the
rationality of they voted to amend the
statute title 21 U.S.C. § 841 (b)(1)(A)(iii) of
the 1986 Act on Aug. 3, 2010, by executive
order of President Obama. Ex Parte Nielsen,
131 U.S. 176, 9 S.Ct. 672, 33 L.Ed 118 (1889).

Especially in cases as when the U.S.
Supreme Court has made new interve-
ning changes in the law not available
at the time of movant's trial or direct appeal
in 1996; see Kimbrough v. United States,
128 S.Ct. 558, 169 L.Ed. 2d 481 (2007); Moore
v. United States, 172 L.Ed. 2d 1, 129 S.Ct. __, (2008);
Spears v. United States, 129 S.Ct. __, 172 L.Ed
2d 592 (2009), made retroactive where
movant had no reasonable opportunity
to obtain judicial correction of his convict-
ion or sentence that are both fundament-
ally defective. These decisions were made
13 yrs. after his trial/appeal. And movant co-
uld not be expected to have had knowledge
of §841 (b)(1)(A) substantive change at that
time. United States v. Clark, 260 F.3d 382 (5th
Cir. 2001); Stratton v. United States, 552 U.S.
1092, 128 S.Ct. 859, 169 L.Ed. 2d 706 (2008). Such
clarification is applicable in this case. Collins
v. Youngblood, 497 U.S. 37, 111 L.Ed. 2d 30, 110
S.Ct. 2715 (1990); Miller v. Florida, 482 U.S.
423, 96 L.Ed. 2d 351, 107 S.Ct. 2446 (1987).

    Therefore, §2255 is inadequate and
ineffective to test the legality of his deten-
tion for conviction of a nonexistent offense.
Wofford, 177 F.3d at 1244; and Reyes-Requena
v. United States, 243 F.3d 893 (5th Cir. 2001); Bousley
v. United States, 140 L.Ed. 2d 828, 118 S.Ct. 1604 (1998).

16

Exhibit "A"

Superseding
Grand Jury Indictment Page
1-4

footnote
1/

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA            :
                                    :
v.                                  :        CASE NO. 90-132-Cr-T-17(C)
                                    :
RETHA WILLIAMS,                     :
   a/k/a RETHA GUERRIER,            :
   a/k/a "MUTT",                    :
BEVERLY WILLIAMS,                   :
   a/k/a "BEV",                     :
ALMA MCDUFFY,                       :
   a/k/a "PEACHES",                 :
REGINALD L. MCCOY,                  :
ESSIE SANDERS,                      :
GEORGE HILLS,                       :
ANNIE MAE RENTZ,                    :
FRITZ P. ZIDOR,                     :
YOLANDA SMITH,                      :
EDMOND GUERRIER and                 :
JOHN SANDERS                        :



## SUPERSEDING INDICTMENT

The Grand Jury charges that:

### COUNT ONE

From on or about an unknown date which was at least

in February 1990, through on or about May 31, 1990, in Manatee

County, in the Middle District of Florida, and elsewhere, the

defendants,

RETHA WILLIAMS,
a/k/a RETHA GUERRIER,
a/k/a "MUTT",
BEVERLY WILLIAMS,
a/k/a "BEV",
ALMA MCDUFFY,
a/k/a "PEACHES",
REGINALD L. MCCOY,
ESSIE SANDERS,
GEORGE HILLS,
ANNIE MAE RENTZ,
FRITZ P. ZIDOR,
YOLANDA SMITH,
EDMOND GUERRIER and
JOHN SANDERS,

157

did unlawfully, willingly, and knowingly combine, conspire, confederate, and agree together and with each other and with other persons, both known and unknown to the Grand Jury, to possess with intent to distribute a quantity of 50 grams or more of a mixture or substance containing a detectable amount of cocaine base, also known as "crack", a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

## COUNT TWO

From on or about an unknown date which was at least in February 1990, through on or about May 31, 1990, in Manatee County, in the Middle District of Florida, and elsewhere, the defendants,

> RETHA WILLIAMS,
> a/k/a RETHA GUERRIER,
> a/k/a "MUTT",
> BEVERLY WILLIAMS,
> a/k/a "BEV",
> ALMA MCDUFFY,
> a/k/a "PEACHES",
> REGINALD L. MCCOY,
> ESSIE SANDERS,
> GEORGE HILLS,
> ANNIE MAE RENTZ,
> FRITZ P. ZIDOR,
> YOLANDA SMITH,
> EDMOND GUERRIER and
> JOHN SANDERS,

did knowingly and intentionally possess with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of cocaine base, also known as "crack", a Schedule II controlled substance.

2

In violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

## FORFEITURES

Through the violations of Title 21, United States Code, Sections 841 and 846, alleged in Counts One and Two of this Superseding Indictment, each punishable by imprisonment for more than one year, which counts are realleged and incorporated as if more fully set forth herein, the defendants did obtain, use or intend to use:

A. Property constituting and derived from any proceeds the defendants obtained, directly or indirectly, as the result of such violations;

B. Property used and intended to be used in any manner or part to commit and to facilitate the commission of such violations.

thereby making the defendant's interest in said property, interests, claims and contractual rights forfeitable to the United States pursuant to Title 21, United States Code, Section 853. Said property, interest, claims and contractual rights include, but are not limited to, the following:

1. Real property including any buildings, appurtenances and improvements thereon, located at 2112 Third Avenue East, Palmetto, Florida, more particularly described as follows: Lots 1 and 2, Block 16, Houghton's

3

Subdivision to New Memphis, as per plat
thereof recorded in Plat Book 1 Page 147,
Public Records of Manatee County, Florida.
2.  Real property including any buildings,
appurtenances and improvements thereon,
located at 1605 17th Street East, Bradenton,
Florida, more particularly described as
follows:  Lots 20 and 21, Kingston Estates
Subdivision, as recorded in O.R. Book 0968,
Page 1417, Public Records of Manatee
County, Florida.

The above-described property is forfeitable to the
United States pursuant to Title 21, United States Code,
Section 853.

A TRUE BILL,

_____
                        FOREMAN

ROBERT W. GENZMAN
United States Attorney

By: _____
         JAMES C. PRESTON, JR.
Assistant United States Attorney

By: _____
         KARLA R. SPAULDING
Assistant United States Attorney
Chief, Drug Trafficking Section

4

Exhibit "B"

Criminal Judgment and Commitment
Order Page 1-4

Footnote
2/

MCCOY, Reginald
Reg. No. 11732-018
Unit IIIA
Page 1

*Inmate Copy*

---

**Inmate Request to Staff Member Response**

This is in response to your Inmate Request to Staff Member in which you state, "Could you please provide me with a copy of the recordings or data of my true identity legalizing your custody of me?"

Upon review, on July 1, 1991, you were sentenced to life in prison after being convicted of Conspiracy to Possess with Intent to Distribute 50 Grams or more of Cocaine Base and Possession with Intent to Distribute 50 Grams or more of Cocaine Base. Senior United States District Judge Lee Gagliardi from the Middle District of Florida passed sentence upon you and a copy of his order has been attached. Based upon this document, we are authorized by the Attorney General of the United States to keep you in our custody.

I trust this addresses your concerns.

Date  10/6/04

_____
Jonathan C. Miner
Warden

*Exhibit B*

AO 245 S (Rev. 4/90) Sheet 1 - Judgm    a   nal Case

# United States District Court

RECEIVED
U.S. MARSHAL

**MIDDLE** District of **FLORIDA**

**TAMPA DIVISION**

91 JUL -2 PM 4: 38

UNITED STATES OF AMERICA

V.

REGINALD L. McCOY 11732-018

(Name of Defendant)

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number:    **90-132-CR-T-17**

**ADRIAN R. CASTRO, ESQUIRE**

Defendant's Attorney

THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☒ was found guilty on count(s) **ONE AND TWO** _____ after a
plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21:USC:846 21:USC:841(A)(1) | CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE 50 GRAMS OR MORE OF COCAINE BASE, SCHEDULE II CONTROLLED SUBSTANCE | FROM AN UNKNOWN DATE WHICH AT LEAST WAS FEBRUARY 1990, THROUGH ON OR ABOUT MAY 31, 1990 | ONE |
| 21:USC:841(A)(1) 18:USC:2 | POSSESSION WITH INTENT TO DISTRIBUTE 50 GRAMS OR MORE OF COCAINE BASE, SCHEDULE II CONTROLLED SUBSTANCE | FROM AN UNKNOWN DATE WHICH AT LEAST FEBRUARY 1990, THROUGH ON OR ABOUT MAY 31, 1990 | TWO |

The defendant is sentenced as provided in pages 2 through _____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984..

☐ The defendant has been found not guilty on count(s) _____,
and is discharged as to such count(s). . _

☐ Count(s) _____ (is)(are) dismissed on the motion of the United States.

☒ It is ordered that the defendant shall pay a special assessment of $ **100.00** _____, for count(s)
**ONE AND TWO** _____, which shall be due **XX** immediately ☐ as follows:

IT IS FURTHER ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.: **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** ✓

Defendant's Date of Birth: **JANUARY 19, 1970** ✓

Defendant's Mailing Address:

**C/O UNITED STATES MARSHAL**

_____

Defendant's Residence Address:

**C/O UNITED STATES MARSHAL**

_____

**JULY 1, 1991**
Date of Imposition of Sentence

_____
Signature of Judicial Officer

**LEE P. GAGLIARDI**
**SENIOR U. S. DISTRICT JUDGE**
Name & Title of Judicial Officer

I certify the foregoing
and correct copy of the original
DAVID L. F         Clerk
United States Di
Middle District of Florida
By: Leslie A. Gutty
Deputy Clerk

**JULY 2, 1991**
Date

*U.S.GPO 1990-722 448-10286

AO 245 S (Rev. 4/90) Sheet 2 · Imprisonment

Defendant:    REGINALD L. MCCOY                    Judgment—Page __2__ of __4__
Case Number:  90-132-T-CR-17

## IMPRISONMENT

     The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of __LIFE IMPRISONMENT ON EACH OF COUNTS ONE AND TWO. SAID TERMS OF IMPRISONMENT SHALL RUN CONCURRENT TO EACH OTHER.__

THE DEFENDANT WAS ADVISED OF HIS RIGHT TO APPEAL, AND WAS GIVEN THE APPROPRIATE FORMS IN OPEN COURT TO EFFECT HIS APPEAL.

☐ The court makes the following recommendations to the Bureau of Prisons:

☒ The defendant is remanded to the custody of the United States marshal. TO AWAIT DESIGNATION BY THE BUREAU
☐ The defendant shall surrender to the United States marshal for this district,    OF PRISONS.
          a.m.
    ☐ at _____ p.m. on _____.
    ☐ as notified by the United States marshal.
☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons,
    ☐ before 2 p.m. on _____.
    ☐ as notified by the United States marshal.
    ☐ as notified by the probation office.

## RETURN

    I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on __8-19-91__ to __USP Lewisburg_____ __/__ at
__Lewisburg, PA_____, with a certified copy of this judgment.

                             _P. W. Keohane  Warden_____
                             ~~United States Marshal~~

                By _C. H. Prigg, Legal Tel_____
                      ~~Deputy Marshal~~

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of

TEN (10) YEARS ON EACH OF COUNTS ONE AND TWO, TO RUN CONCURRENT TO EACH

OTHER.

While on supervised release, the defendant shall not commit another federal, state, or local crime, and shall not illegally possess a controlled substance, and shall not possess a firearm or destructive device. The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). If this judgment imposes a restitution obligation, it shall be a condition of supervised release that the defendant pay any such restitution that remains unpaid at the commencement of the term of supervised release.  The defendant shall comply with the following additional conditions:

The defendant shall report in person to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall pay any fines that remain unpaid at the commencement of the term of supervised release.

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this judgment, the defendant shall not commit another federal, state or local crime. In addition:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer within 72 hours of any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician, and shall submit to periodic urinalysis tests as directed by the probation officer to determine the use of any controlled substance;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245 S (REV. 4/90) Sheet 7 - Statement of Reasons

Defendant:   Reginald L. McCoy
Case Number:  90-132-Cr-T-17(C)

Judgment___Page __4__ of __4__

## STATEMENT OF REASONS

[X]   The court adopts the factual findings and guideline application in the presentence report.

OR

[ ]   The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary).

**Guideline Range Determined by the Court:**

Total Offense Level:_____ 42 _____

Criminal History Category:_____ III _____

Imprisonment Range: _____life___.

Supervised Release Range:___10__years

Fine Range: $_____25,000_____to $___8,000,000_____

    [ ]   Fine is waived or is below the guideline range, because of the defendant's inability to pay.

Restitution: $_____0_____

    [ ]   Full restitution is not ordered for the following reason(s):

[X]   The sentence is within the guideline range, that range does not exceed 24 months, and the Court finds no reason to depart from the sentence called for by application of the guidelines.

OR

[ ]   The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s): A sentence at the top of the guideline range will staisfy the statutory purposes of sentences.

OR

The sentence departs from the guideline range

    [ ]  upon motion of the government, as a result of defendant's substantial assistance.

    [ ]  for the following reason(s):

Exhibit "L"

Governments' §851 Notice of intent
to seek enhancement
Pg. 1-3



**U.S. Department of Justice**

*Executive Office for United States Attorneys*
*Freedom of Information & Privacy Staff*
*600 E Street, N.W., Suite 7300, Bicentennial Building*
*Washington, DC 20530-0001*
*(202) 252-6020   FAX: 252-6047   (www.usdoj.gov/usao)*

Requester:  Reggie L. McCoy                                   Request Number:  10-2889

Subject of Request:  Self (Specific Records)

Dear Requester:                                                        2 4 MAR 2011

     Your request for records under the Freedom of Information Act/Privacy Act has been processed.  This letter constitutes a reply from the Executive Office for United States Attorneys, the official recordkeeper for all records located in this office and the various United States Attorneys' offices.  To provide the greatest degree of access authorized by the Freedom of Information Act and the Privacy Act, we have considered your request in light of the provisions of both statutes.

    All of the records you seek are being made available to you.  We have processed your request under the Freedom of Information Act and are making all records required to be released, or considered appropriate for release as a matter of discretion, available to you.  This letter is a full release.

    This is the final action on this above-numbered request.  You may appeal this decision on this request by writing to the **Office of Information Policy, United States Department of Justice, 1425 New York Avenue, Suite 11050, Washington, D.C.  20530-0001**.  Both the letter and envelope should be marked "FOIA Appeal." Your request must be received by OIP within 60 days from the date of this letter. If you are dissatisfied with the results of any such administrative appeal, judicial review may thereafter be available in U.S. District Court, 28 C.F.R. § 16.9.

               Sincerely,

               William G. Stewart II
               Assistant Director

Requester:     Reggie L. McCoy
FOIA #:        10-2889

**Continuation**:

   We are sorry to inform you that the records you requested from the Middle District of Florida cannot be located even though the District has conducted an exhaustive search for the records.  If the records should be found, we will supplement our response.

   The only record located was the Government's Information and Notice of Prior Convictions, which is attached.

REQUESTER:  Reggie L. McCoy

FOIA FILE#:  10-2889

# DOCUMENTS Released in Full "RIF"

_____3_____ pages

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA     :

                    :

v.                           :      Case No. 90-132-Cr-T-17 (C)

                    :

REGINALD McCOY          :

## GOVERNMENT'S INFORMATION AND NOTICE OF PRIOR CONVICTIONS

       COMES NOW the United States of America, by and through its representative, James C. Preston, Jr., Assistant United States Attorney, and files this Information and Notice of the defendant's prior convictions pursuant to Title 21, United States Code, Sections 851, 841(b)(1)(B) and 960(b)(2), and charges that:

       1. On June 27, 1990, the defendant was charged in a Two-count Superseding Indictment with violations of Title 21, United States Code, Sections 841(a)(1) and 846.

       2. Title 21, United States Code, Section 841(b)(1)(A), provides for a mandatory minimum penalty of ten (10) years to life imprisonment without parole, up to a four two million dollar fine and a five-year term of supervised release upon conviction for the above-stated offenses.

       3. Title 21, United States Code, Section 841(b)(1)(A), provides, however, that if any person commits such a violation of Section 841(a)(1) or 846 after two or more prior convictions for an offense punishable under paragraph 841 or for a felony under any other provision of subchapter I or II of Title 21,

Chapter 13, or other law of a state, the United States, or a foreign country relating to narcotic drugs, marijuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a manatory term of life imprisonment and a fine of eight million dollars.  Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this sub-paragraph.  No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

4.  On or about October 13, 1988, the defendant was convicted of possession of cocaine, contrary to the laws and statutes of the State of Florida, Florida Statute Section 893.13.

5.  On or about September 25, 1989, the defendant was convicted of two counts of the sale of cocaine, contrary to the laws and statutes of the State of Florida, Florida Statute Section 893.13.

6.  Said convictions are prior convictions within the meaning of Title 21, United States Code, Sections 851 and 841(b)(1)(B).

Respectfully submitted,

ROBERT W. GENZMAN
United States Attorney

By:_____
     JAMES C. PRESTON, JR.
Assistant United States Attorney
Room 410, 500 Zack Street
Tampa, Florida 33602
Telephone:  (813) 225-7343

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been sent this 26th day of July, 1990, by U.S. Mail to the following:

> Terry C. Christian, Esquire
> 412 East Madison, Suite 911
> Tampa, Florida  33602
> Attorney for Reginald McCoy

JAMES C. PRESTON, JR.
Assistant United States Attorney

3

Exhibit "D"

Statement of Larry A. Breuer
Assistant Attorney General, Criminal
Division
United States Department of Justice
Presented April 29, 2009
Pg.1-12

And

Analysis and Perspective by
Laurie L. Levenson
June 30, 2010
Pg.1-5



# Department of Justice

STATEMENT OF

LANNY A. BREUER
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

BEFORE THE

UNITED STATES SENATE
COMMITTEE ON THE JUDICIARY
SUBCOMMITTEE ON CRIME AND DRUGS

HEARING ENTITLED

"RESTORING FAIRNESS TO FEDERAL SENTENCING:
ADDRESSING THE CRACK-POWDER DISPARITY"

PRESENTED

APRIL 29, 2009

### Introduction

Mr. Chairman, Senator Graham, distinguished members of the Subcommittee —
thank you for giving the Department of Justice the opportunity to appear before you
today to share our views on the important issue of disparities in federal cocaine
sentencing policy.

The Obama Administration firmly believes that our criminal and sentencing laws
must be tough, predictable, fair, and not result in unwarranted racial and ethnic
disparities. Criminal and sentencing laws must provide practical, effective tools for
federal, state, and local law enforcement, prosecutors, and judges to hold criminals
accountable and deter crime. The certainty of our sentencing structure is critical to
disrupting and dismantling the threat posed by drug trafficking organizations and gangs
that plague our nation's streets with dangerous illegal drugs and violence; it is vital in the
fight against violent crime, child exploitation, and sex trafficking; and it is essential to
effectively punishing financial fraud.

Ensuring fairness in the criminal justice system is also critically important. Public
trust and confidence are essential elements of an effective criminal justice system – our
laws and their enforcement must not only be fair, but they must also be perceived as fair.
The perception of unfairness undermines governmental authority in the criminal justice
process. It leads victims and witnesses of crime to think twice before cooperating with
law enforcement, tempts jurors to ignore the law and facts when judging a criminal case,
and draws the public into questioning the motives of governmental officials.

Changing these perceptions will strengthen law enforcement through increased public trust and cooperation, coupled with the availability of legal tools that are both tough and fair. This Administration is committed to reviewing criminal justice issues to ensure that our law enforcement officers and prosecutors have the tools they need to combat crime and ensure public safety, while simultaneously working to root out any unwarranted and unintended disparities in the criminal justice process that may exist.

There is no better place to start our work than with a thorough examination of federal cocaine sentencing policy. Since the United States Sentencing Commission first reported 15 years ago on the differences in sentencing between crack and powder cocaine, a consensus has developed that the federal cocaine sentencing laws should be reassessed. Indeed, over the past 15 years, our understanding of crack and powder cocaine, their effects on the community, and the public safety imperatives surrounding all drug trafficking has evolved. That refined understanding, coupled with the need to ensure fundamental fairness in our sentencing laws, policy, and practice, necessitates a change. We think this change should be addressed in this Congress, and we look forward to working with you and other Members of Congress over the coming months to address the sentencing disparity between crack and powder cocaine.

In committing ourselves to pursuing federal cocaine sentencing policy reform, we do not suggest in any way that our prosecutors or law enforcement agents have acted improperly or imprudently during the last 15 years. To the contrary, they have applied

2

the laws as passed by Congress to address serious crime problems in communities across the nation.

Most in the law enforcement community now recognize the need to reevaluate current federal cocaine sentencing policy – and the disparities the policy creates. Chief Timoney, Administrator Hutchison, and many other enforcement leaders have repeatedly and clearly indicated that the current federal cocaine sentencing policy not only creates the perception of unfairness, but also has the potential to misdirect federal enforcement resources. They have stressed that the most effective anti-drug enforcement strategy will deploy federal resources to disrupt and dismantle major drug trafficking organizations and drug organizations that use violence to terrorize neighborhoods.

For these and others reasons I will describe in the remainder of my testimony, we believe now is the time for us to re-examine federal cocaine sentencing policy – from the perspective of both fundamental fairness and public safety.

## Background

A. *The Drug Trafficking Threat*

Cocaine and other illegal drugs pose a serious risk to the health and safety of Americans. The National Drug Intelligence Center's 2009 National Drug Threat Assessment identifies cocaine as the leading drug threat to society. Cocaine is a dangerous and addictive drug, and its use and abuse can be devastating to families regardless of economic background or social status. Statistics on abuse, emergency room

3

visits, violence, and many other indicators tell the story of tremendous harms caused by cocaine. We must never lose sight of these harms, their impact on our society, and our responsibility to reduce cocaine use and abuse.

Moreover, drug trafficking organizations and gangs have long posed an extremely serious public health and safety threat to the United States. The Administration is committed to rooting out these dangerous organizations. Whether it is Mexican or Colombian drug cartels moving large quantities of powder cocaine into and through the United States, or local gangs distributing thousands of individual rocks of crack in an American community, we will focus our resources on dismantling these enterprises -- and disrupting the flow of money both here and abroad -- to help protect the American public.

In the fight against illegal drugs, we also recognize that vigorous drug interdiction must be complemented with a heavy focus on drug prevention and treatment. Many state and federal inmates struggle with drug addiction, and not all get the treatment they need. The result is that many prisoners are unprepared to return to society. They not only re-offend, but they feed the lucrative black market for drugs. We cannot break this cycle of recidivism without increased attention to prevention and treatment, as well as comprehensive prisoner reentry programs.

It is only through a balanced approach -- combining tough enforcement with robust prevention and treatment efforts -- that we will be successful in stemming both the

demand and supply of illegal drugs in our country.  Strong and predictable sentencing laws are part of this balanced approach.

B.  *The Enactment of the Current Cocaine Sentencing Scheme*

In the 1980s, crack cocaine was the newest form of cocaine to hit American streets.  As this Committee well knows, in 1986, in the midst of this exploding epidemic, Congress passed the Anti-Drug Abuse Act, which set the current federal penalty structure for crack and powder cocaine trafficking.[1]

In doing so, Congress established the five- and ten-year mandatory minimum sentencing regime still in effect today.  Under the law, selling five grams of crack cocaine triggers the same five-year mandatory minimum sentence as selling 500 grams of powder cocaine; those who sell 50 grams of crack are sentenced to the same ten-year mandatory minimum as those selling 5,000 grams of powder cocaine.  Pursuant to its mandate to ensure that the federal sentencing guidelines are consistent with all federal laws, the U.S. Sentencing Commission in 1987 applied this same "100-to-1" ratio to the sentencing guidelines.

Leading up to the enactment of this law, Congress was confronted with heightened public attention on the scourge of illegal drugs and high profile drug overdose deaths, including that of Len Bias, a National Collegiate Athletic Association basketball star drafted by the Boston Celtics.  Proposals for making crack penalties more severe than

---

[1] In 1988, Congress also established a five gram, five-year mandatory minimum sentence for simple possession of crack cocaine, the only federal mandatory minimum penalty for a first offense of simple possession of a controlled substance.  Anti-Drug Abuse Act of 1988, P.L., 100-690.

5

powder penalties ranged from the Reagan Administration's proposed 20-to-1 ratio to the late-Senator Chiles' 1000-to-1 disparity.

The legislative history does not provide definitive evidence for the rationale behind the adoption of the 100-to-1 ratio. What we do know from floor statements and reports on earlier versions of the enacted legislation is that during this debate, Congress sought to focus the tough five- and ten-year mandatory minimum penalties on "serious" and "major" traffickers—the traffickers who keep the street markets operating and the heads of drug trafficking organizations, responsible for delivering very large quantities of drugs. With stiff mandatory minimum penalties for crack cocaine set at levels as low as five grams, many have questioned whether these policy goals were achieved. An analysis by the Sentencing Commission using Fiscal Year 2005 data shows that 55 percent of federal crack defendants were street-level dealers. This compares with only 7.3 percent of powder defendants who were street-level dealers. And while both crack and powder offenders are concentrated in lower-level functions, crack cocaine offenders continue to be dominated by street-level dealers.

C. *The Science of Cocaine: One Drug, Two Forms*

Since the time Congress passed the crack cocaine penalties, much of the information on the different impact and effects of crack cocaine as compared to powder cocaine has come under scrutiny. We have since learned that powder cocaine and crack cocaine produce similar physiological and psychological effects once they reach the

brain. Whether in its powder or crack form, both types of cocaine are addictive and both pose serious health risks.

According to the National Institute on Drug Abuse (NIDA), the key difference in cocaine's effects depends on how it is administered – by snorting, inhaling, or injecting. The intensity and duration of cocaine's effects – in any form – depend on the speed with which it is absorbed into the bloodstream and delivered to the brain. Smoking or injecting cocaine produces a quicker, stronger high than snorting it. For that reason, the user who is smoking or injecting the drug may need more of it sooner to stay high. Because powder cocaine is typically snorted, while crack is most often smoked, crack smokers can potentially become addicted faster than someone snorting powder cocaine. Notably, however, the NIDA has found that smoked cocaine is absorbed into the bloodstream as rapidly as injected cocaine, both of which have similar effects on the brain.

D. *The Policy Debate*

For nearly two decades, the 100-to-1 disparity has been the subject of dynamic debate and discussion among policymakers, academics, criminal justice organizations, and others.

The supporters of the current cocaine penalty structure believe that the disparity is justified because it accounts for the greater degree of violence and weapon possession or

7

use associated with some crack offenses, and because crack can be potentially more addictive than powder, depending on the usual method of use.

This Administration shares these concerns about violence and guns used to commit drug offenses and other crimes associated with such offenses. We recognize that data suggests that weapons involvement and violence in the commission of cocaine-related offenses are generally higher in crack versus powder cases: a 2007 Sentencing Commission report found that weapons involvement for cocaine offenses was 27 percent for powder cocaine and 42.7 percent for crack. The same sample found that some form of violence occurred in 6.3 percent of powder cocaine crimes and in 10.4 percent of crack cocaine crimes.

Violence associated with any offense is a serious crime and must be punished; we think that the best way to address drug-related violence is to ensure the most severe sentences are meted out to those who commit violent offenses. However, increased penalties for this conduct should generally be imposed on a case-by-case basis, not on a class of offenders the majority of whom do not use any violence or possess a weapon. We support sentencing enhancements for those who use weapons in drug trafficking crimes, or those who use minors to commit their crimes, or those who injure or kill someone in relation to a drug trafficking offense. We also support charging separate weapons offenses to increase a sentence when an offender uses a weapon in relation to a drug trafficking offense.

But we cannot ignore the mounting evidence that the current cocaine sentencing disparity is difficult to justify based on the facts and science, including evidence that crack is not an inherently more addictive substance than powder cocaine. We know of no other controlled substance where the penalty structure differs so dramatically because of the drug's form.

Moreover, the Sentencing Commission has documented that the quantity-based cocaine sentencing scheme often punishes low-level crack offenders far more harshly than similarly situated powder cocaine offenders. Additionally, Sentencing Commission data confirms that in 2006, 82 percent of individuals convicted of federal crack cocaine offenses were African American, while just 9 percent were White. In the same year, federal powder cocaine offenders were 14 percent White, 27 percent African American, and 58 percent Hispanic. The impact of these laws has fueled the belief across the country that federal cocaine laws are unjust. We commend the Sentencing Commission for all of its work on this issue over the last 15 years. The Sentencing Commission reports are the definitive compilation of all of the data on federal cocaine sentencing policy. We cannot ignore their message.

### Moving Forward: A Tide of Change

Since 1995, at Congress's request, the Commission has called for legislation to substantially reduce or eliminate the crack/powder sentencing disparity. Most recently, in 2007, the Commission called the crack/powder disparity an "urgent and compelling" issue that Congress must address. Both chambers of Congress have held multiple

9

hearings on the topic, and legislation to substantially reduce or eliminate the disparity has been introduced by members of both political parties.

In addition, the overwhelming majority of states do not distinguish between powder cocaine and crack cocaine offenses.

For the reasons outlined above, this Administration believes that the current federal cocaine sentencing structure fails to appropriately reflect the differences and similarities between crack and powder cocaine, the offenses involving each form of the drug, and the goal of sentencing serious and major traffickers to significant prison sentences. We believe the structure is especially problematic because a growing number of citizens view it as fundamentally unfair. The Administration believes Congress's goal should be to completely eliminate the sentencing disparity between crack cocaine and powder cocaine.

Earlier this month the Attorney General asked the Deputy Attorney General to form and chair a working group to examine federal sentencing and corrections policy. The group's comprehensive review will include possible recommendations to the President and Congress for new sentencing legislation affecting the structure of federal sentencing. In addition to studying issues related to prisoner reentry, Department policies on charging and sentencing, and other sentencing-related topics, the group will also focus on formulating a new federal cocaine sentencing policy; one that completely eliminates the sentencing disparity between crack and powder cocaine but also fully accounts for

10

violence, chronic offenders, weapon possession and other aggravating factors associated – in individual cases – with both crack and powder cocaine trafficking. It will also develop recommendations for legislation, and we look forward to working closely with Congress and the Sentencing Commission on this important policy issue and finding a workable solution.

Until a comprehensive solution – one that embodies new quantity thresholds and perhaps new sentencing enhancements – can be developed and enacted as legislation by Congress and as amended guidelines by the Sentencing Commission, federal prosecutors will adhere to existing law. We are gratified that the Sentencing Commission has already taken a small step to ameliorate the 100:1 ratio contained in existing statutes by amending the guidelines for crack cocaine offenses. We will continue to ask federal courts to calculate the guidelines in crack cocaine cases, as required by Supreme Court decisions. However, we recognize that federal courts have the authority to sentence outside the guidelines in crack cases or even to create their own quantity ratio. Our prosecutors will inform courts that they should act within their discretion to fashion a sentence that is consistent with the objectives of 18 U.S.C. § 3553(a) and our prosecutors will bring the relevant case-specific facts to the courts' attention.

### Conclusion

As the history of this debate makes clear, there has been some disagreement about whether federal cocaine sentencing policy should change, and, if so, how it should change. This Administration and its components, including the Justice Department and

11

the Office of National Drug Control Policy, look forward to working with this Committee and members of Congress in both chambers to develop sentencing laws that are tough, smart, fair, and perceived as such by the American public.  We have already begun our own internal review of sentencing and the federal cocaine laws.  Our goal is to ensure that our sentencing system is tough and predictable, but at the same time promotes public trust and confidence in the fairness of our criminal justice system.  Ultimately, we all share the goals of ensuring that the public is kept safe, reducing crime, and minimizing the wide-reaching, negative effects of illegal drugs.

Thank you for the opportunity to share the Administration's views, and I welcome any questions you may have.

12

**Analysis & Perspective**
**87 Crim. L. Rep. (BNA) 531**
**Sentencing**
**June 30, 2010**

By Laurie L. Levenson

Laurie L. Levenson is professor of **law** and holds the William M. Rains Fellow and David W. Burcham Chair in Ethical Advocacy at Loyola **Law** School, Los Angeles. This piece is derived from her May 27 testimony before the U.S. Sentencing Commission. $99:SENTENCING

Laurie L. Levenson

<sm name="btn" attrs="cmd=.GI:201;12164:CR1063010;14"><sm name="/btn">

Newspaper headlines from across the nation make it apparent that there is overwhelming dissatisfaction with mandatory minimum sentences. Not only are they perceived as unfair, but they are, in fact, inequitable, costly, and ineffectual in achieving their goals. Mandatory minimum sentences, especially with regard to drug offenses, have undermined public confidence in our federal sentencing system. When judges with lifetime tenure quit over the unfairness of sentences, when dozen of former federal prosecutors petition Congress to change such sentences, 1 and when defense lawyers inundate the executive branch with complaints and pleas **for** clemency, it is clear that the downside of such sentences eclipses their usefulness in our federal sentencing scheme.

Today, discomfort with the mandatory minimum sentencing **laws** goes beyond just the issue of the disparity between **crack** and powder cocaine offenses. With at least 171 federal mandatory minimum sentencing **laws** currently on the books, judges are increasingly speaking out against the injustices of mandatory minimum sentences. These judges represent the full political spectrum. They include members of our current U.S. Supreme Court 2 and judges who proudly wear the label "**law** and order" jurists. 3

Just this month, a poll of judges by the U.S. Sentencing Commission revealed that 62 percent of federal judges believe that current mandatory minimums are generally too high. Moreover, 76 percent were particularly concerned that mandatory minimums **for crack** cocaine are too high, and 71 percent believed the mandatory minimums **for** receipt of child pornography are too severe. **For** judges, 75 percent would embrace a system of advisory guidelines without the mandatory minimums. 4

Numerous studies **for** the last 20 years have demonstrated that mandatory minimum sentences in their current configuration do not work. 5 Mandatory minimums do not make us safer, they do not create more equity in sentencing, and they do not create more certainty in sentencing. They are costly, have a disproportionate impact on minority defendants, and force our judges to impose sentences they do not believe are appropriate in the individual case. They shift power

BNACRM                                              1

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

from judges to prosecutors, and they work at odds with our post-*Booker* sentencing system.

As Judge John S. Martin Jr. said shortly after he resigned from the federal bench, mandatory minimums are "cruel, unfair, a waste of resources, and bad <u>law</u> enforcement policy. Other than that they are a great idea." 6

**Problems With Mandatory Minimum Sentences**

The documented problems with mandatory minimum sentences include: (1) they are costly and ineffective; (2) they are not applied uniformly; (3) they transfer discretion from neutral judges to adversarial prosecutors; (4) they have a disparate impact on nonwhite offenders; (5) they create anomalies in the <u>law</u> of sentencing; and (6) they hamper sentencing reform.

Most importantly, mandatory minimums do not make us safer. I have seen no credible evidence, especially in the context of narcotics offenses, that mandatory minimum sentences provide any greater deterrence than sentences imposed under a discretionary sentencing scheme. There are many reasons <u>for</u> this, including the fact that those involved in drug offenses know that the easiest escape from a mandatory minimum sentence is to provide information to prosecutors. By doing so, we end up with a skewed system where more serious offenders are not subject to the mandatory minimum sentences, but where street-level offenders are. As our federal prisons explode with prisoners, primarily nonviolent drug offenders, we cannot seriously say that mandatory minimum sentences have made a positive impact in the so-called "War on Drugs."

Mandatory minimum sentences are also not fairer. Everyone who has worked in the criminal justice system knows of cases where a defendant received a mandatory minimum sentence that seemed grossly excessive <u>for</u> the offense committed. Again, these most often include nonviolent drug offenders who receive mandatory five-, 10-, or 20-year sentences <u>for</u> first-time offenses involving a range of narcotics. Judges across the political spectrum have protested against the injustice of these sentences. As District Judge Paul G. Cassell testified in 2007, it is "simply irrational" to be sentencing a 24-year-old first-time drug offender to life imprisonment when aircraft hijackers, terrorists who detonate bombs in public places, or second-degree murderers would receive less prison time <u>for</u> their offenses. 7

Likewise, mandatory minimum sentences do not create more certainty in sentencing. Studies have documented how prosecutors and judges have devised methods to circumvent the Sentencing Guidelines through, <u>for</u> example, plea bargaining or dismissal of cases. Mandatory minimum <u>laws</u> remain on the books <u>for</u> those unlucky defendants who cannot trade information with the prosecutor in order to avoid the harsh consequences of the mandatory minimums. Unfortunately, that has meant that less-culpable defendants often spend more time in prison than those higher up in the echelons of a drug organization. 8

In addition to knowing what mandatory minimums have not accomplished, we also know the harmful things they have done. First, they have overpopulated our prisons. According to the Bureau of Justice Statistics, with more than 208,000 inmates, federal prisons are operating at 37 percent above their rated capacity. 9 The costs of our current incarceration policies are exorbitant. In 2011, the projected budget <u>for</u> the Federal Prison Bureau is $ 6.1 billion, which is approximately $ 6 million more than its <u>2009</u> budget. Inmates serving mandatory minimum sentences deplete government and correctional facility coffers of the resources that might be used more effectively to provide rehabilitation and alternative sentencing programs <u>for</u> inmates.

BNACRM                                        2

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Second, mandatory minimum sentences have created two systems of justice: one **for** white defendants and another **for** inmates of color. Hispanics and African American defendants have suffered the most because of mandatory minimum sentences, due in part to the 100:1 disparity between the mandatory sentencing provisions **for crack** and powder cocaine. More than 71 percent of the inmates in federal prison are inmates of color; 39.4 percent are black and 32 percent are Hispanic. 10 Most of them are there **for** violations of federal drug offenses which, not coincidentally, are the crimes most affected by mandatory minimum sentences. 11

Most significantly, mandatory minimum sentences have created a crisis of confidence in our criminal justice system. In preparing **for** my May 27 testimony before the U.S. Sentencing Commission, I surveyed close to 100 articles, electronic and traditional, addressing mandatory minimum sentences. These publications run close to 100 to 1 against maintaining our current approach to mandatory minimum sentences. 12 Prior reports cite polls in which Americans voted overwhelming to eliminate mandatory minimums **for** nonviolent crimes. 13 It is difficult **for** the public to have confidence in a criminal justice system when there is an outpouring of criticism from judges, defense lawyers, and even prosecutors.

Given the evident problems with our current system of mandatory minimum sentences, the real question is what we should do to remedy this problem. To answer this question, one must consider the goals of mandatory minimums.

**The Goals of Mandatory Minimum Sentences**

In a recent article on the unintended effects of mandatory **penalties**, Professor Michael Tonry of the University of Minnesota **Law** School summarized the goals of mandatory minimums as follows: They are enacted to promote evenhandedness, transparency, and crime prevention. 14

Under our current approach, mandatory minimums do not lead to evenhandedness in the handling of sentencing. Because judges and prosecutors can circumvent the mandatory minimums, most easily by rewarding "substantial assistance" by a defendant, everyday defendants who have committed the same crimes receive very different sentences. 15 If one truly wants the courts to be evenhanded, judges should be allowed to examine all of the facts of a defendant's case and background, in the manner now allowed **for** sentencing under the advisory Guidelines, in deciding what sentence to impose. Substantial assistance might be one factor, but it is not the only factor that may affect a judge's sentencing decision.

Second, from my own experience, I can tell you that the current sentencing system is anything but transparent. Knowing that their clients face potential mandatory minimums, defense lawyers are quick to make backdoor deals even before an indictment is returned. Thus, the prosecutor and defense lawyer can manipulate the charge and evade the mandatory minimums before the public or a court focuses on the case.

Finally, mandatory minimums have not been effective in crime prevention. 16 While we have certainly incarcerated more defendants, any increase in overall general deterrence has been negligible. More importantly, mandatory minimums are not necessary to deter those individuals who receive lengthy sentences under them. **For** many young offenders, a much shorter sentence is likely to have the same deterrent effect without permanently destroying the defendant's chances at reintegration into society upon release.

Years ago, then-Assistant Attorney General Robert S. Mueller III offered one more argument in

BNACRM                                           3

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

favor of mandatory minimum sentences. He argued that mandatory minimum sentences are necessary because it is the way that "Congress [can send] a strong message that our society will not tolerate certain forms of criminal behavior." 17 That message has been sent. The federal statutes and U.S. Sentencing Guidelines provide ample notice of the stiff **penalties** that await offenders of serious crimes.

Society should not tolerate criminal behavior, but mandatory minimums are a cure worse than the disease. There are more effective and fairer approaches that would be more consistent with sentencing in a post-*Booker* world in which judges' discretion is carefully guided by the U.S. Sentencing Guidelines.

**Proposals for Reform**

The Sentencing Commission and Congress have several options **for** remedying the problems with mandatory minimum sentences. First, as occurred in the 1970s, Congress could simply repeal all of the mandatory **penalty** provisions in the U.S. Code. This would be the most principled approach. The federal system's overall approach toward sentencing is one of "guided discretion." If district judges are going to depart from the Guidelines, they must explain their decisions. Their judgment is then subject to review by an appellate court **for** reasonableness. While the courts use a deferential standard to determine reasonableness, extremely lenient sentences that disregard the seriousness of an offense or an offender's background are still unlikely to stand. Appellate review of sentences guarantees there will be transparency in the process.

In my experience, there is nothing to suggest that judges are looking **for** a way to put dangerous people back on the street. 18 At most, all they want is the flexibility to tailor sentences so that they are accurately taking into account all of the circumstances of the crime and information about the defendant who committed it.

If there is a concern that judges will not take seriously enough the nature of the offense or the actions of a repeat offender, crimes that are now governed by mandatory minimums could instead have "presumptive" sentences. These would act like "reverse safety valves." If the case involves certain aggravating factors, the **law** would trigger a strong presumption that sentencing must be within the Guidelines. Once the government demonstrates that the facts of the case warrant a harsh punishment, the burden would be on the district court to justify a lesser sentence and the appellate courts would not be required to give deference to the lower court's decision. Thus, before a sentence would become permanent, four judges, not just one sentencing judge, would be conducting a careful review of the imposed sentence.

If repeal of mandatory minimum sentences is not politically feasible, Congress should narrow the categories of crimes eligible **for** mandatory minimum sentences. The key, of course, is finding the right criteria to use in making this determination. While challenging, I do not believe this would be an impossible task. Polls demonstrate that the public is most concerned about physical danger, especially from repeat offenders. Therefore, if there are to be mandatory minimum sentences, they should be limited to crimes that cause serious immediate physical harm to others. The Department of Justice agrees with this approach. As U.S. Attorney Sally Yates said, "Mandatory minimum **penalties** should be used judiciously and only **for** serious offenses and should be set at severity levels that are not excessive." 19 If repeat offenders are to face mandatory minimum sentences, these sentences should only be triggered when the offender

BNACRM                                    4

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

poses a significant threat of physical harm to others. If this criterion is used, we would realistically eliminate the majority of mandatory sentencing <u>laws</u> on the books.

What this would mean is that those crimes that have created the most controversy over mandatory minimums would no longer be a problem. In particular, nonviolent drug offenses, immigration offenses, identity theft, pornography offenses not involving actual contact with the child, obstruction-of-justice charges, food stamp charges, white collar offenses, and miscellaneous other offenses (e.g., interference with civil service examinations and trespassing on federal lands) would no longer carry a mandatory minimum prison sentence. It certainly would be worthwhile to revisit the dozens of mandatory sentencing <u>laws</u> enacted in the 18th and 19th centuries, including those, <u>for</u> example, that deal with bribing harbor inspectors or sentencing pirates. 20

I believe that the least effective approach to dealing with mandatory minimum sentences is the piecemeal approach undertaken so far. While I agree that it is critical to reduce the disparity in sentencing <u>for</u> <u>crack</u> and powder cocaine, 21 this change alone will not remedy the racial disparities in sentencing in our criminal justice system. An incremental approach, including proposals to tweak current safety valve standards, ignores the opportunities we have if we conduct a wholesale change in mandatory minimum sentencing. Mandatory minimums have been a failed strategy. The goal is to come up with sentencing strategies that actually work. The federal courts have not yet embraced alternative approaches to, <u>for</u> example, drug offenders. Yet, work in that area is promising. 22

### Conclusion

In my opinion, Congress would be missing a crucial opportunity to act on behalf of the American people to improve our sentencing system if it did not make major changes in our mandatory minimum sentencing scheme. Throughout the decades, the sentencing pendulum has swung back and forth. When I began as a young Assistant U.S. Attorney, judges had unfettered discretion. I admit that there were some times when I was frustrated by that system. Without a Commission to monitor their sentences or national standards to guide them, judges would give wildly different sentences <u>for</u> the same offense. The pendulum then swung toward mandatory sentences, and I became frustrated by that system as well. Prosecutors take an oath to "do justice." That is not synonymous with obtaining a lengthy sentence, especially in cases where everyone in the courtroom -- judge, defense lawyer, and prosecutor -- knows that the mandatory minimum sentence is far more than the defendant deserves.

The current post-*Booker* sentencing scheme has achieved something that did not exist when I began as a prosecutor. The Guidelines themselves present national expectations <u>for</u> the range of sentence in a case. In my experience and from the studies published to date, judges do not readily ignore this information. If we are going to be consistent with Guideline sentencing, the number of mandatory minimum offenses should be drastically reduced or eliminated.

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Dsf buf !QEG!gifnt !x juí pvuíi jt !n f t t bhf !cz!qvsdi bt joh!opwbQEG!qsjouf s!)i uq;0x x x /opwbqegdpn *

APPENDIX B

Title 21 U.S.C. § 841 and 21 U.S.C. § 960

Westlaw.

21 U.S.C.A. § 841

▷

**Effective: November 02, 2002**

UNITED STATES CODE ANNOTATED
TITLE 21. FOOD AND DRUGS
**CHAPTER 13--DRUG ABUSE PREVENTION AND CONTROL**
SUBCHAPTER I--CONTROL AND ENFORCEMENT
PART D--OFFENSES AND PENALTIES
→**§ 841. Prohibited acts A**

(a) Unlawful acts

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

(b) Penalties

Except as otherwise provided in section 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:

(1)(A) In the case of a violation of subsection (a) of this section involving--

(i) 1 kilogram or more of a mixture or substance containing a detectable amount of heroin;

(ii) 5 kilograms or more of a mixture or substance containing a detectable amount of--

(I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;

(III) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(IV) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III);

(iii) 50 grams or more of a mixture or substance described in clause (ii) which contains cocaine base;

(iv) 100 grams or more of phencyclidine (PCP) or 1 kilogram or more of a mixture or substance containing a detectable amount of phencyclidine (PCP);

(v) 10 grams or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 841

(LSD);

(vi) 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide or 100 grams or more of a mixture or substance containing a detectable amount of any analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide;

(vii) 1000 kilograms or more of a mixture or substance containing a detectable amount of marijuana, or 1,000 or more marijuana plants regardless of weight; or

(viii) 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18, or $8,000,000 if the defendant is an individual or $20,000,000 if the defendant is other than an individual, or both. If any person commits a violation of this subparagraph or of section 849, 859 , 860, or 861 of this title after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence. Notwithstanding section 3583 of Title 18, any sentence under this subparagraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

(B) In the case of a violation of subsection (a) of this section involving--

(i) 100 grams or more of a mixture or substance containing a detectable amount of heroin;

(ii) 500 grams or more of a mixture or substance containing a detectable amount of--

(I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;

(III) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(IV) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III);

(iii) 5 grams or more of a mixture or substance described in clause (ii) which contains cocaine base;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 841

**(iv)** 10 grams or more of phencyclidine (PCP) or 100 grams or more of a mixture or substance containing a detectable amount of phencyclidine (PCP);

**(v)** 1 gram or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD);

**(vi)** 40 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide or 10 grams or more of a mixture or substance containing a detectable amount of any analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide;

**(vii)** 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana, or 100 or more marijuana plants regardless of weight; or

**(viii)** 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18, or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of Title 18, any sentence imposed under this subparagraph shall, in the absence of such a prior conviction, include a term of supervised release of at least 4 years in addition to such term of imprisonment and shall, if there was such a prior conviction, include a term of supervised release of at least 8 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

**(C)** In the case of a controlled substance in schedule I or II, gamma hydroxybutyric acid (including when scheduled as an approved drug product for purposes of section 3(a)(1)(B) of the Hillory J. Farias and Samantha Reid Date-Rape Drug Prohibition Act of 2000), or 1 gram of flunitrazepam, except as provided in subparagraphs (A), (B), and (D), such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18, or $2,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of Title 18, any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 6 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 841

the provisions of this subparagraph which provide for a mandatory term of imprisonment if death or serious bodily injury results, nor shall a person so sentenced be eligible for parole during the term of such a sentence.

**(D)** In the case of less than 50 kilograms of marihuana, except in the case of 50 or more marihuana plants regardless of weight, 10 kilograms of hashish, or one kilogram of hashish oil or in the case of any controlled substance in schedule III (other than gamma hydroxybutyric acid), or 30 milligrams of flunitrazepam, such person shall, except as provided in paragraphs (4) and (5) of this subsection, be sentenced to a term of imprisonment of not more than 5 years, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 10 years, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18, or $500,000 if the defendant is an individual or $2,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of Title 18, any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 2 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 4 years in addition to such term of imprisonment.

**(2)** In the case of a controlled substance in schedule IV, such person shall be sentenced to a term of imprisonment of not more than 3 years, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 6 years, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18, or $500,000 if the defendant is an individual or $2,000,000 if the defendant is other than an individual, or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least one year in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 2 years in addition to such term of imprisonment.

**(3)** In the case of a controlled substance in schedule V, such person shall be sentenced to a term of imprisonment of not more than one year, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $100,000 if the defendant is an individual or $250,000 if the defendant is other than an individual, or both. If any person commits such a violation after one or more convictions of him for an offense punishable under this paragraph, or for a crime under any other provision of this subchapter or subchapter II of this chapter or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such persons shall be sentenced to a term of imprisonment of not more than 2 years, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18, or $200,000 if the defendant is an individual or $500,000 if the defendant is other than an individual, or both.

**(4)** Notwithstanding paragraph (1)(D) of this subsection, any person who violates subsection (a) of this section by distributing a small amount of marihuana for no remuneration shall be treated as provided in section 844 of this title and section 3607 of Title 18.

**(5)** Any person who violates subsection (a) of this section by cultivating a controlled substance on Federal property shall be imprisoned as provided in this subsection and shall be fined any amount not to exceed--

**(A)** the amount authorized in accordance with this section;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 841

(B) the amount authorized in accordance with the provisions of Title 18;

(C) $500,000 if the defendant is an individual; or

(D) $1,000,000 if the defendant is other than an individual;

or both.

(6) Any person who violates subsection (a), or attempts to do so, and knowingly or intentionally uses a poison, chemical, or other hazardous substance on Federal land, and, by such use--

(A) creates a serious hazard to humans, wildlife, or domestic animals,

(B) degrades or harms the environment or natural resources, or

(C) pollutes an aquifer, spring, stream, river, or body of water,

shall be fined in accordance with title 18, United States Code, or imprisoned not more than five years, or both.

(7) **Penalties for distribution. (A) In general.** Whoever, with intent to commit a crime of violence, as defined in section 16 of Title 18 (including rape), against an individual, violates subsection (a) of this section by distributing a controlled substance or controlled substance analogue to that individual without that individual's knowledge, shall be imprisoned not more than 20 years and fined in accordance with Title 18.

(B) **Definitions.** For purposes of this paragraph, the term "without that individual's knowledge" means that the individual is unaware that a substance with the ability to alter that individual's ability to appraise conduct or to decline participation in or communicate unwillingness to participate in conduct is administered to the individual.

(c) Offenses involving listed chemicals

Any person who knowingly or intentionally--

(1) possesses a listed chemical with intent to manufacture a controlled substance except as authorized by this subchapter;

(2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance except as authorized by this subchapter; or

(3) with the intent of causing the evasion of the recordkeeping or reporting requirements of section 830 of this title, or the regulations issued under that section, receives or distributes a reportable amount of any listed chemical in units small enough so that the making of records or filing of reports under that section is not required;

shall be fined in accordance with Title 18 or imprisoned not more than 20 years in the case of a violation of paragraph (1) or (2) involving a list I chemical or not more than 10 years in the case of a violation of this subsection other than a violation of paragraph (1) or (2) involving a list I chemical, or both.

(d) Boobytraps on Federal property; penalties; "boobytrap" defined

(1) Any person who assembles, maintains, places, or causes to be placed a boobytrap on Federal property where a controlled substance is being manufactured, distributed, or dispensed shall be sentenced to a term of imprisonment for not more than 10 years or fined under Title 18, or both.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 841

**(2)** If any person commits such a violation after 1 or more prior convictions for an offense punishable under this subsection, such person shall be sentenced to a term of imprisonment of not more than 20 years or fined under Title 18, or both.

**(3)** For the purposes of this subsection, the term "boobytrap" means any concealed or camouflaged device designed to cause bodily injury when triggered by any action of any unsuspecting person making contact with the device. Such term includes guns, ammunition, or explosive devices attached to trip wires or other triggering mechanisms, sharpened stakes, and lines or wires with hooks attached.

**(e)** Ten-year injunction as additional penalty

In addition to any other applicable penalty, any person convicted of a felony violation of this section relating to the receipt, distribution, manufacture, exportation, or importation of a listed chemical may be enjoined from engaging in any transaction involving a listed chemical for not more than ten years.

**(f)** Wrongful distribution or possession of listed chemicals

**(1)** Whoever knowingly distributes a listed chemical in violation of this subchapter (other than in violation of a recordkeeping or reporting requirement of section 830 of this title) shall be fined under Title 18 or imprisoned not more than 5 years, or both.

**(2)** Whoever possesses any listed chemical, with knowledge that the recordkeeping or reporting requirements of section 830 of this title have not been adhered to, if, after such knowledge is acquired, such person does not take immediate steps to remedy the violation shall be fined under Title 18 or imprisoned not more than one year, or both.

**(g)** Redesignated (f)

Current through P.L. 109-169 (excluding P.L. 109-162,109-163)approved 01-11-06

Copr. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(c) Acts committed outside territorial jurisdiction of United States; venue**

This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States. Any person who violates this section shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia.

(Pub.L. 91–513, Title III, § 1009, Oct. 27, 1970, 84 Stat. 1289; Pub.L. 99–570, Title III, § 3161(a), Oct. 27, 1986, 100 Stat. 3207–94; Pub.L. 104–237, Title I, § 102(a), (b), Oct. 3, 1996, 110 Stat. 3100; Pub.L. 104–305, § 2(b)(2)(A), Oct. 13, 1996, 110 Stat. 3807.)

**HISTORICAL AND STATUTORY NOTES**

**References in Text**

Schedules I and II, referred to in text, are set out in section 812(c) of this title.

**Effective and Applicability Provisions**

**1970 Acts.** Section effective the first day of the seventh calendar month that begins after the day immediately preceding Oct. 27, 1970, see section 1105(a) of Pub.L. 91–513, set out as a note under section 951 of this title.

**§ 960. Prohibited acts A**

**(a) Unlawful acts**

Any person who—

(1) contrary to section 952, 953, or 957 of this title, knowingly or intentionally imports or exports a controlled substance,

(2) contrary to section 955 of this title, knowingly or intentionally brings or possesses on board a vessel, aircraft, or vehicle a controlled substance, or

(3) contrary to section 959 of this title, manufactures, possesses with intent to distribute, or distributes a controlled substance,

shall be punished as provided in subsection (b) of this section.

**(b) Penalties**

(1) In the case of a violation of subsection (a) of this section involving—

(A) 1 kilogram or more of a mixture or substance containing a detectable amount of heroin;

(B) 5 kilograms or more of a mixture or substance containing a detectable amount of—

(i) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(ii) cocaine, its salts, optical and geometric isomers, and salts or isomers;

(iii) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(iv) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in clauses (i) through (iii);

(C) 50 grams or more of a mixture or substance described in subparagraph (B) which contains cocaine base;

(D) 100 grams or more of phencyclidine (PCP) or 1 kilogram or more of a mixture or substance containing a detectable amount of phencyclidine (PCP);

(E) 10 grams or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD);

(F) 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1–(2–phenylethyl)–4–piperidinyl] propanamide or 100 grams or more of a mixture or substance containing a detectable amount of any analogue of N-phenyl-N-[1–(2–phenylethyl)–4–piperidinyl] propanamide;

(G) 1000 kilograms or more of a mixture or substance containing a detectable amount of marihuana; or

(H) 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers.

the person committing such violation shall be sentenced to a term of imprisonment of not less than 10 years and not more than life and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than 20 years and not more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not less than 20 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18, or $8,000,000 if the defendant is an individual or $20,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of Title 18, any sentence under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment. Notwith-

standing any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this paragraph. No person sentenced under this paragraph shall be eligible for parole during the term of imprisonment imposed therein.

(2) In the case of a violation of subsection (a) of this section involving—

(A) 100 grams or more of a mixture or substance containing a detectable amount of heroin;

(B) 500 grams or more of a mixture or substance containing a detectable amount of—

(i) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(ii) cocaine, its salts, optical and geometric isomers, and salts or isomers;

(iii) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(iv) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in clauses (i) through (iii);

(C) 5 grams or more of a mixture or substance described in subparagraph (B) which contains cocaine base;

(D) 10 grams or more of phencyclidine (PCP) or 100 grams or more of a mixture or substance containing a detectable amount of phencyclidine (PCP);

(E) 1 gram or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD);

(F) 40 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide or 10 grams or more of a mixture or substance containing a detectable amount of any analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide;

(G) 100 kilograms or more of a mixture or substance containing a detectable amount of marihuana; or

(H) 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers.

the person committing such violation shall be sentenced to a term of imprisonment of not less than 5 years and not more than 40 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years and not more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or

$2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not less than 10 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of Title 18, any sentence imposed under this paragraph shall, in the absence of such a prior conviction, include a term of supervised release of at least 4 years in addition to such term of imprisonment and shall, if there was such a prior conviction, include a term of supervised release of at least 8 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this paragraph. No person sentenced under this paragraph shall be eligible for parole during the term of imprisonment imposed therein.

(3) In the case of a violation under subsection (a) of this section involving a controlled substance in schedule I or II, gamma hydroxybutyric acid (including when scheduled as an approved drug product for purposes of section 3(a)(1)(B) of the Hillory J. Farias and Samantha Reid Date-Rape Drug Prohibition Act of 2000), or flunitrazepam, the person committing such violation shall, except as provided in paragraphs (1), (2), and (4), be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years and not more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $2,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of Title 18, any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 3 years

in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 6 years in addition to such term of imprisonment. Notwithstanding the prior sentence, and notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under the provisions of this paragraph which provide for a mandatory term of imprisonment if death or serious bodily injury results, nor shall a person so sentenced be eligible for parole during the term of such a sentence.

(4) In the case of a violation under subsection (a) of this section with respect to less than 50 kilograms of marihuana, except in the case of 100 or more marihuana plants regardless of weight, less than 10 kilograms of hashish, less than one kilogram of hashish oil, or any quantity of a controlled substance in schedule III, IV, or V,[1] (except a violation involving flunitrazepam and except a violation involving gamma hydroxybutyric acid) the person committing such violation shall be imprisoned not more than five years, or be fined not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual, or both.  If a sentence under this paragraph provides for imprisonment, the sentence shall, notwithstanding section 3583 of Title 18, in addition to such term of imprisonment, include (A) a term of supervised release of not less than two years if such controlled substance is in schedule I, II, III, or (B) a term of supervised release of not less than one year if such controlled substance is in schedule IV.

(c) Repealed.  Pub.L. 98–473, Title II, § 225, formerly § 225(a), Oct. 12, 1984, 98 Stat. 2030, as amended by Pub.L. 99–570, Title I, § 1005(c), Oct. 27, 1986, 100 Stat. 3201–6.

(d) Penalty for importation or exportation

A person who knowingly or intentionally—

(1) imports or exports a listed chemical with intent to manufacture a controlled substance in violation of this subchapter or subchapter I of this chapter;

(2) exports a listed chemical in violation of the laws of the country to which the chemical is exported or serves as a broker or trader for an international transaction involving a listed chemical, if the transaction is in violation of the laws of the country to which the chemical is exported;

(3) imports or exports a listed chemical knowing, or having reasonable cause to believe, that the chemical will be used to manufacture a controlled substance in violation of this subchapter or subchapter I of this chapter;

(4) exports a listed chemical, or serves as a broker or trader for an international transaction involving a listed chemical, knowing, or having reasonable cause to believe, that the chemical will be used to manufacture a controlled substance in violation of the laws of the country to which the chemical is exported;

(5) imports or exports a listed chemical, with the intent to evade the reporting or recordkeeping requirements of section 971 of this title applicable to such importation or exportation by falsely representing to the Attorney General that the importation or exportation qualifies for a waiver of the 15–day notification requirement granted pursuant to section 971(e)(2) or (3) of this title by misrepresenting the actual country of final destination of the listed chemical or the actual listed chemical being imported or exported;

(6) imports or exports a listed chemical in violation of section 957 or 971 of this title; or

(7) manufactures, possesses with intent to distribute, or distributes a listed chemical in violation of section 959 of this title.[2]

shall be fined in accordance with Title 18, imprisoned not more than 20 years in the case of a violation of paragraph (1) or (3) involving a list I chemical or not more than 10 years in the case of a violation of this subsection other than a violation of paragraph (1) or (3) involving a list I chemical, or both.

(Pub.L. 91–513, Title III, § 1010, Oct. 27, 1970, 84 Stat. 1290; Pub.L. 98–473, Title II, § 225 (formerly § 225(a)), Title V, § 504, Oct. 12, 1984, 98 Stat. 2030, 2070; renumbered § 225 and amended Pub.L. 99–570, Title I, §§ 1004(a), 1005(c), 1302, 1866(e), Oct. 27, 1986, 100 Stat. 3207–6, 3207–15, 3207–55; Pub.L. 100–690, Title VI, §§ 6053(c), 6475, Nov. 18, 1988, 102 Stat. 4315, 4380; Pub.L. 101–647, Title XII, § 1204, Title XXXV, § 3599J, Nov. 29, 1990, 104 Stat. 4830, 4932; Pub.L. 103–200, §§ 4(b), 5(b), Dec. 17, 1993, 107 Stat. 2338, 2339; Pub.L. 103–322, Title IX, § 90105(a), Title XXXIII, § 330024(d)(2), Sept. 13, 1994, 108 Stat. 1987, 2151; Pub.L. 104–237, Title I, § 102(c), Title III, § 302(b), Oct. 3, 1996, 110 Stat. 3100, 3105; Pub.L. 104–305, § 2(b)(2)(B), (C), Oct. 13, 1996, 110 Stat. 3807; Pub.L. 105–277, Div. E, § 2(b), Oct. 21, 1998, 112 Stat. 2681–759; Pub.L. 106–172, § 3(b)(2), Feb. 18, 2000, 114 Stat. 9; Pub.L. 107–273, Div. B, Title III, § 3005(b), Nov. 2, 2002, 116 Stat. 1806.)

[1] So in original.

[2] So in original.  The period probably should be a comma.

### HISTORICAL AND STATUTORY NOTES

References in Text

Schedules I, II, III and IV, referred to in subsec. (b), are set out in section 812(c) of this title.

"Section 3(a)(1)(B) of the Hillory J. Farias and Samantha Reid Date–Rape Drug Prohibition Act of 2000", referred to in subsec. (b)(3), is classified as a note under section 812 of this title.

## A.

## Ground Two

Whether Attorney Adrian P. Castro, Esq. failure to object to district court's lack of jurisdiction to impose enhanced mandatory life sentence under §841(b)(1)(A)(iii) because government §851 Notice was defective for failure to identify Location crime was committed and name of court that adjudicated the cases as a "serious felony drug Offences*" against McCoy under §841 subject to the maximum term of imprisonment, rendering him ineffective assistance of counsel in violation of movants 6th Amendment right to effective assistance of counsel and 5th Amendment right to notice requirement by due process to the U.S. Constitution and fair trial by jury and Liberty?

## Cause for default

Executive Office for United States Attorneys did an extensive search for records under FOIA Request no.10-2889. On March 14, 2011, the search disclosed only a defective Government's Information and Notice of Prior Convictions dated July 27, 1990 to Terry L. Christian, Esq. Mr. Christian withdrew from case. Mr. Christian and the court withheld this Notice of Prior Convictions from Adrian P. Castro, Esq. before and during trial because Mr. Castro never mentioned the defects or requirements of §851 Notice to enhance McCoy's sentence to Life to movant. Had movant seen the defective §851 Notice prior to trial

or anytime before sentencing, he would have request-
ed Mr. Castro object to invalid § 851 Notice of Pri-
or Convictions for lack of jurisdiction. Therefore, absent
Mr. Castro's knowledge of defects in § 851 Notice, he
failed to object to enhanced mandatory life sentence
or raise the issue on direct appeal. Wherefore, mov-
ant suffered an illegal mandatory life sentence enhan-
cement based on defective § 851 Notice of Prior Convict-
ions. Absolutely prejudicial. United States v. Frady, 456 US
152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

Movant did not raise this issue in his initial
§ 2255 motion because he did not obtain a copy of
the Government's Information and Notice of Prior Con-
victions under § 851 until March 24, 2011 from EOUSA
March 14, 2011 Discovery. Therefore, movant was unab-
le to bring or raise this issue earlier. However, had
Adrian R. Castro raised this error on direct appeal,
the Appellate Court would have reversed convictions
and vacated sentences for lack of jurisdiction. United
States v. Olson, 716 F.2d 850, 853 (11th Cir. 1983); United States
v. Williams, 59 F.3d 1180, 1185 (11th Cir. 1995).

This document can be designated as Newly Dis-
covered Evidence because it was discovered after due
diligence; 20 yrs. after trial through search for reco-
rds under FOIA Request to EOUSA Freedom of In-
formation Act of 1974. Thereby exempt from AEDPA
of 1996 second or successive stringent requirements
under § 2244 (b)(3)(D)(E). United States v. Orozco-Ramir-
ez, 211 F.3d 862 (5th Cir. 2000). It is clear and convincing
evidence that no reasonable factfinder would have found
movant guilty of § 851 Enhancement under § 841 (b)(1).

Mr. Castro knew or should have known that the government had a mandatory duty to comply with the statutory requirement § 851(a)(1) before being authorized to seek enhancement under 18 U.S.C. § 3559(c)(1) for one or more serious drug offenses and that the U.S. Attorney General Janet Reno had to authorize by memorandum such enhancement. And had counsel reasonably investigated the government's intent to seek enhancement, he would have discovered that the United States Attorney did not obtain the proper authorization by the DOJ. See FOIA Request Responses by EOUSA dated July 28, 2009, Sept. 15, 2009 and Jan. 27, 2010 Request no. 09-2647, attached Exhibit "A." Any other strategy by counsel was clearly unreasonable. And could have been vacated on appeal. United States v. Rutherford, 175 F.3d 899, 904 (1999); United States v. Olson, 716 F.2d 850, 852-53 (11th Cir. 1983).

Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct 2052 (1984), the court declared, "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."

Exhibit "A"

FOIA REQUEST NO. 09-2647 RESPONSE

EOUSA DATED JULY 28, 2008; SEPTEM-
BER 15, 2009 and JANUARY 27, 2010.



7-31-09
Received

**U.S. Department of Justice**

*Executive Office for United States Attorneys*
*Freedom of Information & Privacy Staff*
*600 E Street, N.W., Suite 7300, Bicentennial Building*
*Washington, DC 20530-0001*
*(202) 616-6757  FAX: 616-6478  (www.usdoj.gov/usao)*

Requester: Reggie L. McCoy          Request No.: 09-2647          JUL 28 2009

Subject:  DOJ Memo/Director's Office

The Executive Office for United States Attorneys (EOUSA) has received your Freedom of Information Act/Privacy Act (FOIA/PA) request.  It has been assigned the above number. Please give us this number if you write about your request.  If we need additional information, we will contact you within two weeks.

Your request will be placed in the order in which it was received for processing, unless it is a very large request (Project Request).  Then, it will be placed in a separate group of Project Requests, which are also processed in the order received.

EOUSA makes every effort to process most requests within a month (20 working days). There are some exceptions; for example, Project Requests usually take approximately nine months to process.  Requests for "all information about myself in criminal case files" are usually Project Requests.  If you have made such a request, you may either write us and narrow your request for specific items, or you may expect that the processing of your request may take nine months from the date of this letter.

By making a FOIA/PA request, you have agreed to pay fees up to $25, as stated in 28 CFR § 16.3(c), unless you have requested a fee waiver.  Please note that pursuant to 28 CFR § 16.11, if you have not been granted a fee waiver, we are required to charge fees for time used to search for the documents you have requested and for duplication of all pages released to you. Normally, search time is charged at a rate of $28 per hour after the first two hours which are free, and duplication fees are $0.10 per page after the first 100 pages which are free.  Please do not send any payment at this time!  If we anticipate that fees will exceed $25 or the amount you have stated in your letter (if greater than $25), we will normally notify you of our estimate of fees. After we have received your agreement to pay for the expected fees (or you have narrowed your request to reduce fees) and we have processed your request, we will require payment for the accumulated charges before we release documents to you.  Without such payment, your request file will be closed without further action.

Sincerely,

William G. Stewart II
Assistant Director

Form No. 001 - 1/09

**U.S. Department of Justice**

*Executive Office for United States Attorneys*
*Freedom of Information & Privacy Staff*
*600 E Street, N.W., Suite 7300, Bicentennial Building*
*Washington, DC 20530-0001*
*(202) 616-6757 FAX: 616-6478 (www.usdoj.gov/usao)*

Requester: __Reggie L. McCoy__

Request Number: __09-2647__                Date of Receipt: __07/09/09__

Subject: __DOJ Memo__

Dear Requester:

SEP 1 5 2009

In response to your Freedom of Information Act and/or Privacy Act request, the paragraph(s) checked below apply:

1.     [X   ]   A search for records located in EOUSA - __Director's Office__ has revealed no responsive records regarding the above subject.

2.     [   ]   A search for records located in the United States Attorney's Office(s) for the _____ _____ has revealed no responsive records regarding the above subject.

3.     [   ]   After an extensive search, the records which you have requested cannot be located.

4.     [   ]   Your records have been destroyed pursuant to Department of Justice guidelines.

5.     [   ]   Please note that your original letter was split into separate files ("requests"), for processing purposes, based on the nature of what you sought. Each file was given a separate Request Number (listed below), for which you will receive a separate response:

_____

This is the final action on this above-numbered request. You may appeal this decision on this request by writing within 60 days from the date of this letter to the **Office of Information and Privacy, United States Department of Justice, 1425 New York Avenue, Suite 11050, Washington, D.C. 20530-0001.** Both the letter and envelope should be marked "FOIA Appeal." If you are dissatisfied with the results of any such administrative appeal, judicial review may thereafter be available in U.S. District Court, 28 C.F.R. §16.9.

Sincerely,

William G. Stewart II
Assistant Director

Form No. 005 - 3/07



**U.S. Department of Justice**

Office of Information Policy

_Telephone: (202) 514-3642_                    _Washington, D.C. 20530_

**JAN 2 7 2010**

Mr. Reggie L. McCoy
Register No. 11732-018
United States Penitentiary          Re:    Appeal No. 2010-0151
Post Office Box 1034                        Request No. 09-2647
Coleman, FL  33521                          CAS:SKV

Dear Mr. McCoy:

    You appealed from the action of the Executive Office for United States Attorneys
(EOUSA) on your request for access to records pertaining to a 1959 Department of Justice
Memorandum and portions of the United States Attorneys' Manual (USAM).

    After carefully considering your appeal, I am affirming EOUSA's action on your request.
By letter dated September 15, 2009, EOUSA informed you that it could locate no responsive
records related to the portion of your request seeking the memorandum. I have determined that
EOUSA's response was correct and that it conducted an adequate, reasonable search for records
responsive to your request. You may provide more specific details to EOUSA in a new request if
you have more information available that would aid in locating the documents you are seeking.

    As to the portion of your request seeking a copy of pages from the USAM, please be advised
that the USAM is available online at http://www.justice.gov/usao/eousa/foia_reading_room/usam/.
I suggest that you have a friend or family member access this website for you.

    As part of the 2007 FOIA amendments, the Office of Government Information Services
(OGIS) offers mediation services to resolve disputes between FOIA requesters and Federal agencies
as a non-exclusive alternative to litigation. You may contact OGIS in any of the following ways:

        Office of Government Information Services
        National Archives and Records Administration
        Room 2510
        8601 Adelphi Road
        College Park, MD  20740-6001

        E-mail:    ogis@nara.gov
        Telephone: 301-837-1996
        Facsimile:  301-837-0348
        Toll-free:  1-877-864-6448

-2-

If you are dissatisfied with my action on your appeal, you may file a lawsuit in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Janice Galli McLeod
Associate Director

## Facts

Before trial, Adrian A. Castro, Esq. failed to dili-
gently and reasonably search for and investigate
the Government's Information and Notice of Prior Con-
victions under §851. Had Mr. Castro reviewed and
reexamined the 3rd, 4th and 5th paragraph of the infor-
mation, he would have discovered that the Notice fail-
ed to identify the Location the crimes were allegedly
committed nor the name of the court that adjudicat-
ed the cases as Controlled substance offenses under
§841 imposing the maximum term of imprisonment
on McCoy. [1] After discovering these defects in the §
851 Notice, Mr. Castro would have motioned the trial
court to suppress the information under §851 and
dismiss the notice of intent to seek enhancement
under §841(b)(1)(B) for lack of jurisdiction. United
States v. Chandler, 125 F.3d 892 (11th Cir. 1997); United States
v. Orihuela, 451 F.3d 1302 (11th Cir. 2003); United States v.
Saavedra, 148 F.3d 1311 (11th Cir. 1998); United States v. Alva-
rez, 451 F.3d 320 (11th Cir. 2006); United States v. McCall,
553 F.3d 821 (11th Cir. 2008).

But Mr. Castro, without even questioning the
validity or authority of the court's power to enhan-
ce movant's sentence, proceeded to trial and allow-
ed the government to question movant about prior
convictions unrelated to the instant offense and wasn't
final yet, without the jury being instructed not to con-
sider the invalid information of prior convictions as
evidence; thereby leaving the petit jury unaware of
the inaccuracy of the §851 information used and pr-

sented at trial to discredit movant's testimony. Massaro v. United States, 538 US 500, 155 L.Ed. 2d 714, 123 S.Ct. 1690 (2003).* No competent counsel in Mr. Castro's position, knowing his client faced a mandatory life sentence if found guilty and convicted based on prior convictions, would not have objected to the defective §851 Notice of enhancement to prevent the jury from being mislead to believe movant had previously served a maximum term of imprisonments as a recidivist under §841(b)(1) as falsely stated by the government in paragraph 6 of §851 notice. Giglio v. United States, 405 U.S. 150 (1972); Napue v. Illinois, 360 U.S. at 270. But for counsels negligent misconduct, the petit jury was prejudiced by being deceived to believe that movant had previously been convicted and sentenced to a maximum term of imprisonment under §841 by the government's introduction of defective §851 Notice as evidence into trial. Neder v. United States, 527 US 1, 144 L.Ed. 2d 35, 119 S.Ct. 1827 (1999); Johnson v. United States, 130 S.Ct. 1265, 176 L.Ed. 2d 1 (2010); Rogers v. United States, 522 US 252, 139 L.Ed. 2d 686, 118 S.Ct. 673 (1998); Davis v. United States, 40 L.Ed 499 (1895); Coffin v. United States, 39 L.Ed 481 (1895); Cochran v. United States, 39 L.Ed 704 (1895); Staples v. United States, 511 U.S. 600, 128 L.Ed. 2d 608, 114 S.Ct. 1793 (1994). Had the petit jury been cautioned not to consider the §851 information as facts into evidence, it's a likely probability that, but for counsel's failure to object, no reasonable juror being properly instructed of the defect would have believed that the instant drug traffic-

king offense related to some past conduct of movant in relation to prior convictions where movant had already served a maximum prison sentence for similar crimes. But the jury, upon examination and deliberation on the defective §851 Information and Notice of Prior Conviction, would have questioned the validity of the §851 Notice and reasoned among themselves and determined unanimously that movant did not qualify for §841(b)(1) sentence enhancement of life imprisonment due to the defective §851 notice, and would have returned a not guilty verdict and acquitted movant of the §841(b)(1) offense for lack of jurisdiction. Liparota v. United States, 471 U.S. 419, 85 L.Ed.2d 434, 105 S.Ct 2084 (1985): United States v. Gainey, 380 U.S. 63, 13 L.Ed.2d 658, 85 S.Ct 754 (1969): Flores-Figueroa v. United States, 129 S.Ct 1886, 173 L.Ed.2d 853 (2009): Henry v. Henkel, 59 LED 203, 235 U.S. 219 (1914).

McCoy's sentence enhancement for §851 Notice of Prior Convictions was fundamentally defective and his incarceration for that enhancement is a miscarriage of justice. In fact, he is factually innocent of the legal requirement for such an enhancement — two prior felony drug convictions having become final. According to the §851 Information and Notice of Prior Convictions paragraph 3, 4 and 5, McCoy had none. Bousley v. United States, 523 U.S. 614 (1998). Therefore, he was convicted of a nonexistent offense. Begay v. United States, 170 L.Ed.2d 490 (2008): United States v. Archer, 531 F.3d 1347, 83 c.rl. 629 (11th Civ. 2008): Gilbert v.

United States, 609 F.3d 1159 (11th Cir. 2010), as required by Wofford v. Scott, 177 F.3d 1236 (11th Cir. 1999).

Movant contends that his convictions for Count One and Two of the federal grand jury indictment is void. Fay v. NOIA, 372 US 391, 91 L.Ed. 2d 837, 83 S.Ct 822 (1963); Kolender v. Lawson, 461 US 352, 75 L.Ed.2d 903, 103 S.Ct 1855 (1982); Lane v. Williams, 455 US 624, 71 L.Ed.2d 508, 102 S.Ct 1322 (1982). Government's failure to comply w/ §851(a)(1) requirements.[2]

Relief

Wherefore, for cause shown above, movant demands this hon. district court to vacate conviction and sentence for lack of jurisdiction and issue an order granting his immediate release from unlawful custody of one actually innocent to prevent further complete miscarriage of justice due to wrongful incarceration. Murray v. Carrier, 477 US 478, 495-96, 91 L.Ed.2d 1397 (1986), as justice and fairness so requires.

Respectfully,

Reggie L. McCoy

3.28.2011

Reginald L. McCoy
#11732-018
USP Lewisburg SMU
P.O. Box 1000
Lewisburg, PA 17837

Footnote
[1] See FOIA Request no. #10-2889 disclosure, Exhibit "A".

Footnote

[2] See United States v. Harris, 149 F.3d 1304 (11th Cir. 1998); United States v. Sanchez, 138 F.3d 1410 (11th Cir. 1998); United States v. Ramirez, 501 F.3d 1237 (11th Cir. 2007); United States v. Jackson, 544 F.3d 1176 (11th Cir. 2008); Vadas v. United States, 527 F.3d 16, 23 (11th Cir. 2007); United States v. Morales, 560 F.3d 112 (11th Cir. 2009).

[*] See no state case no citation. No drug quantity as required under § 3559 (c)(2)(H)(ii) Paragraph 6 states movant qualifies for the 10 yr. mandatory minimum under § 841 (b)(1)(B) for prior convictions. But paragraph 2 cites subsections (b)(1)(A) mandatory life imprisonment without parole. This is ambiguous. Unclear. And not specific. The government failed to strictly comply with § 851 (a)(1).

[3] Especially in cases as when the U.S. Supreme Court has made new intervening changes in law not available at the time of movant's direct appeal in 1996: Rosendo v. Holder, 130 S.Ct. 2577, 177 L.Ed. 2d 68, (2010); Abuelhawa v. United States, 129 S.Ct. 2102, 173 L.Ed.2d 982 (2009); Salina v. United States, 547 U.S. 188, 126 S.Ct. 1675, 164 L.Ed.2d 364 (2006); United States v. Labonte, 520 U.S. 751, 137 L.Ed.2d 1001 - 117 S.Ct. 1637 (1997); United States v. Stone, 139 F.3d 822 (11th Cir. 1998); United States v. Orihwela, 320 F.3d 1302 (2003); made retroactive where

movant had no reasonable opportunity to obtain judicial correction of his conviction or sentence that are both fundamentally defective. The decisions were made 4 to 13 yrs. after direct appeal. And movant could not be expected to have had knowledge of these substantive changes at that time. United States v. Clark, 260 F.3d 382 (5th Cir. 2001). Such clarifications are applicable in this case. Collins v. Youngblood, 497 U.S. 37, 111 L.Ed.2d 30, 110 S.Ct. 2715 (1990); Miller v. Florida, 482 U.S. 423, 96 L.Ed.2d 351, 107 S.Ct. 2446 (1987).

Therefore, § 2255 is inadequate and ineffective to test the legality of his detention for conviction of a nonexistent offense. Wofford, 177 F.3d at 1244; and Reyes-Requena v. United States, 243 F.3d 893 (5th Cir. 2001); Bousley v. United States, 140 L.Ed.2d 828, 118 S.Ct. 1604 (1998).

Exhibit "A"

FOIA Request no. *10-2889

Newly Discovered Evidence
March 14, 2011
from
Executive Office for United States
Attorneys

Footnote
* Strickland v. Washington, 466 U.S. 668 (1984).

reliable and cognizable authority defining criteria for review upon which the court could consider grant of relief as sought, such that cuts to the heart of instant matter. Otherwise, with faith Petition-[er] relies on this Honorable court prudential gate-keeping praying that it bring to a cease a fundamental miscarriage of justice, where petitioner can demonstrate that he's innocent of underlying conviction; a "<u>Gateway Claim</u>".

The United States Supreme Court has held:

"[U]nder actual innocence exception to procedural bar rule, habeas Petitioner asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt."

\*                    \*                    \*

"Although to be credible, a gateway claim by <u>habeas</u> Petitioner seeking to invoke the actual innocence exception to procedural bar rule requires new reliable evidence that was not presented at trial, the habeas court must assess the likely impact of all the evidence on reasonable juror."

\*                    \*                    \*

"Rather than requiring absolute certainty about guilt or innocence in a habeas case in which, the actual innocence exception to procedural bar rule is invoked, a habeas Petitioner's burden at the gateway stage is to demonstrate that more likely than not, no reasonable juror would find him guilty beyond a reasonable doubt."

\*                    \*                    \*

"... the inquiry requires the [] <u>habeas</u> court to assess how reasonable jurors would react to the overall newly supplemental record."

<u>House v. Bell</u>, 165 L.Ed.2d 1, 126 S.Ct. 2064 (2006).

And:

> "[H]abeas Petitioner made strongest showing required by actual
> innocence exception ... particularly where petitioner called
> into question semen and blood evidence which, was central for-
> ensic proof connecting him to Murder, and put forward substan-
> tial evidence of another suspect".

Id.

Additionally, the District Of Columbia Court Of Appeals has
specifically held:

> "[I]n order to be entitled to a new trial based on newly
> discovered evidence, the defendant must show that (1)
> the evidence proffered is newly discovered; (2) the mov-
> ing party must show diligence in his efforts to obtain
> the new evidence; (3) the evidence must not be merely
> cumulative or impeaching; (4) it must be material to the
> issues involved; and (5) it must be of such a nature that
> an acquittal would likely result from use."

ARRINGTON V. U.S., 804 A.2d 1068, fn.13 (D.C. 2002)(quoting Dantzler,
696 A.2d at 1355-56 (D.C.1997) explaining "there are, however, cir-
cumstances in which it serves the interest of justice to consider a
new motion containing significant and potentially exculpatory infor-
mation not previously available to the defendant)).

**U.S. Department of Justice**

*Executive Office for United States Attorneys*
*Freedom of Information & Privacy Staff*
*600 E Street, N.W., Suite 7300, Bicentennial Building*
*Washington, DC 20530-0001*
*(202) 252-6020   FAX: 252-6047   (www.usdoj.gov/usao)*

Requester: __Reggie L. McCoy__                      Request Number: __10-2889__

Subject of Request: __Self (Specific Records)__

Dear Requester:                                                      *1 4 MAR 2011*

     Your request for records under the Freedom of Information Act/Privacy Act has been processed. This letter constitutes a reply from the Executive Office for United States Attorneys, the official recordkeeper for all records located in this office and the various United States Attorneys' offices. To provide the greatest degree of access authorized by the Freedom of Information Act and the Privacy Act, we have considered your request in light of the provisions of both statutes.

     All of the records you seek are being made available to you. We have processed your request under the Freedom of Information Act and are making all records required to be released, or considered appropriate for release as a matter of discretion, available to you. This letter is a full release.

     This is the final action on this above-numbered request. You may appeal this decision on this request by writing to the **Office of Information Policy, United States Department of Justice, 1425 New York Avenue, Suite 11050, Washington, D.C. 20530-0001.** Both the letter and envelope should be marked "FOIA Appeal." Your request must be received by OIP within 60 days from the date of this letter. If you are dissatisfied with the results of any such administrative appeal, judicial review may thereafter be available in U.S. District Court, 28 C.F.R. § 16.9.

                    Sincerely,

                    William G. Stewart II
                    Assistant Director

REQUESTER: _Reggie L. McCoo_

FOIA FILE#: _10-2889_

# DOCUMENTS Released in Full "RIF"

## _____3_____ pages

Requester:    Reggie L. McCoy
FOIA #:       10-2889

**Continuation**:

  We are sorry to inform you that the records you requested from the Middle District of Florida cannot be located even though the District has conducted an exhaustive search for the records.  If the records should be found, we will supplement our response.

  The only record located was the Government's Information and Notice of Prior Convictions, which is attached.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA          :
                                  :
v.                                :          Case No. 90-132-Cr-T-17(C)
                                  :
REGINALD McCOY                    :

GOVERNMENT'S INFORMATION AND
NOTICE OF PRIOR CONVICTIONS

COMES NOW the United States of America, by and through its representative, James C. Preston, Jr., Assistant United States Attorney, and files this Information and Notice of the defendant's prior convictions pursuant to Title 21, United States Code, Sections 851, 841(b)(1)(B) and 960(b)(2), and charges that:

1. On June 27, 1990, the defendant was charged in a Two-count Superseding Indictment with violations of Title 21, United States Code, Sections 841(a)(1) and 846.

2. Title 21, United States Code, Section 841(b)(1)(A), provides for a mandatory minimum penalty of ten (10) years to life imprisonment without parole, up to a four two million dollar fine and a five-year term of supervised release upon conviction for the above-stated offenses.

3. Title 21, United States Code, Section 841(b)(1)(A), provides, however, that if any person commits such a violation of Section 841(a)(1) or 846 after two or more prior convictions for an offense punishable under paragraph 841 or for a felony under any other provision of subchapter I or II of Title 21,

Chapter 13, or other law of a state, the United States, or a foreign country relating to narcotic drugs, marijuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a manatory term of life imprisonment and a fine of eight million dollars.  Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this sub-paragraph.  No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

4.  On or about October 13, 1988, the defendant was convicted of possession of cocaine, contrary to the laws and statutes of the State of Florida, Florida Statute Section 893.13.

5.  On or about September 25, 1989, the defendant was convicted of two counts of the sale of cocaine, contrary to the laws and statutes of the State of Florida, Florida Statute Section 893.13.

6.  Said convictions are prior convictions within the meaning of Title 21, United States Code, Sections 851 and 841(b)(1)(B).

Respectfully submitted,

ROBERT W. GENZMAN
United States Attorney

By: _____

JAMES C. PRESTON, JR.
Assistant United States Attorney
Room 410, 500 Zack Street
Tampa, Florida 33602
Telephone:  (813) 225-7343

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been sent this 26th day of July, 1990, by U.S. Mail to the following:

Terry C. Christian, Esquire
412 East Madison, Suite 911
Tampa, Florida  33602
Attorney for Reginald McCoy

JAMES C. PRESTON, JR.
Assistant United States Attorney

3